# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re:<br><br>STARLIGHT GROUP, LLC,<br><br>    Debtor. | Case No. 11-18241-RGM<br>(Chapter 7) |
| W. MICHAEL DORULA,<br><br>    Plaintiff,<br><br>vs.<br><br>WILLIAM L. BROOKS,<br><br>    Defendant. | Contested Matter<br>(Objection to Proof of Claim 3,<br>Docket Entry 128) |
| ROBERT A. MELETTI and<br>JULIE E. MELETTI,<br><br>    Plaintiffs,<br><br>vs.<br><br>WILLIAM L. BROOKS,<br><br>    Defendant. | Contested Matter<br>(Objection to Proof of Claim 3,<br>Docket Entry 129) |
| W. MICHAEL DORULA,<br><br>    Plaintiff,<br><br>vs.<br><br>CHARLES M. FLORY,<br><br>    Defendant. | Contested Matter<br>(Objection to Proof of Claim 4,<br>Docket Entry 127) |

1

|  |  |
|---|---|
| ROBERT A. MELETTI and<br>JULIE E. MELETTI,<br><br>     Plaintiffs,<br><br>vs.<br><br>CHARLES M. FLORY,<br><br>     Defendant. | Contested Matter<br>(Objection to Proof of Claim 4,<br>Docket Entry 130) |

## MEMORANDUM OPINION

The issue in this case is whether a pre-petition settlement agreement that reduced the indebtedness to two creditors was procured by fraud. If so, the creditors are entitled to their full claim rather than the reduced settlement amount. Three other creditors objected to the proofs of claim.[1] If successful, the total amount of claims in the case will be reduced, thereby increasing the dividend to be paid to all other creditors.[2]

## Findings of Fact[3]

Starlight Group, LLC, was organized by Spencer C. Brand in 2004 or 2005 to invest in the rapidly appreciating real estate market. Tr. at 27. The initial results were outstanding. The first property was purchased in January 2005 and sold in three months for a gross profit of $60,000. Tr.

---

[1]Michael Dorula and Robert and Julie Meletti separately objected to Claim 3 filed by William L. Brooks and Claim 4 filed by Charles M. Flory. The objections were identical and are treated together.

[2]The creditors in this case can be categorized into three groups: the Old Starlight Creditors (William L. Brooks and Charles M. Flory); the realtor who is also a creditor (Gregory Holmes); and the New Starlight Creditors (everyone else). The proof of claim of Kathryn Flanders was disallowed. *Meletti v. Flanders (In re Starlight Group, LLC),* 2014 WL 481317 (Bankr.E.D.Va. 2014)

[3]This section together with the additional facts in the Discussion section constitute the court's findings of fact. Fed.R.Bankr.P. 7052.

at 29.  The purchases were financed by a combination of bank loans and private investors.  Brand

personally qualified for the bank loans needed to purchase the properties.[4]  Tr. at 31.  Private

investors provided the down payments and funds to cover carrying costs.  Tr. at 28-29.  The investor

notes were for three-year terms with ten percent interest, or, at the election of the investor at the end

of the three years, a percentage of the profits of the properties.  Tr. at 28, 36, 185-186.  Starlight

borrowed about $1 million from private investors.  Tr. at 34.  Brooks and Flory were among the

eight to ten investors.[5]  Tr. at 33-34.  They lent Starlight substantial amounts in 2004 and 2005.[6]

*See, e.g.,* Ex. B, Real Estate Investment Agreement between Starlight and Brooks dated June 1, 2005

and Ex. C, Real Estate Investment Agreement between Starlight and Flory dated June 1, 2005

Starlight purchased twelve properties.  It intended to hold them for appreciation and then sell

them.  The real estate market, however, "turned south rapidly.  Property values began to plummet,"

Brand testified.  Tr. at 29.   When the market collapsed, Brand intended to hold the properties until

the values returned, but was unable to do so.  "So all of those properties were eventually short – sold

at short sale or foreclosed or right now, in the process of foreclosure with the exception of one."  Tr.

at 30.

Brand testified that over time "all the other lenders had realized they had lost their money,

and had walked away."  Tr. at 61.  Only Brooks and Flory continued to inquire about payment of

---

[4]The properties were titled in Brand's name but were held for Starlight's benefit.

[5]Brooks and Flory are cousins.  Brooks is a practicing patent attorney.  Flory is a retired government employee.
Tr. at 184, 209.  Flory generally deferred to Brooks' advice.  Tr. at 211.

[6]Brooks' proof of claim was for $517,913.10.  (Proof of Claim 3).  Flory's proof of claim was for $589,073.02.
(Proof of Claim 4).  Both proofs of claims included interest to November 16, 2011, the petition date.  Each made a loan
to another Brand company, Northstar, that intended to invest in real estate in Shippensburg, Pennsylvania for student
housing at the University of Pennsylvania.  Tr. at 34.  When that project failed to materialize, Brand – without objection
from Brooks or Flory – transferred the loans to Starlight.  Tr. at 35, 41.  While interesting, it has no bearing on the
resolution of the objections to the proofs of claims.

3

their notes.  Brooks and Flory retained counsel, Ronald L. Eakin, who sent Starlight letters on

April 28, 2008, demanding payment.  Brand met with Eakin, Brooks and Flory but no resolution was

reached.  Brand used the meeting to explain why there was a loss and why Starlight was unable to

meet the demand for payment.[7]  Tr. at 60, 189.  Over the following years, Brooks and Flory had

numerous conversations with Brand.[8]  Tr. at 40, 189-190.

---

[7]Brand testified:

Q.    Now, after you received the letter in April 2008 from Mr. Eakin demanding payment of the
      money that Mr. Flory and Mr. Brooks had lent to Starlight, what did you do?
A.    I went out and met with the attorney, Mr. Eakin and Charlie Flory .
Q.    Okay.  And what did you discuss at this meeting?
A.    I tried to explain why Starlight didn't have any money, what had happened to the real estate
      market, why they were in the state that the property that we'd had at that point.
Q.    And when did these meetings occur?
A.    Shortly after that I letter, that don't recall I'd – within a month, I would think.

Tr. at 59-60.

[8]Brand testified that he "met with Billy [Brooks] and Charlie [Flory] repeatedly, and told them what going on."

Q.    These conversations you just described, when did they occur?
A.    Well, prior to this, we met probably half a dozen times out at the airport as well as at Billy's
      apartment over in Fairfax.

Tr. at 40.

Brooks testified about conversations after the meeting with Eakin.

Q.    Did you subsequently have a meeting with Mr. Brand about this?
A.    I stayed in touch with him.  Charlie and I were very, very disappointed.  We kind of knew
      that would be the outcome, because we had kind of stayed in touch with him as friend.  I
      looked up to him as kind of like a mentor.  Charlie had known him for years.  I mean, many
      years.  I've been with him to several church activities.  I've been to the movies with him.

      I took him flying. I have a little private  plane and I [him] took flying in that to visit
      my parent's farm. He took me to Hillsdale College to some events.

      And every time I saw him, over the next year or so, I would always ask little
      questions like: "How the properties are doing?"  And it was always an answer like:
      "Oh gosh, another one – we're short selling another.  We're short selling another
      one."

      I said, "Are you still in business?"  He said, "Yeah, but barely.  And you know, it
      [is] just so bleak."

(continued...)

4

In May 2010, almost two years after the Eakin meeting, Brand "all of a sudden out of the blue" contacted Brooks and wanted to enter into a settlement agreement. Tr. at 190. Brooks testified that after some discussions:

> [Brand] came back again and I guess, and said that he was going to give us $200,000 split between Charlie [Flory] and me over a period of 20 years. And I thought, well that's like throwing us a bone, 'cause that's hardly – he could stop that at any time. But I thought something is better than nothing. And he flat out said that we would never get anything if we didn't take this.

Tr. at 191.

On May 16, 2010, Brooks and Flory agreed to accept $200,000, split evenly between them, and to be paid over 20 years in satisfaction of their claims. Ex. L, Agreement dated May 16, 2010.

Unbeknownst to Brooks or Flory, Starlight had gross sales of $11,232,895 in 2009 and $8,847,891 in 2010 with gross profits of $567,776 and $514,453, respectively. The new, post-2008 investment model was devised by J. Gregory Holmes, a real estate agent who was acting as Starlight's real estate agent. Holmes' investment in Starlight began at $110,000 at the beginning of 2009 and was $900,000 by the beginning of 2011. Tr. at 221 and 229.

Starlight filed bankruptcy on November 16, 2011. Brooks and Flory each filed a proof of claim for the full amount of his debt together with interest to the filing date. Three creditors, W. Michael Dorula and Robert A. and Julie E. Meletti, objected to the proofs of claims, asserting that the claims were limited to the amount due under the settlement agreement. Brooks and Flory assert

---

[8](...continued)

I did talk to him periodically just to get a feel for what's happening.

Tr. at 189-190.

that the settlement agreement was obtained by fraud, is void, and that they are entitled to the full amount of their claim.

### Legal Standard

A properly executed and filed proof of claim "constitute[s] prima facie evidence of the validity and amount of the claim." Fed.R.Bankr.P. 3001(f). The party objecting to the proof of claim must overcome that presumption. *Juniper Dev. Group v. Kahn (In re Hemingway Transport, Inc.),* 993 F.2d 915, 925 (1st Cir. 1993); *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173 (3d Cir. 1992). If the objecting party overcomes the presumption, the claimant bears the burden of proof of its claim. *In re Organogenesis, Inc.,* 316 B.R. 574, 583 (Bankr. D. Mass 2004). In this case, the parties agree that the proof of claim asserts a claim for the original contractual amount and that there was a novation that reduced the principal amount to $200,000. The objecting creditors have overcome the presumption of validity because Brooks and Flory agree that the new agreement was a novation.[9] Tr. at 285. The burden is on Brooks and Flory to prove the validity of their claim which they endeavor to do by showing that the novation was procured by fraud. If the novation was procured

---

[9]The Supreme Court of Virginia set out the nature and elements of a novation. A novation is

a mutual agreement among all parties concerned for discharge of a valid existing obligation by the substitution of a new valid obligation on the part of the debtor or another. To effect a novation there must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement, for it is a well settled principle that novation is never to be presumed. To establish novation the proof must be clear and satisfactory. Its essential requisites are a previous valid obligation, the agreement of all parties to the new contract, the extinguishment of the old contract, and the validity of the new contract.

*Honeywell, Inc. v. Elliott,* 213 Va. 86, 89-90, 189 S.E.2d 331, 334 (1972).

by fraud, it is not a valid contract and the original contract remains in effect.[10] *Honeywell, Inc. v. Elliott,* 213 Va. 86, 89-90, 189 S.E.2d 331, 334 (1972) (an essential requisite of a novation is "the validity of the new contract"). *See also Metrocall of Delaware, Inc. v. Continental Cellular Corp.,* 246 Va. 365, 373, 437 S.E.2d 189, 193 (1993) ("[A] written mutual release memorializing a compromise and settlement may be rescinded for fraud in its procurement.").

In Virginia, fraud requires a

> false representation of a material fact; made intentionally, in the case of actual fraud, or negligently, in the case of constructive fraud; reliance on that false representation to [Brooks' and Flory's] detriment; and resulting damage.

*Klaiber v. Freemason Assocs., Inc.,* 266 Va. 478, 485, 587 S.E.2d 555, 558 (2003) (citing *Evaluation Research Corp. v. Alequin,* 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994). *Anthony v. Verizon Virginia, Inc.,* ___ Va. ___, 758 S.E.2d 527 (2014); *Caperton v. A.T. Massey Coal Co.,* 285 Va. 537, 553, 740 S.E.2d 1, 9 (2013). The defrauded party must reasonably rely on the false statement. *Anthony v. Verizon Virginia, Inc.,* ___ Va. ___, 758 S.E.2d at 534; *Jared and Donna Murayama 1997 Trust v. NISC Holdings, LLC,* 284 Va. 234, 727 S.E.2d 80 (2012).

"Concealment of a fact that is material to the transaction, knowing that the other party is acting on the assumption that no such fact exists, is as much fraud as if existence of the fact were expressly denied." *Metrocall,* 246 Va. at 374, 437 S.E.2d at 194. The Court of Appeals stated:

> When the one inducing the other to enter the contract throws the other off guard or diverts him from making the reasonable inquiries which usually would be made, however, Virginia law will forgive an incomplete investigation: "one cannot, by fraud and deceit, induce another to enter into a contract to his disadvantage, then escape liability by saying that the party to whom the misrepresentation was made was negligent in failing to learn the truth." *Nationwide Ins. Co. v. Patterson,* 229 Va. 627, 331 S.E.2d 490, 492 (1985).

---

[10]The objecting creditors make no claim that if the novation is invalid that the amount claimed due by Brooks and Flory is incorrect.

*Bank of Montreal v. Signet Bank,* 193 F.3d 818, 828 (4th Cir. 1999).

Fraud must be proven by clear and convincing evidence. *Mortarino v. Consulting Engineering Services, Inc.,* 251 Va. 289, 295, 467 S.E.2d 778, 872 (1996).

### Discussion

**Representations.**  The first step in resolving Brooks' and Flory's allegation that the settlement was obtained by fraud is determining what representations Brand made.  The starting point is the June 25, 2010 agreement.  The first and seventh recitals state:

> Starlight and Northstar .   .   . were in the business of real estate investment, including provision of financing secured by mortgages on real property and equity investment in real property; and .   .   . Starlight and Northstar have been unable to meet their monthly and final payment obligations and will be unable to do so in the future.

Ex. M at 3; Ex. N at 3.

In addition to the settlement agreement, Brand, Brooks and Flory testified as to the representations that Brand made.  Brand testified:

> Q.    Now, Mr. Brand, in your mind, in 2010 – June of 2010, did Starlight have any ability to pay money to Mr. Flory or Mr. Brooks on the money they had lent?
> A.    No.
> Q.    Why not?
> A.    Because all of the monies they lent with that other business lenders had been expended and the fact that we had liabilities beyond that.  And all of the new monies that came into Starlight came in under security agreements, that, in my mind, clearly put them in a preferred position, guaranteed/secured by all the assets of Starlight.  If Starlight had been liquidated at any moment in time, there would not have been any money to pay Charlie or Billy.
> Q.    Mr. Brand, what were, if any, the representation to Mr. Flory and Mr. Brooks regarding the financial conditions of Starlight?
> A.    As I put in the agreement, Starlight had no money to pay them off, and in the future, wouldn't be able to earn enough to pay them off.

Tr. 72-73.

When Brooks and Flory's investments were not paid when they matured, they retained

Ronald L. Eakin.  Eakin wrote two letters, one on behalf of each of them, to Starlight on April 28,

2008, demanding payment.  Exs. D and E.  Brand testified:

> Q.   Now, after you received the letter in April 2008 from Mr. Eakin demanding
>      payment of the money that Mr. Flory and Mr. Brooks had lent to Starlight,
>      what did you do?
> A.   I went out and met with the attorney, Mr. Eakin and Charlie Flory.
> Q.   Okay.  And what did you discuss at this meeting?
> A.   I tried to explain why Starlight didn't have any money, what had happened
>      to the real estate market, why they were in the state that the property that
>      we'd had at that point.
> Q.   And when did these meetings occur?
> A.   Shortly after that I letter, that don't recall I'd – within a month, I would think.

Tr. 59-60.

> Q.   Now, I'd like you to turn to Exhibit D, and can you tell the Court do you
>      recognize this?
> A.   Yes.
> Q.   And tell Court what this is?
> A.   This is a letter I received from William Brooks' attorney demanding payment
>      of the note – of the total sum money that I owe him – that Starlight owed
>      him.
> Q.   It's dated April 28, 2008; is that correct?
> A.   Yes.
> Q.   At that time, did Starlight have the money to pay what was demanded here?
> A.   No.  In fact, when Starlight started going – when the properties started losing
>      considerable value – to put it in perspective, Prince William County in 2005,
>      I think there were something like six foreclosures.  By 2007, for there were
>      4000 of them.
>           So that's what was happening to the real estate market.
>           I met with Billy and Charlie  repeatedly, and told them what going on,
>      asked them if they wanted to put more money into trying to sustain these
>      properties.  They didn't.  I asked them if they wanted to take the property
>      itself, and they didn't want to do that.
>           Starlight ran out of money.  There was back –
> Q.   These conversations you just described, when did they occur?
> A.   Well, prior to this, we met probably half a dozen times out at the airport as
>      well as at Billy's apartment over in Fairfax.

Tr. 39-40.

Brooks testified:

A.    .  .  .We had a meeting at the attorney's office – as Mr. Brand testified to earlier – where Mr. Brand flat out said, "Well, I don't have the money." We said, "We don't – it doesn't matter. You know, it doesn't what the properties" – he said, "We've had a bad time in real estate." I said, "That was a loan to you. We want our 10 percent" – you know – "our principle back with the 10 percent as called for in the contract." He said, "Well, I'm not going to give you."

Q.    Did you subsequently have a meeting with Mr. Brand about this?

A.    I stayed in touch with him. Charlie and I were very, very disappointed. We kind of knew that would be the outcome, because we had kind of stayed in touch with him as friend.

I looked up to him as kind of like a mentor. Charlie had known him for years. I mean, many years. I've been with him to several church activities. I've been to the movies with him. I took him flying. I have a little private plane and I took flying in that to visit my parent's farm. He took me to Hillsdale College to some events.

And every time I saw him, over the next year or so, I would always ask little questions like: "How the properties are doing?" And it was always an answer like: "Oh gosh, another one – we're short selling another. We're short selling another one." I said, "Are you still in business?" He said, "Yeah, but barely. And you know, it just so bleak." I did talk to him periodically just to get a feel for what's happening.

Tr. 189-190.

Q.    And this is the settlement agreement you eventually entered into on June 25, 2010? It's the last sentence on the first page, first paragraph.

A.    Yes, it is.

Q.    Okay. And you read this agreement before you signed it?

A.    I did.

Q.    Okay. And you read the clause in the beginning of the second page that says, "Whereas Starlight and Northstar have been unable meet their monthly and final payment obligations, and will be unable do so in future"?

A.    It's pretty clear to me what it said. Yes, I understood completely. And it was consistent with the statements he had made to me the previous 3 years.

Q.    Did he make any representations to you regarding the activities of Starlight?

A.    None.

Q.    Did he advise you that you were in business or not?

A.    He didn't advise me of any such thing.

Q.    Okay.

10

A.    The first time I heard that, it was when the – it was from the Bankruptcy Court that there were still some properties a year and half later.

Q.    And so, when did you first realize that Starlight had not ceased operations but was, in fact, a going business?

A.    When I got a notice from – about the bankruptcy of Starlight, which was probably late 2011.

Q.    Okay.

A.    And then, I started – and it said in there, you perhaps may have a claim.  And I was thinking, oh, my God, I couldn't believe it.

There were four properties they said there no mortgages – no liens attached – no mortgages. .  .  .

Q.    Now, what would you have done if you'd known that Starlight was continuing in business in 2010?

A.    I would have never have signed that agreement.

Tr. at 192-194.

Q.    What changed between the May agreement and the June agreement that made you reconsider?  You didn't sign the May agreement.

A.    The fact – the fact the he was going to give us a little piece of money – a few dollars.

Q.    Okay.  All right.

A.    Because there was the affirmation that they had no money.  I didn't know where that money was coming from.
.  .  .
Especially, since we figured they had no money, based on what they told us, for the last several years.
.  .  .

Q.    .  .  . You had an opportunity to ask him the direct question about Starlight, did you not?

A.    I asked him direct questions.  I just testified to that, several times.  All those meetings and even during that period over the last several years.  And he always – he never stated about any activity.

Tr. at 198-199.

THE COURT:  Before you go Mr. Brooks, the representations made to you to get sign this were what?

THE WITNESS:  The one that I signed.  What I remember him telling me, in addition to the statement that's in the document, he told me, he said, "I don't want – I don't want your liabilities hanging over our heads forever."  Or something to that effect.  "And therefore, you sign this now. This is the only thing you're ever going to get or you will get nothing."

11

And it was like – it was just take it or leave it.  To me, it was surprising, because I had asked him if there was any possibility of anything, any properties being bought, any continuing operations.  And there's no evidence – no information that there ever would be.  I just –

THE COURT:  Was he saying there wasn't ever, did he not respond to that?

THE WITNESS:  See, that's what I've been trying to remember.  Through that period, when I would ask him, I'd say things like – 2009/2010 – I'd say how are things going the properties?  He'd either tell me they had another one short sold, either or there was one in foreclosure or going to go to foreclosure or that – or that – or that – I said, "Are you in bankruptcy yet?"

And he made it sound like they were real close, but they were still in business, but nothing was going on.

So I just don't how know much more I inquired further.  I don't know whether he was passed it and then he flat out said, "Take this now or leave it, 'cause you're not going to get anything more from Starlight."

Tr. at 203-205.

Q.    Well, my point – let me ask you this directly:  When you asked Mr. Brand how things were going and how the properties were doing, and had he told you that one went to foreclosure, the other is not doing well, was he referring to these properties [that were listed on an attachment to the June 1, 2005 investment agreement]?

A.    Well, when he would – we didn't ask in general.  We were talking about collectively, all the properties of Starlight at this time.  Like I said, I didn't feel like my investment was tied only to these listed in the schedule.

Q.    Wait a minute.  We were talking about all – how were you talking about all properties?

A.    He had a list of 11 or 12 properties that Starlight owned.  It's – it was a general statement and that you know, another property – obviously, nothing was going well, in general.

Tr. at 207.

The last exchange needs a brief explanation.  During Starlight's first investment period it purchased properties with the intention of profiting from the appreciation.  Starlight purchased twelve properties before the real estate market collapsed.  Tr. at 28-29.  After the collapse, Brand initially thought that Starlight could hold the properties until the values returned.  Tr. at 29, 30-32.  "[T]he assumption all along," he testified, "if I could just keep these things afloat long enough,

certainly in Washington, DC, the property values would come back and we can and sell and be

okay." Tr. at 32.  While the real estate market was collapsing and the Starlight properties were

rapidly losing value, the Northstar project ended because the individual principally involved died.

Tr. at 34-35.  As the "real estate market was collapsing and the assets of Starlight were dwindling,"

Brand, with the agreement of the Northstar investors, transferred the remaining Northstar investment

money to Starlight "to try to stop those properties from collapsing."  Tr. at 34-35; Ex. F.  This

proved a short-lived expectation as property values continued to drop "faster than we could possibly

imagine."  Tr. at 30.  Most of the properties were rented, but the rents were insufficient to service

the mortgages.  Tr. at 30-31, 44-45.  Brand used the investors' remaining money and his credit cards

to cover the negative cash flow in order to service the mortgages.  Tr. at 29-31.  This did not last.

Brand "maxed out all [his] personal credit cards" and spent the investors' money.  Tr. at 32.

Starlight "had no money and just a huge liability."  Tr. at 44.

At first, after the money ran out, the properties "just sat there" because "with so many

properties in such a – on a scale, the banks didn't respond quickly."  Tr. at 43.  Then, Holmes

suggested that Brand sell the Starlight properties at short sales.  Brand testified that:

> In fact, you didn't have to be foreclosed, and get a judgment against you.  But rather,
> you can work out an arrangement with a bank where they would accept what is
> called a short sale.

Tr. at 44.  Holmes sold "as either the buyer's agent or the selling agent for Starlight on ten of them,

and received a referral fee on one of them."  Tr. at 43.  The reference to the list of 11 or 12

properties was to the properties Starlight purchased for appreciation, not the properties later

purchased as short sales during Starlight's second investment effort.

13

Brand wrote a letter to "The Investors in Northstar Holdings, LLC" on March 11, 2009. He told the investors that their loans or investments in Northstar "should be written off as bad debts or worthless stock." Ex. F. It stated that Northstar terminated all its business activities in 2008 and that the company had been terminated with the Virginia State Corporation Commission. It advised the investors that Brooks' Northstar investment "was used to sustain Mr. Brooks investment in the bundle of properties held by Starlight Group. . . . Unfortunately, the cataclysmic drop in the real estate values" and other actions "consumed all cash including Mr. Brook's loan and forced sales of the properties with catastrophic losses." Ex. F; Tr. at 41.

On March 3, 2010, Brand sent separate letters to Brooks and Flory telling them that their $100,000 investments in Northstar that had been transferred to Starlight had been lost. He identified five properties – three for Flory and two for Brooks – where the Northstar investment "was used to sustain . . . Properties purchased by Starlight." Exs. G and H. "Unfortunately, because of the catastrophic decline in the real estate market we were forced to liquidate these assets at a substantial loss." Exs. G and H. Some details of the disposition of the five properties were given. The sales dates given were July 11, 2008, August 13, 2008, February 10, 2009, June 24, 2009, and October 19, 2009.

The court finds as a matter of fact that Brand represented to Brooks and Flory on multiple occasions from at least April 28, 2008 through at least March 3, 2010, and again on June 25, 2010, that Starlight was not engaged in business except liquidating the eleven properties it purchased prior to the collapse of the real estate market;[11] that it had no funds with which to pay Brooks and Flory; and would not have funds with which to pay Brooks and Flory in the future. In support of these

---

[11]The twelfth property was sold for a profit of $60,000 before the collapse.

representations, Brand told them that the eleven properties were being sold at short sales which meant that there were no funds available to pay them after payment of the mortgages secured by the properties. While the written representation in the June 25, 2010 settlement agreement was narrower, in the context of the discussions over more than two years, it was properly understood to include not only full payment, but partial payment as well.

The settlement agreement uses the past tense verb, "were", in the first recital. It states that Starlight and Northstar "were in the business of real estate investment." It does not use the present tense, "are engaged in the business of real estate investment." Brooks and Flory reasonably understood this to mean that the business was concluded and that, except for liquidating its properties, neither Starlight nor Northstar was operating. This was certainly true of Northstar, according to the March 11, 2009 letter to investors which reported Northstar had been terminated by the Virginia State Corporation Commission. Ex. F. In the context of the discussions with Brand, and the settlement agreement referring to both entities in the past tense, Brand led Brooks and Flory to believe that Starlight was not engaged in any business.

**Reliance.** Brooks and Flory[12] reasonably relied on Brand's representations in entering into the settlement agreement. Brooks testified that he would never have signed the settlement

---

[12]Flory attended meetings with Brooks and Brand. He was "very friendly with [Brand]. I e-mailed [him] jokes for years. We went with Billy – we went flying, and various things, like, we went to the movies together, and just – I had become really good friends with him." Tr. at 210. Flory testified:

Q.    . . .[Y]ou've heard Mr. Brooks testify, correct?
A.    Yes.
Q.    And do you have anything to add? As far as his discussions he may have had with Mr. Eakin or things like that?
A.    In fact, since Mr. Brooks is a lawyer – and I'm not knowledgeable on that – almost all of these actions that happened between Billy and myself and Spencer, I deferred to Billy. And Billy would make the calls and have the conversations, and I was the yes man. And we went along – I went along with almost everything Billy said.

Tr. at 210-211.

agreement if he had known that Starlight was still in business. Tr. at 194. He signed it after negative reports for over two years and when he concluded that "something is better than nothing. And he flat out said that we would never get anything if we didn't take this." Tr. at 191. On June 25, 2010, Brooks and Flory signed the settlement agreement in reliance on Brand's representations that Starlight was out of business and that its properties had been sold at a loss. *See,* Ex. G and H.

**Falsity.** The representations were false. Starlight had $715,907.66 in its SunTrust bank account as of the close of business on June 25, 2010. Ex. 12, June 2010 Statement at 9.[13] It owned several properties with an aggregate value of over $1 million. There were no perfected liens on any of its assets, including the real estate.

Starlight was actively engaged in business on June 25, 2010, and had been for more than a year when Brooks and Flory signed the settlement agreement. Starlight started buying short sales and selling the properties at a profit in early 2009. Tr. at 44, 46, 138, 219. Brand testified that it did "extraordinarily well, in terms of the gross revenue." Tr. at 70. He added, "I'm not quite sure how well it if I – we were paying 19 percent rate of interest. I'd have to look at the financial statement to see. But we bought and sold a lot of property." Tr. at 70-71.

Schedule C from Brand's 2007, 2008, 2009 and 2010 federal tax return show gross receipts of $39,870; $68,731; $11,232,895; and $8,847,891, respectively. The cost of goods sold was $10,665,119 and $8,339,960 for 2009 and 2010. There were no costs of goods sold in 2007 or 2008. The 2009 and 2010 Schedule Cs show that Starlight was actively engaged in business on June 25, 2010. Ex. P.

---

[13]According to Starlight's general ledger the balance was $652,291.60, likely reflecting outstanding transactions that had not yet cleared the bank.

Brand asserts that the Schedule Cs show that Starlight was operating at a loss.  The 2009 net loss shown on the tax return was $3,505.  The 2010 net loss was $466,931.  Both show significant "Other Expenses" on line 27: $414,479 and $505,867, respectively.  The rest of Brand's tax returns were not offered into evidence.  The business activities of Starlight were reportable on his individual tax return on his Schedule C because Starlight is a single-member limited liability company of which Brand is the sole member.  The Other Expenses are not explained.

However, it is clear that Holmes was entitled to a percent of the profits from each sale.  He testified that it was 90%.[14]  Brand testified that it was 50%.  The other 10% or 50%, depending on who is to be believed, went to Brand.  Exhibit 9 consists of 26 emails from Holmes to Brand which contain Holmes' instructions to Brand on how to disburse the profits from the sales.  Most show a profit on the individual transactions.  The total was $228,155.08 with $167,850.00 payable to Holmes or his wife and $39,868.32 to Brand.  These payments do not show on the Schedule Cs unless they are included as "Other Expenses."  Holmes testified that he made significant profits from the transactions and himself loaned money to Starlight from those profits.  Tr. at 221.  The amounts payable to Holmes were profits from the sales.  The agreement was to split the profits between Brand and Holmes.[15]  The court finds as a matter of fact that in 2009 and 2010 Starlight engaged in

---

[14] Holmes testified that:

Q.    And what was monetary arrangement with Mr. Brand and Starlight on those transactions?

A.    My monetary arrangement that once there was a determined net profit on deal, and net profit would be property was acquired, property was sold. You deduct all the expenses that were associated with the sale of that property and whatever was left, I would keep 90 percent of the profit and he would keep 10 percent of the profit.

Tr. at 220-221.  Holmes calculated the net profits and the split.  Tr. at 222-223.  The split of the profits was in addition to Holmes' real estate commissions.  Tr. at 222.

[15] They do not disagree that the profits were to be split, only the percentage of the split.

numerous transactions that resulted in significant profits to Starlight.  While the profits were distributed to Holmes and Brand, they were, nonetheless, profits.  Brand's representations that there were no profits were false.

Brand defends his position that there were no profits by arguing that the new lenders – those that loaned Starlight money after the collapse for the purpose of purchasing short sales – were fully secured and, therefore, the money was not available to pay Brooks and Flory.  The flaw in this argument is that on June 25, 2010, there were no security agreements.  The security agreements were entered into later.  Brand testified that the original Starlight investors did not receive a security interest for their loans; only the new investors did.  *See* Tr. at 53.  They received their security agreements after June 25, 2010.  The security agreements are attached to their proofs of claim. Christopher Townsend signed two security agreements, one on July 29, 2010 and other on August 25, 2010.  Claim Nos. 1 and 7.  Thomas Moak signed three identical security agreements – August 6, 2010, September 16, 2010, and March 15, 2011 for his loans to Starlight.  Claim No. 5 Donald Olinger, Mr. and Mrs. Dorula, Mr. and Mrs. Meletti, and Andrea Aunon, also signed identical security agreements for their loans to Starlight on August 25, August 5, August 25, and August 30, 2010, respectively.  Claim Nos. 6, 8–9, and 14.

Brand testified that he believed that all Starlight's assets were subject to liens and, therefore, there were no funds that would have been available to pay Brooks and Flory.  However, the security agreements were never perfected.  No financing statement was ever signed or filed.  There were no control agreements for bank deposits.  Va. Code Ann. §8.9A-312(b)(1)(2014) ("[A] security interest in a deposit account may be perfected only by control").  Brand testified:

> Q.   Did there come a time when you went to an attorney and asked for some form of security agreements for these new lenders?

A.      Yes.

Q.      Can you tell the Court the circumstances of that?  Why that happened and what you did.

A.      .    .    . The purpose of that security was to secure these loans coming into Starlight with all of assets at Starlight.  So whether Starlight – at one moment in time, owned some real estate that it had purchased or whether Starlight had cash in its checking account, whether Starlight held notes – which it eventually held some notes.  At any moment in time, the lenders that put money into this – in this new short sale phase of Starlight, were secured by all assets of Starlight, LLC.

Q.      I'd ask you to turn to Exhibit Q.  And look at that and tell me if you recognize that.

A.      Yes.  This one of the security agreements.  This one is made out to Michael and Donna Dorula.

Q.      Okay.  And can you tell me what security is offered in this agreement?

A.      Well, the collateral shall include, but not limited to, the following: Each and every account receivable, all debtor's real estate holdings and chattel paper of every nature.  I assumed that meant my checking.  I don't know what chattel paper is.  But, I assumed that meant all the stuff in Starlight.

Q.      Did you believe that this included money that Starlight had in its account?

A.      .    .    . Oh, yes.  I believed it was 100 percent of everything we had.  And the reason for that is because we were buying and selling real estate so fast, in other words, sometimes we would close on a property on day 1 and sell by day 3.  And it was not practical to secure just by real estate, so we secured by all of the assets of Starlight, because at any moment in time, I could sell a property for $700,000.  That $700,000 could be sitting in a SunTrust checking account.  Well, that belonged to those lenders, even though it was in the checking accounts, not in a piece of property.  Because it was turning like that all the time.

Tr. at 49-53.

Brand may have been uninformed as to the need to file financing statements or have control agreements, but he knew that a deed of trust was necessary to encumber real property and that there were no deeds of trust.  He testified:

Q.      And you're familiar with a deed of trust, correct?

A.      Yes.

Q.      And you know to get a lien on real estate you've got to have a deed of trust, right?

A.      Yes, I didn't see this as a lien on real estate.  I saw it as – I thought the others did as well – as a lien on the assets of Starlight, which may or may not

19

|     | include the real estate at any given point in time. Because the moment this money came in – let's say, today, it would go into a SunTrust checking account. So now, that's monies in the SunTrust checking account where the assets back in this security agreement whether they were in real estate or not. |
| --- | --- |
| Q. | But you knew if it was been used to purchase real estate that none of the lenders had a lien on the real estate. You knew that. Cause you know what a deed of trust is, correct? |
| A. | Yes. But that didn't concern me that they didn't have a lien on an individual piece of real estate property. |
| Q. | So you understand if a creditor sued Starlight, and got a judgment against Starlight, it would be a lien that would be ahead any of these? |
| A. | Well, I don't know – |

Tr. at 91-92.

Brand's argument that the new lenders held liens on all of Starlight's assets is not well taken.

Moreover, Brand knew that the real estate was not encumbered by deeds of trust.

**Knowledge.** False statements must be made intentionally and knowingly. *Yuzefovsky v. St. John's Wood Apts.*, 540 S.E.2d 134, 142 (Va. 2001). On June 25, 2010, Brand knew that Starlight was actively engaged in new business – this time, buying properties at short sales and then selling them for a profit. He knew that the business was very active and profitable. He was distributing profits to Holmes and himself. The timing of Brands' settlement offer is revealing. He had had discussions with Brooks and Flory for more than two years with no serious settlement offers from him. When Starlight began making large profits with no end in sight, Brand made a settlement proposal "out of the blue." Tr. at 190–191. He stated that he did not want Starlight's liabilities hanging over his head forever. This reason rings hollow. The obligations were Starlight's, not his. If Starlight was liquidating its assets and no proceeds were anticipated to be available to Brooks and Flory because the properties were all subject to bank deeds of trusts and had no equity, Brooks' and Flory's debts would have been of no practical concern to Starlight and of no legal consequent to

Brand personally.  However, Brand created a personal liability where there was none by guarantying the settlement payments.

The real reason for the "out of the blue" settlement offer was concealed from Brooks and Flory:  Starlight was making money.  It was doing "extraordinarily well," Brand testified.  Tr. at 70.  Collection activity by Brooks and Flory would have endangered the new, profitable business.  In order to control the risk, Brand offered a significant settlement payable over a long term.  As long as Starlight paid the monthly installment, Brooks and Flory had no ability to sue Starlight or jeopardize the new business.

Brand knew, when he signed the settlement agreement on June 25, 2010, that Starlight's assets – especially the real estate – were unencumbered and that Starlight had $757,522.15 in its bank account.  He knew that Starlight was doing "extraordinarily well."  Although it would have reduced Starlight's ability to purchase as many properties as it did, he could have used the cash to pay Brooks and Flory.  He could also have paid them from future transactions, although this would have reduced – not the profits from the transactions – but the amount of money available from the profits that could be paid to Holmes and to himself.

The representations were made knowingly and with the intention to deceive Brooks and Flory.

**Damages.**   Brooks and Flory were damaged by entering into the settlement agreement.  They gave up their original claims for a single claim of $200,000.  Brooks and Flory had the ability to collect the entire amount due to them on June 25, 2010, if they had known that Starlight was actively in business and was profitable.

21

**Conclusions of Law**

Brand procured Brooks' and Flory's June 25, 2010 settlement agreement by fraud.  For two years he affirmatively represented that Starlight was no longer operating, that it was in liquidation, and that there were no funds available for unsecured creditors from the liquidation of its properties. While these representations were correct for a period of time, they became false when Starlight began purchasing properties at short sales and selling them.  This was a very successful venture. In order to protect that venture, Brand successfully sought to limit and to control the payment of the claims of the only creditors of the first venture who had not walked away from their claims.  In doing so, he failed to correct his prior representations which were now false so that Brooks and Flory continued to rely on them and made further false representations as to the business activities of Starlight.

The settlement agreement is void ab initio because it was procured by fraud.  Brooks' and Flory's proofs of claims will be allowed as filed.

Alexandria, Virginia
October 21, 2014

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically  to:

Richard G. Hall
Bennett A. Brown
Robert M. Marino

19207