# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| In re: | |
| STARLIGHT GROUP, LLC | Case No. 11-18241-RGM |
| | (Chapter 7) |
| Debtor. | |
| W. MICHAEL DORULA, *et als.,* | |
| Plaintiffs, | |
| v. | Adv. No. 13-1060-RGM |
| J. GREGORY HOLMES, | |
| Defendant. | |
| W. MICHAEL DORULA, | |
| Objector, | Contested Matters |
| | (Corrected Objections to Proofs of Claims |
| vs. | No. 10, 11, and 12 of J. Gregory Holmes) |
| | (Docket Entries 164, 165, 166, 167) |
| J. GREGORY HOLMES, | |
| Respondent. | |
| ROBERT A. MELETTI and JULIE E. MELETTI, | |
| Objectors, | Contested Matters |
| | (Corrected Objections to Proofs of Claims |
| vs. | No. 10, 11, and 12 of J. Gregory Holmes) |
| | (Docket Entries 168, 169, 170) |
| J. GREGORY HOLMES, | |
| Respondent. | |

## MEMORANDUM OPINION

The question presented in this case is the relative priority of various unsecured claims, in

particular, whether the claims of creditors who loaned money to the debtor in reliance on security

1

agreements that were ineffective to grant liens on real property have priority over the unsecured

claims of a creditor who was not an owner of the debtor but who controlled the debtor and knew that

the security agreements were ineffective to grant liens on the debtor's real property.[1]  The court

concludes that the unsecured creditors' claims have priority over the claims of the creditor in control

of the debtor by virtue of the unsecured creditors' equitable liens, or in the alternative, equitable

subordination.  The chapter 7 trustee is not a party to the litigation.

## I.  Findings of Fact

## A.  Brief Overview

Starlight Group, LLC, the debtor, bought residential real estate at short sales and resold it

from January 2009 until November 2011 when it filed bankruptcy.[2]  During this period, it bought

82 properties and had sold all but four when it filed bankruptcy.  Its gross receipts for this period

were more than $27.5 million.  Statement of Financial Affairs, Question 1.  This phase was the idea

of J. Gregory Holmes, a top-selling real estate agent who prides himself on his expertise in pricing

real estate.  He observed that  there were many properties in Northern Virginia that were

"underwater," that is, the debt secured by the property was greater than the value of the property;

that some of the owners were unable to make the contractual mortgage payments; and, that mortgage

---

[1]Six identical objections were filed by creditors to the three proofs of claims filed by J. Gregory Holmes, the person in control of the debtor.  Three were filed by W. Michael Dorula and three by Robert A. Meletti and Julie E. Meletti.  In addition, W. Michael Dorula and Donna Dorula filed a complaint requesting that Holmes' claims be subordinated to all other unsecured claims.  The six objections and the complaint were heard together.  In addition to seeking equitable subordination, the objections also sought to recharacterize the loans as equity contributions to the debtor.  In light of the disposition of the request for equitable subordination, it is not necessary to reach the recharacterization issue.

[2]Starlight was organized by Spencer C. Brand in 2004 or 2005.  2 Tr. 172.  It purchased 12 residential properties for investment, intending to hold them for appreciation.  This phase of Starlight's life ended in the real estate crash of 2007-2008.  The parties called this Starlight I.  They call Starlight's second phase, its purchase of real property at short sales from 2009 to 2011, Starlight II.

lenders were willing to approve short sales – a sale where the lender accepted less than the amount

owed to it – at prices less than the market value.  He realized that if he purchased a distressed

property at a short sale, he could make a quick profit by promptly reselling the property himself at

its market value.  1 Tr. 47.     These observations gave rise to Holmes' scheme which the parties

called "the Holmes Model."  5 Tr. 176.  There were two key elements: The purchases were cash

transactions and Holmes was the real estate agent for the purchase and the sale of the property.[3]

Holmes approached Spencer C. Brand, a trusted friend and mentor.  He proposed that Brand

– and at Brand's suggestion, Starlight, Brand's single-member limited liability company – purchase

the distressed properties at the below-market price with money Starlight borrowed from private

lenders to conduct its business and not for specific purchases.  He would then quickly resell them

for a profit and would split the profit, 90% to himself and 10% to Brand.

---

[3]There were two transactions for each property, the purchase of the distressed property and its sale.  Holmes
was the distressed homeowner's (the seller's) real estate agent as well as Starlight's (the purchaser's) agent.  2 Tr. 12-14.
He was again Starlight's agent on the sale of the property.  The purchaser of the property at the second transaction
generally had his own real estate agent.  2 Tr. 163.  In Northern Virginia at this time, there was generally a six percent
commission paid to real estate agents on real estate transactions, half to the seller's agent and half to the purchaser's
agent.  It can be thought of as two commissions, each being three percent.  Holmes' scheme resulted in him receiving
three of the four commissions involved for each property, two on its purchase and one on its sale.  2 Tr. 186-187.  He
also received a part of the profit when the distressed property was sold by Starlight.  Had he acted solely as the distressed
owner's real estate agent and sold the property directly to a purchaser who intended to live in the property, he would have
received one of two commissions and none of the benefit of the short sale profit.

Holmes used the services of members of the "Holmes Team" – other real estate agents in the real estate firm
who worked closely with him.  He largely determined the split of the commission between the members of the Holmes
Team and himself.  He testified:

    Q.      .   .   . How often did you use an agent from your team on these part 1 of the Starlight
            transactions?
    A.      Most of the time.
    Q.      Most of the time.  Okay.  And do I understand your testimony correctly that you would sit
            down at some point with your team member and decide how much they did and how much
            you did and what percentage of their commission you should receive. Is that correct?
    A.      Pretty much.
    Q.      Okay.  Was there ever any discussion about how much of your commission they should
            receive?
    A.      No.  I was the team leader.

7 Tr. 39-40.  *See also* 2 Tr. 168-169.

Starlight's first purchase was funded solely by Holmes who borrowed $110,000 on his life insurance policy and lent it to Starlight. 1 Tr. 47-48.. After the first few transactions proved very successful, Holmes approached W. Michael Dorula and negotiated a loan from him to Starlight. 1 Tr. 68. Dorula became an intermediary for his friends who also lent money to Starlight. At Starlight's height, it had more than $2.3 million in outstanding loans to the Dorula lenders and $800,000 to Holmes.

Holmes' key accounting idea was that at the end of each transaction – the purchase and then the sale of the distressed property – the lenders' money would be restored to Starlight's bank account and the profits would be split. 1 Tr. 61-62. Between the real estate owned and the money in the bank, the lenders would be assured of repayment of their loans. 7 Tr. 22-23.

Homes testified that "Starlight was not a money-making entity. Starlight was a bookkeeping entity." 1 Tr. 61. Starlight received the net proceeds from each sale and made disbursements – principally monthly interest payments to the lenders and the profits to Holmes and Brand as computed by Holmes. Brand acted on behalf of Starlight in this regard. In addition, once Holmes established the relationship with Dorula, Brand was responsible for lender relations and dealt directly with Dorula who acted on behalf of his friends. 6 Tr. 75; 1 Tr. 61.

The venture ended shortly after Brand admitted to Holmes that he had unsuccessfully invested idle funds in the stock market and had lost more than $400,000. 4 Tr. 92. Holmes later learned that Brand had been paying himself more than the profits Holmes had determined were due to him. This amount, charged to Brand as compensation on Starlight's books, amounted to several hundred thousand dollars. 3 Tr. 153-155.

4

When informed of the situation, Holmes and the Dorula lenders agreed to place the proceeds from the sales of the remaining properties owned by Starlight in escrow. 3 Tr. 52. The escrow agent was initially Northern Virginia Title & Escrow. *Id.;* 5 Tr. 236-239. Although the settlement company was owned by Scott Flanders, Don Olinger, a Dorula lender, was the individual who had authority to disburse money from it. The funds were moved to American Title & Escrow because of concern over the close relationship between Holmes and Flanders. 5 Tr. 59. Olinger distributed the money in the escrow account to the Dorula lenders, to the exclusion of Holmes. Holmes filed suit against Starlight to stop the distributions to the Dorula lenders and Starlight filed a chapter 7 petition. 3 Tr. 59.

## B.  Credibility of the Witnesses

There was extensive oral testimony and numerous exhibits at the seven-day trial of this matter. The transcript is 1,788 pages long.[4] The principal witnesses were Holmes, Brand and Dorula. Holmes devised the Holmes Model, lent Starlight substantial amounts of money and was Starlight's real estate agent. He filed three proofs of claims totaling $1,019,860.09. He found almost all of the properties Starlight purchased and was the primary listing agent for their sale. He earned a real estate commission on each property Starlight purchased and another when it was sold. Brand was responsible for dealing with the lenders, keeping the books and making disbursements. He made no claims against Starlight and was granted a discharge in bankruptcy of his debts on April 30, 2012. Starlight's business was run ostensibly by Brand, but, in fact, by Holmes. Despite

---

[4]For convenience the transcripts are referred to by volume number. The volume numbers are the daily transcripts which are for Dec. 9, 2013 (1 Tr.); Dec. 11, 2013 (2 Tr.); Dec. 13, 2013 (3 Tr.); Dec. 19, 2013 (4 Tr.); Dec. 20, 2013 (5 Tr.); Feb. 7, 2014 (Vol. 6); and Feb. 10, 2014 (Vol. 7). In addition, portions of the trial testimony in the Brooks and Flory matter, *Dorula v. Brooks (In re Starlight Group, LLC),* 519 B.R. 157 (Bankr.E.D.Va. 2014), *rev'd and remanded for further consideration,* were admitted without objection as Exhibit 2 and are referenced as "Ex. 2 at ___." The page designation is that of the original transcript.

the fact that they started the venture as trusted friends, Holmes trenchantly blames Brand for Starlight's failure.  Brand, in turn, blames Holmes, but acknowledges his errors and accepts responsibility for them and their contribution to Starlight's failure.  Their testimony was not always consistent.

After having heard the testimony of Holmes, Brand and the other witnesses, examined the exhibits, and considered the access of both Holmes and Brand to information, their respective biases, their roles in the business venture, their stakes in the litigation and its outcome,[5] and their demeanor, the court finds that neither Holmes nor Brand was wholly reliable and that their testimony should be considered with skepticism.  Discrepancies were considered and reconciled when possible.  Some testimony of each was disregarded because it lacked credibility.  Overall, Brand was more credible than Holmes.  The findings of fact are based on the entire record with Holmes and Brand being given credit when appropriate.

Dorula's credibility was also considered.  He lent his money to Starlight and filed a proof of claim for $174,128.  He was the liaison between Brand and the other lenders who were his friends.  They collectively filed proofs of claims for $1,994,984.  They were paid, generally, 14% per annum on their loans.  Starlight paid Dorula, generally without the knowledge of his friends, an additional 5% override on their loans.  7 Tr. 204-205.  The cost to Starlight was a total of 19% per annum.

---

[5]Brand filed a voluntary petition in bankruptcy under chapter 7 of the Bankruptcy Code in this court on January 24, 2012.  Starlight creditors to whom he was or may have been liable were scheduled.  No complaint objecting to his discharge or the dischargeability of a debt was filed.  The trustee filed a Report of No Distribution and Brand was granted a discharge on April 30, 2012.  He made no claim in this case and is not listed as a creditor.  He is scheduled as a co-debtor with Starlight on Mr. Brooks' and Mr. Flory's claims.

Dorula was the spokesman for the lenders when Starlight collapsed and negotiated the establishment of the escrow account from which payments were made to Dorula and his friends within 90 days before Starlight filed bankruptcy. 5 Tr. 90-91. The chapter 7 trustee filed preference suits against Dorula and Robert Meletti, one of Dorula's friends and a fellow lender, and threatened preference suits against the rest. Docket Entry 88, ¶5-6. Prior to the trial in these matters, the Dorula lenders and the trustee reached a settlement. *Id.* It allowed the Dorula lenders to retain the money they were paid and established a basis for distributing the remaining funds the trustee recovered. Brooks, another creditor, objected to the proposed settlement because it could give the Dorula lenders a more favorable distribution than he would get, depending on the outcome of the objections to Holmes' and his claims. The proposed settlement was not prosecuted during the trial of these matters but has since been approved. In general, Dorula was a creditable witness, but he – for himself and his friends – had a clear interest in recharacterizing or subordinating Holmes' claims. He is the primary moving party on the objections and is the complainant, together with his wife, in the adversary proceeding.

## C.  Starlight's Operations.

### 1.  Holmes Relationship with Brand.

Holmes was licensed as a realtor in 1986. 1 Tr. 28. He testified that he was the third highest selling Century 21 agent in the country in 1999, 2000, and 2001. 1 Tr. 29. He met Brand about 1997, and they became close friends. Brand became his mentor and they spoke many times during the week.[6] In 2004, Holmes decided, in addition to selling real estate, to start investing in real

---

[6]Holmes testified:

A.        . . . [Brand] was my mentor at this point, and he had been my mentor for seven or eight

(continued...)

estate.  Brand made the same decision, organized Starlight and invested through it.[7]  Both financed

their purchases through bank loans.  In addition, Brand borrowed money from individuals for down

payments and to cover carrying costs.  2 Tr. 175.

Brand's first purchase was a property at Trinity Square.  3 Tr. 54-55.  In light of their close

relationship, Brand offered to give Holmes a one-half interest in it.  The purpose was to show

---

[6](...continued)
years.

Q.     .  .  .What do you mean, "mentor"?

A.     Well, I had accepted Christ as my lord and savior in 1997.  And one of the first people I was
introduced to by – I was introduced to George Kettle that owned all of the Century 21
franchises, and I was attending a Bible study at Mr. Kettle's office every Tuesday afternoon,
and that was – that was in late 1997.  And I was introduced to Mr. Brand who was, I guess,
the moderator of that Bible study.

And so from that point on, Mr. Brand took me under my wing – took me under his
wing.  He taught me the Bible.  He taught me.  And he became – he became a very big
support system in my life.  He was a support system so as that I called him eight, ten, twelve
times a day.  I mean, anything that would come up, I'd go – I would ask him biblically, what
would the translation be.  I would ask him about almost every situation that came up in my
life.

1 Tr. 32-33.

[7]Brand testified that the twelve properties he purchased belonged to Starlight even though some were titled in
his individual name.  They were titled in his name, he said, for convenience because banks would not lend to a limited
liability company.  2 Tr. 173-174.  Prior to Starlight's bankruptcy, Brand testified that he conveyed the remaining
properties to Starlight. Three were listed on Schedule A, Real Property.  Each was annotated:  "Title in name of Spencer
C. Brand and held as Nominee for Starlight Group, LLC."  Brand testified that he quitclaimed his interest to Starlight
before it filed bankruptcy.  Holmes agreed that Brand's interest in Trinity was transferred. He testified, "In December
of 2012, unbeknownst to me, the ownership changed fifty percent Greg Holmes to fifty percent the Starlight Group.  But
this was December of 2012 that there was a quitclaim deed filed shifting his interest in the property to that of Starlight
Group."  1 Tr. 35.  Brand testified:

Q.     Now, in this letter, Mr. Holmes appears to be asking you to transfer a deed to him on Trinity
Square.  Do you see that?

A.     Yes.

Q.     Okay. And what was your response to that?

A.     I wouldn't do it.  First of all, my attorney advised me not to have any business dealings
whatsoever of any kind with Mr. Holmes.  Secondly, again, what he wanted me to do was
quitclaim the deed of this property over to him claiming it had nothing to do with Starlight,
but it was the very first Starlight – very first property Starlight bought.  The down payment
money on this property was Starlight's; the mortgage payments for the first couple of years
had been made – been paid by Starlight; the income, rental income collected for the first
couple of years until, again, the market collapsed was paid by –.  Then, as the market
collapsed, Greg had additional cash, Starlight ran out, Greg assumed the mortgage, and Greg
assumed collecting the rents, and so on.  But this was a Starlight
property from the very beginning."  3 Tr. 54-55.

Holmes how to be generous and to make gifts.  1 Tr. 33-34.  *Cf.* 2 Tr. 177 ("I [Brand] told Greg that

if he negotiated the contract on behalf of Starlight, I would give him fifty percent of the deal,

because I wanted to start a relationship that would be fifty/fifty.")  Holmes accepted the gift and the

two owned the property as tenants in common.[8]  Both continued to invest heavily, but separately,

in real estate.  By 2007, the very strong appreciating real estate market quickly turned downward

and both began experiencing financial difficulties.  During this adverse market, Holmes learned

about short sales. He sold about 20 of his investment properties in this manner.  Ex. 2 at 217.  He

told Brand about short sales and sold some of Starlight's property as short sales.

A digression about Starlight's first venture into real estate investment is helpful in

understanding Holmes' relationship with Brand.  It is not particularly helpful as it relates to the

transactions involved in this case, but is relevant as to Holmes' knowledge of Starlight's prior

transactions and his relationship with Brand.  Prior to Starlight's venture into short sales, Starlight

had purchased 12 properties in the booming real estate market intending to hold them for

appreciation.  The parties referred to this phase of Starlight's business as Starlight I and the short-

sale period involved in this case as Starlight II.  They are one in the same entity.  Holmes was

Starlight's real estate agent on a number of the Starlight I purchases. 2 Tr. 173.  Holmes sold several

of Starlight I's 12 properties as short sales as Starlight's real estate agent after the real estate market

crashed.  Holmes testified that he thought that Starlight had no liabilities when he agreed to use it

for the short-sale business because Brand told him that Starlight was a dormant entity with no assets

---

[8]The transaction did not turn out well.  Like so many other properties, it lost its value in the real estate crash.
The trustee abandoned it.  *See* Notice of Abandonment, Docket Entry 62.  Starlight did not list Holmes as a co-debtor
of the loan secured by Trinity Square on Schedule G and there was no evidence that Holmes was liable to the bank for
the loan secured by Trinity Square.  Holmes testified that it ultimately cost him money.  1Tr. 34-35.  Brand agreed. 3
Tr. 54-55.

or liabilities.  1 Tr. 54.  Had he known that Starlight had liabilities, he testified, he would never have

agreed to use it.  Ex. 2 at 262.  Brand testified that Holmes knew of the existing debt because of his

involvement in the sale of Starlight's properties at short sales.  3 Tr. 142.[9]  While Holmes denied that

he knew that Starlight had any existing debt when he began purchasing properties for Starlight at

short sales, the court finds that he knew of the existing debt because of his previous work for

---

[9]Brand testified:

Q.      And what debt existed in the Starlight bank account from that Starlight I?
A.      Well, in the bank account, there wouldn't have been any debt. .   .   .
Q.      Well Starlight I had unpaid notes, correct?
A.      Well, yes, but that wasn't in the – I mean, you're talking about the bank account –
Q.      Well, I'm trying to –
A.       – or the balance sheet.
Q.      Yeah.  Excuse me.
A.      Well, the balance .   .   . sheet has the – .   .   .
Q.      So when you s -- when Greg Holmes talked to you about forming this agreement, did he ask you about the Starlight bank account?
A.      I don't know if he asked about the bank account, but he knew the situation of the Starlight balance sheet.  The bank account, again, is different.  You know, the bank – whether there was 100 dollars or 500 dollars, I don't remember.  But Greg knew that we had this substantial debt because we were liquidate – he was representing Starlight as we were selling these properties.
Q.      Well, you think – you've talked about how astute Mr. Holmes is, correct?
A.      Yes.
Q.      And you're telling me that he would allow money to go into Starlight's bank account or go into the coffers of Starlight when they owed one million dollars in debt?
A.      Because Starlight had reached an agreement with all of those lenders.  They either just forgave their loan, or we had created an agreement with .   .   . Charlie Flory and Billy Brooks.
            So, yes, there were – I mean, while it had that debt, those lenders had already walked away.  The market had collapsed.  They understood that.
Q.      But it remained on the books?
A.      Yes.
Q.      And is it your testimony that Mr. Holmes never asked you about that?
A.      No, no, no. We – well, no, we had many discussions as to the status of Starlight, because he knew that we had all these lenders that put money in.  He knew that we had short sold all those properties.  He knew the lenders had walked away except one guy that kind of a whatever, named Mitch Purcell, and he eventually signed off and walked away too.  Again, but Greg was aware of all of that. We had many conversations about this.

3 Tr. 141-143.

Starlight as its real estate agent in selling Starlight properties at short sales and his close relationship

with Brand.

Starlight's existing debt, that is, when Holmes began using Starlight as his short sale

purchaser, had little impact on the operation of the Holmes Model.  The banks that loaned money

for the purchase of the 12 properties made loans to Brand individually and not to Starlight.[10]  Brand

testified that they would not make loans to a limited liability company and that he had to purchase

the properties and borrow the money in his own name.  3 Tr. 74.  They did not have claims against

Starlight, only Brand.  The required down payments, however, were made from money Starlight I

borrowed from individuals.  The properties were not intended to be sold immediately, but to be held

so that Starlight could benefit from the rapidly appreciating real estate market.  The properties were

rented, but the rental income was not sufficient to pay the carrying costs.  The money borrowed from

the individuals was also used to cover the carrying costs.  2 Tr. 175.  With the change in the real

estate market, Starlight I was unable to sell the properties at a profit.  All but two of the individuals

who loaned Starlight I money walked away from their losses.  Two asserted claims in this case.[11]

While some money was paid by Starlight II to Starlight I creditors and to others for expenses, the

evidence presented does not support the argument that it had any material impact on Starlight II's

---

[10]No institutional lenders were scheduled as creditors in Starlight's case.  While lenders secured by liens on Starlight's four properties remained from its first phase (Starlight I), they had no in personam claims against Starlight, only in rem rights against the real estate, all of which the chapter 7 trustee abandoned.

[11]When Starlight began to become successful in its short sale business, Brand approached the two remaining lenders and compromised their claims.  They agreed to a significantly reduced principal with payment over an extended period.  Brand who was not personally liable on the loans to Starlight agreed to guarantee the settlement.  Starlight paid several hundred dollars a month to service this obligation.  There is a dispute in this case over the amount of these creditor's claims.  They filed a proof of claim asserting the full amount they loaned, not the reduced settlement amount.  Dorula and Mr. and Mrs. Meletti objected to the full amount of the loan, but not the settlement amount.  The lenders asserted that the settlement was procured by fraud.  *See Dorula v. Brooks (In re Starlight Group, LLC),* 519 B.R. 157 (Bankr.E.D.Va. 2014), *rev'd and remanded for further consideration*; Ex. 2 (portions of transcript of trial on objection to Brooks' & Flory's claims).

operations or its failure.  3 Tr. 141-143; 4 Tr. 188-189.[12]  However, the two proofs of claims for Starlight I loans affect the distribution to the Starlight II creditors.[13]

### 2.  The Holmes Model.

There were four elements to the Holmes Model: Holmes' expertise in pricing real estate; Holmes acting as the real estate agent in the transactions; Holmes' use of a third party to conceal his participation in the real estate transactions; and financing.

### a.  Holmes' Pricing Expertise.

Both Holmes and Brand testified that one of the primary reasons that Holmes was so successful as a real estate agent was his ability to accurately price real estate.  As Holmes testified, "I study pricing on a daily basis.  And that's a big majority of my day.  I think I'm better at pricing real estate than anybody.  I think that my success in real estate is because of being able to price real estate."  1 Tr. 43.

Holmes noticed a difference in pricing between a conventional real estate sale and a distressed sale (either a foreclosure or a short sale).  A foreclosure or short sale sold for considerably less.  Holmes testified that there were several reasons for this.  When the bank sold a property at foreclosure, it generally was the purchaser and incurred expenses in acquiring, holding and selling the property.  Among the expenses, Holmes testified, was an asset manager who generally received

---

[12]Brand testified:

| | |
|---|---|
| THE COURT: | How much of that loss [from Starlight I] was paid out of funds borrowed for Starlight II? |
| THE WITNESS: | None.  None of those lenders [Starlight I lenders] received payment from Starlight II, except for Charlie Brooks and – excuse me –  Charlie Flory and Billy Brooks. |

4 Tr. 188.  Brooks and Flory received about $19,200 over two years.  4 Tr. 189.

[13]Dorula and the Melettis objected to the claims.  Docket Entries 126-130.

a 10-12% commission on the sale.  1 Tr. 45.  There was a stigma to a distressed sale that negatively

affected its price.  1 Tr. 47.  Finally, the bank often would have to repair the property to bring it to

a condition to sell.  1 Tr. 45.  Due to these factors, mortgage lenders were willing to agree to a short

sale to third parties for less than the price the property could reasonably be expected to receive at

a traditional sale by the owner.

Holmes believed he could make money by purchasing distressed properties at short sales.

His pricing expertise allowed him to accurately calculate the resale price, determine the potential

profit in a transaction in light of a mortgage lender's agreed price and close on the deals with a

reasonable amount of profit in them.  With his real estate license, he would not have to pay a real

estate agent a commission on the purchase or the sale of the distressed property.[9]

### b.  Holmes' Role as Real Estate Agent.

Holmes' involvement as Starlight's real estate agent was very important to Holmes.  Dorula

and Brand characterized Holmes as earning three commissions on each property, two when it was

purchased by Starlight and one when it was sold.  When the property was purchased, Holmes acted

as the buyer's and the seller's agent, which Dorula and Brand counted as two commissions because

a real estate commission is traditionally split between the seller's agent who lists the property for

sale and the buyer's agent who brings the buyer to the table.  When the property was sold by

Starlight, Holmes was again Starlight's agent, but not generally the buyer's agent.  Holmes generally

sought to dismiss this characterization and noted that other agents who were generally part of the

"Holmes Team" acted as listing agents and selling agents as well.  3 Tr. 11.  The evidence shows

that Holmes controlled the transactions, and that he determined the commission split between this

---

[9]He expected that the real estate agent for the ultimate purchaser would be paid one-half of the total commission
on the sale.

team members and himself.  The Holmes Team – and the fair inference, Holmes himself – received the lion's share of the "three" commissions.  The real estate commissions were more than $2.7 million.[10]

### c.  Holmes' Use of a Third-Party Purchaser.

Holmes did not want to trade in his own name.[11]  He wanted a third party to act as the short-sale purchaser.  He testified that if he personally bought and sold a property, he expected a purchaser at the resale of the distressed property to argue that the sales price should be reduced by three percent because Holmes, a licensed real estate agent, would be working for himself and not paying a commission to someone else.[12]  Ex. 2 at 260.  He implied that this would reduce his profit because,

---

[10]A real estate commission was paid when a property was purchased and sold.  The gross receipts are only when a property is sold.  The estimate of the total commissions assumes that the purchase price of the parties does not exceed the sales prices.  A six percent commission is then calculated on the purchase price as well as the gross receipts.  The buyers' broker on the sales transaction was usually not a member of the Holmes Team.  As a result, three quarters of the estimated commissions, about $2.25 million was paid to Holmes' broker and the Holmes Team, principally Holmes himself.

[11]Dorula testified that "Greg had explained to me that Starlight needed to be used because he could not be associated with Starlight.  It could not appear that he is associated with Starlight in any way."  5 Tr. 43.

[12]Portions of Mr. Holmes' testimony in the Brooks and Flory matter was admitted into evidence in this case.  Mr. Holmes testified:

> Q.    Mr. Holmes, why was it necessary, again to use the Starlight as a vehicle for the short sale?
> A.    Negotiation.
> Q.    Explain please?
> A.    If you're a realtor, and you call me as a realtor and you have buyer for a property, and I am also the seller of the property, you will, as a realtor, will make the supposition that I will already discount 3 percent because I do not have to pay a commission because I'm the owner. . .  . So negotiation is much, much easier when I'm – can turn around and say my seller wants this amount for the house.  Too bad, take it or leave it.  It's a much better position to be in as a realtor.
> Q.    Well, would it be true that that's a much better position personally for you to be in, because in your view, you were entitled to 90 percent profit from the transaction.
> A.    Exactly, it was my model.

Ex 2 at 260-261.

14

presumably, he would give in to the demand to some extent.[13]  In the same vein, if he was acting as

the realtor and not the seller, he felt he had more negotiating strength because he could shift the onus

of the decision for accepting or rejecting an offer to the ostensible seller and claim that the seller was

not willing to negotiate further, all the while remaining sympathetic to the purchaser's desires.  Ex.

2 at 261.  He had similar concerns in negotiating with the bank for the short sale.  Ex. 2 at 264.[14]

---

[13]While the court recognizes that this situation may arise in negotiations and may be a distraction, the court does not believe Holmes would have acceded to such a demand.

[14]Holmes testified that the owners were aware of his financial interest in the transactions.  He testified:

| | |
|---|---|
| Q. | .  .  . So most of the time you represented the seller.  And the sale was to Starlight.  And you were rep – you were the listing agent, is that correct? |
| A. | Correct. |
| Q. | Okay.  Would you disclose to your client, the seller, that you had a financial interest in Starlight? |
| A. | Oh, yes.  Every time.  There was huge document that we disclosed that said that I had a huge financial interest in the resell of the property. |
| Q. | Did you disclose that you were going to get ninety percent? |
| A. | Yes. |
| | .  .  . |
| Q. | Okay.  So you're saying that you can produce documents showing that you advised your client, the seller, that you had a financial interest in the purchaser and were going to take – ultimately realize ninety percent of the profit on the – |
| A. | It doesn't say ninety percent, but it says that I have a huge interest in the resell of the property and that I'm going to make a lot of money. |
| Q. | Okay.  Was that document disclosed to any other party?  Was it disclosed to the first trust holder? |
| A. | No, it wasn't an ag – I didn't have an agreement.  I have – I have no agreement with the – with the first trust holder; they're not my client. |

2 Tr. 143-144.  Exhibit F is one disclosure statement.  There are 20 numbered statements, each initialed by the owner of the distressed property.  Number 11 states:

I understand that Buyer may make a profit from the resale or immediate resale of this property and that his/her only motivation is to make a profit.

Disclosure 20 addresses Holmes' involvement.  It states:

I understand that the Listing Agent, Greg Holmes of Samson Properties, has a business relationship with the Purchaser and, as such, may derive financial gain from the Purchaser's acquisition and subsequent sale of the Property.  Whenever the interest of a Buyer or Seller might be affect by the business or financial interests of a real estate agent, there is always a possibility for the existence of such multiple interests to interfere with the Agent's ability to serve one set of interests without adversely affecting other interests.  Despite the forgoing, Seller still desires to retain Greg Holmes of Samson Properties as the Listing Agent for the sale of the Property and hereby waives any conflicts

(continued...)

These considerations required that his interest in the transaction be concealed.  His solution was to have a third party be the ostensible purchaser at the short sale and the owner at the sale of the property.

Holmes presented his plan to Brand who agreed to participate, but suggested that they use Starlight as the purchaser rather than himself.  Holmes agreed.  1 Tr. 48-51; 53-54.  They agreed to split the profits with respect to each property when it was sold.  Holmes testified that the split was 90%/10% with the lion's share to himself.  1 Tr. 53.  The profits were calculated after payment of real estate commissions to Holmes and his team members.

---

[14](...continued)
of interest that may how *[sic]* or hereafter exists as a result of Mr. Holmes' business relationship with the Purchaser.

Ex. F, Affidavit of Understanding for Short Sale of Real Estate, ¶¶11 and 20.  "Buyer" and "Purchaser" refer to Starlight.

Holmes' view of his role with respect to the parties of the transaction is reflected in the following testimony by Holmes:

| | |
|---|---|
| THE COURT: | You were the listing agent on these? |
| THE WITNESS: | Sometimes I was.  Sometimes I wasn't.  Myself and my assistant would negotiate with the servicer of the loan. |
| THE COURT: | Well, if you are the listing agent on these, and they ended up that Starlight was the – |
| THE WITNESS: | Buyer. |
| THE COURT: | – was the buyer, who are you negotiating with? |
| THE WITNESS: | Who am I negotiating on the acquisition? |
| THE COURT: | Yes. |
| THE WITNESS: | I'm negotiating – it's different than the traditional sale, in that I'm not really negotiating with the seller, because the seller has different needs on a short sale than they do on traditional sale.<br><br>        As long as – let's say that they're upside down and doesn't matter to them what the price is on the property.  Therefore, what they want is out of the loan, out of the house, and out of the debt.  But more importantly, they want a full release of liability. |

Ex. 2, Transcript of Hearing on Objection to Proofs of Claim of William Brooks and Charles Flory at 263-264.

### d. Financing.

Holmes financed Starlight's first transactions. He borrowed $110,000 from his life insurance policy and loaned it to Starlight at a 12% interest rate.[15]   Starlight made its first purchase for $100,000 and sold it for $130,000.  Holmes loaned Starlight an additional $200,000 at 14% interest "to do a bigger deal or do more deals." 1 Tr. 63.  After the first few transactions with his money, he felt that he had a good business model and wanted additional financing to expand the business.

He was limited by two factors.  First, it is most likely that Holmes could not qualify for mortgage loans himself.  1 Tr. 42.[16]  When the real estate market "fell off a cliff" in 2006 and 2007, Holmes testified, he "had extreme expenses to service" his investment properties.  Even if "they were all rented out, I still had a big negative monthly cash flow."  1 Tr. 36-37.  As a real estate professional, he could deduct all of his real estate losses from his taxable income.[17]  He continued:

A.    . . .[W]hat I did not foresee and what I was not ultimately a good businessman about, was if the cash flow income that was needed to get to the point where you could get the tax break by owning the properties, came about so that I couldn't keep up in a cash flow, then I was a sinking ship.
Q.    Is that what happened?
A.    That's what happened.
Q.    So is – would it be a correct statement to say that you were no longer able to pay the mortgages on the properties you owned?
A.    Correct.

---

[15] This loan was repaid in full. It is not clear when it was repaid.

[16] Holmes testified:

Q.    Now, as a result of this residual liability and the result – and the fact that you had not been able to service these loans or make payments, and the fact that the mortgages fell into default, would it be a fair statement to say that at that point, after getting rid of those properties, you had no credit or ability to obtain a mortgage in your own name?
A.    I had no credit prior to short selling them.  The credit started improving once I short sold them.
Q.    Okay.  But do you believe at that point you could've gotten a mortgage in your own name?
A.    No.

1 Tr. 42.

[17] Taxpayers who are not real estate professionals are limited to a $25,000 deduction.  1 Tr. 36-37.

Q.    And you fell into default on how many mortgages, would you guess?
A.    Many

1 Tr. 37.  He learned about short sales and sold about 20 of his investment properties at short sales.

1 Tr. 38, 41; Ex. 2 at 217.  The lender's losses would likely have been negative considerations on

a loan application and he most likely had little by way of collateral except the property to be

purchased.  Moreover, lenders would likely have required down payments.  While he could have

used the money he loaned Starlight for this purpose, it was limited.  Second, his business model was

time sensitive.  5 Tr. 39.  Mortgage loans took too long to get approved and the loan fees and costs

were expensive in light of the short time he intended to hold the properties.  Most mortgage

commitments are time limited.  The time period for a loan commitment and the time it generally

took a lender to approve a short sale were incompatible.  A typical loan commitment is relatively

short, such as 60 days.  Approval of a short sale was longer, from six months to a year according to

Holmes.  2 Tr. 81-82.

He turned to Michael Dorula whom he knew from previous real estate transactions they had

worked on together.  5 Tr. 43-51.  He contacted Dorula to see if he was interested in loaning money

to purchase the distressed properties.  He was.  After Holmes and Dorula reached an agreement on

the 14% interest rate and Dorula's 5% finder's fee, Holmes – for the first time – told Dorula that the

borrower would be Starlight.  5 Tr. 47-48.  Dorula thought that Starlight was owned by Holmes and

Brand in a 90%/10% ownership split.[18]  Holmes negotiated the first loans to Starlight.  They bore

14% interest, a high rate at that time.  Dorula received a finder's fee of 5% per annum on every loan

---

[18]Dorula testified that "I had incorrectly assumed that [Starlight, a limited liability company, was] like Mr.
Meletti's LLC and mine, with two partners, and that when, you know, Mr. Holmes was getting ninety percent, I just
assumed that he's buried in the Starlight Group, so the name doesn't come out, if that's what he was trying, you know,
to hide."  5 Tr. 50.

18

that he brought to Starlight, including his own.  7 Tr. 204.  Starlight's effective interest rate was

19%.  Dorula liked the investment and solicited his friends who began to make loans to Starlight.

In February or March of 2004, Thomas Moak loaned $500,000 evidenced by two promissory notes

and Andrea Aunon and Christopher Townsend both loaned $200,000 each evidenced by a

promissory note.  5 Tr. 207-208.

The initial loans from Dorula and his friends were loans that Starlight could repay at any

time without penalty.  In August of 2009, Holmes directed Brand to repay Aunon's and Townsend's

loans.  This angered Dorula and his lenders because, as he explained, he felt that Starlight "was

taking advantage of my friends."  They had to go through the effort and expense of liquidating other

investments in order to fund their loans to Starlight, who used it for a very short period of time and

paid very little interest on the loan.  5 Tr. 54.  Dorula expressed his displeasure in an email to Brand

that he copied to Holmes.  5 Tr. 55.  As a result, Dorula and his lenders decided that any additional

loans would have to be for a one-year term with a penalty for early payment equal to the interest due

over the remaining portion of the one-year term.  *Id.*

Holmes guaranteed the initial loans, but not the new one-year loans with the prepayment

penalties.  He was evasive in explaining why he guaranteed the initial loans.  He testified when

examined on Moak's note:

> Q.    Are you guaranteeing the note to Mr. Moak?
> A.    I did originally.
> Q.    Why did you do that?
> A.    I was asked to.
> Q.    And who asked you to do that?
> A.    I don't remember.  It wouldn't have been Mr. Moak, because I never talked
>       to Mr. Moak, never seen or talked to – I don't know anything about Mr.
>       Moak except Mr. Dorula brought him in.  So Mr. Brand would have asked
>       me to do that.
> Q.    Why did you agree to do it?

19

A.     Because I had no problem guaranteeing it.  I –
Q.     Okay.
A.     I trusted Mr. Brand at that point, you know.  I mean, I look pretty foolish
       now having trusted Mr. Brand, but –
       .   .   .
Q.     Okay.  Did you guarantee other debts, money went to Starlight?
A.     Early on I thought –  yeah, there were two guarantees, there may have been
       a third, but the notes that were guaranteed early on Brand ended up repaying
       those notes, and then saying you no longer have –  telling me I no longer had
       to guarantee notes.  That they had a comfortable working relationship.
       .   .   .
Q.     Let me put it to you this way.  Would it not be correct that you agreed to
       guarantee the note because Mr. Brand told you that he needed to guarantee
       the note or they couldn't borrow the money?
A.     Possibly.
Q.     Okay.  So your guarantee of the note was in order for Starlight to obtain that
       loan, isn't that correct?
A.     I don't know if it was or not; I said possibly.

2 Tr. 109-111.

Dorula testified that Holmes had guaranteed all the loans up to the prepayment incident and

that it was Holmes' decision not to guarantee the loans made after the prepayment incident.  He

testified:

A.     .   .   . Mr. Brand indicated to me that Mr. Holmes was not interested in
       providing a personal guarantee to this note because it was a twelve-month
       note.
Q.     Now, let me stop you there.  Prior to that Mr. Holmes had guaranteed your
       notes.
A.     Yes.  Prior to this  .   .   . Mr. Holmes was personally guaranteeing the notes
       on all of the investors.
Q.     I'm sorry.  I've misunderstood perhaps.
A.     Okay.  Sorry.
Q.     Mr. Holmes had guaranteed the notes prior to this.
A.     Yes.
Q.     But he was not willing to guarantee these notes.
A.     Correct.

5 Tr. 58.

20

After the August 2009 prepayment incident and the revision in the terms of the notes,

Holmes did not guarantee the loans. Dorula, in turn, sought collateral for the loans in lieu of

Holmes' guarantee. He negotiated with Brand who was now handling Starlight's lender

relationships. Starlight granted a lien on "each and every account receivable, all [Starlight's] real

estate holdings and chattel paper of every nature and type, wherever located." Ex. 100. Thereafter,

all the Dorula lenders' notes were secured. Holmes' notes were never secured. Needless to say,

although the documents asserted that the lenders were granted a lien on Starlight's real estate

holdings, the UCC security interest did not create a lien on Starlight's real estate. That could only

be accomplished by a deed of trust. The UCC liens were not perfected.[19]

---

[19]The court is troubled by Dorula's answer to one question:

> Q.   Mr. Holmes had guaranteed the notes prior to this.
> A.   Yes.
> Q.   But he was not willing to guarantee these notes.
> A.   Correct.
> Q.   Okay. And what, if anything, did you do as a result of learning that?
> A.   Well, seeing that there was still indicated that there was great opportunities, the investors were very pleased with receiving a, you know, fourteen percent, you know, monthly payment, which they got timely every month. I knew that they were still interested in invest – they. I understood that Moak, Townsend, Aunon, you know, would be interested in this twelve-month note, because Aunon and Townsend had to come back, because they were the ones that were paid off early.
>       And so talking with Spencer – talking with Mr. Brand trying to figure out, you know, the solution to this problem, *we couldn't very well get a lien on every property, because that would take forever for the properties, because they're moving in and out, in and out, in and out, and we'd be signing, you know, the documents.* So this is the type of security agreement that we came up with in hopes that it would provide the collateral for the loans.

5 Tr. 58-59 (emphasis added).

   If Dorula and his friends did not expect a lien on the real estate, then they were not harmed when they did not get it. An equitable lien would not attach in nonbankruptcy litigation and equitable subordination on this basis might not be available. The court finds that the Dorula lenders intended to, and thought that they obtained, a lien on the real estate as is expressly stated in the security agreement. *See* 5 Tr. 66-68. They thought that because Starlight frequently purchased and sold a property at back-to-back settlements or in a matter of days, that the additional paperwork associated with creating a deed of trust and releasing it would be difficult to accomplish in the brief period of time available and could slow down the process. Slowing down the process did not hurt the Dorula investors. Their money was committed, and interest was to be paid on it, for one-year periods whether it was being used in a transaction or was sitting in Starlight's bank account. Slowing down the process did hurt Starlight because it slowed the turn-over of the funds

(continued...)

From 2009 through 2011, Holmes continued to invest in Starlight.  On November 1, 2009,

he loaned Starlight $215,000 at 14% interest.  He made additional loans on May 17, 2010, for

$175,000 at 12% interest; on July 20, 2010, for $130,000 at 8% interest; on August 27, 2010, for

$70,000 at 8% interest; and on June 29, 2011, for $45,000 at 8% interest.  All were evidenced by

unsecured promissory notes.  Ex. B.

---

[19](...continued)
available and could affect transactions that Holmes wanted to do.  In light of this, they sought another way to obtain a
lien on real estate, as the security agreement expressly states.  The mechanism was the security agreement.  It was the
wrong mechanism and was ineffective to achieve the Dorula investor's objective of a lien on real estate.  Brand and
Holmes knew this because they were licensed real estate agents and well experienced in real estate transactions.  Dorula
and his friends did not recognize this.  This situation is very similar to the situation described by the Supreme Court in
*Sexton v. Kessler & Co., Ltd.*, 225 U.S. 90 (1912).  The Supreme Court stated:

> The parties were business men, acting without lawyers, and in good faith attempting to create a present
> security out of specified bonds and stocks. Their conduct should be construed as adopting whatever
> method consistent with the facts and with the rights reserved is most fitted to accomplish the result.
> If an express declaration of an equitable lien, or, again, a statement that the New York firm constituted
> itself the servant of the English company to maintain possession for the latter, or that it held upon
> certain trusts, or that a mortgage was intended, or any other form of words, would effect what the
> parties meant, we may assume that it was within the import of what was done, written, and said.

*Id.* at 96-97.

In *Sexton*, the debtor represented to its lender that certain securities had been set aside as collateral for draws
on a line of credit.  The debtor had the right to substitute the collateral, at its discretion, with collateral of equal value.
*Id.* at 95. The debtor delivered the collateral to the lender before it filed bankruptcy, but within the preference period.
The trustee in bankruptcy unsuccessfully brought a preference action against the lender. *Id.* at 96.  The Supreme Court
affirmed because there was an equitable lien in favor of the lender.  *Id.* at 98–99.

The idea that recording a deed of trust and releasing it on every transaction would slow down the process is
erroneous.  There would have been little extra effort on the part of a settlement agent to complete and record a deed of
trust in a standard form acceptable to the Dorula lenders or the release.  Releases are not ordinarily delivered at the
closing.  Releases from banks typically trail the closing by several weeks.  Recording deeds of trust required paying the
recording tax.  The state recording tax was 25¢ per $100 of the loan and the local recording tax was one-third of the state
recording tax.  Va. Code (1950) §§58.1-803A and 58.1-3800.  This would have cost Starlight $333 for every $100,000
of a loan secured by a deed of trust, a relatively large expense for using the money for a few days or weeks.  For
comparison purposes, if a borrower paid $333 in interest on a $100,000 loan outstanding for one year, the interest rate
would be .333%.  If the loan were outstanding for one month, the interest rate would be 4.00%.  If the loan were
outstanding for one week, the interest rate would be 17.00%.  Starlight intended to, and did in most cases, flip the
properties within a matter of days or a few weeks.  For examples of the computation of the recording tax on sales by
Starlight to third parties, see, *inter alia*, Ex. PP at 4-5, 8-9 ($1,276.67 on a deed of trust securing $383,000; $1,316.93
on a deed of trust securing $395,000).

### 3.  The Holmes Model in Operation.

Holmes and Brand agreed on the structure of business, which they referred to as the "Holmes Model." It involved two transactions for each property.  In the first transaction, Starlight purchased a property at a short sale.  Holmes looked for suitable properties to purchase and negotiated the sales price with the banks as either the realtor for the homeowner as the seller or for Starlight as the purchaser.[20]  Holmes testified that in 2009 it took a minimum of six months to negotiate a price which a bank would accept.[21]  1 Tr. 70.  Holmes negotiated and signed the sales contracts on behalf of Starlight, signing Brand's name on behalf of Starlight, all without Brand's involvement or immediate knowledge.  Brand did not object to this process.  Brand himself signed the settlement statements.

In the second transaction, Starlight sold the same property traditionally.  Holmes acted as Starlight's real estate agent.  He negotiated the sales contract without Brand's involvement or immediate knowledge and signed Brand's name to the sales contract on behalf of Starlight.  Brand himself signed the settlement statements.  2 Tr. 74.

After the property was sold, Holmes sent Brand an email advising him of the amount of the profits and instructing him how to disburse the profits.[22]  Holmes' calculations were based on the

---

[20]Holmes explained that he could act as either party's agent or both because the main issue in each short sale transaction was at the price the bank would accept.  The seller only wanted to be rid of the property without a deficiency and the buyer wanted to purchase the property at the lowest price possible. Holmes attempted to achieve both objectives. Ex. B at 262:12-263:2.

[21]One unarticulated assumption of the Holmes Model was that a short sale purchaser would be ready, willing and able to close on the short sale when the bank approved it.  The long approval time and the uncertainty of the process are discouraging to individuals who would like to purchase a home to live in.  They must remain committed to the transaction for a lengthy and uncertain period of time, be prepared to renegotiate the purchase price, maintain a loan commitment and make living arrangements with a landlord (or the sale of their home) for an indefinite period.  These conditions differ from conventional purchasers who would like to move into their new home as soon as possible. Starlight with, in effect, an open line of credit was the ideal short sale purchaser.

[22]Brand testified:

(continued...)

settlement statements; his records of the costs of the transaction including the amounts he advanced; and Brand's statement of the interest due to the lenders that month. *See generally* Ex. L. Brand paid interest to the lenders from cash on hand in Starlight's bank account. They intended to replace it from the net proceeds from the first sale in each month, or if that was not sufficient, from a subsequent sale. The profits were to be divided on the completion of each sale. Holmes and Brand strongly disagreed on the division of profits due to each, Holmes contending that he was entitled to 90% and Brand to 10%. Brand contended that the profits were to be divided equally. *Compare* 1 Tr. 53, *with* 2 Tr. 182.

There was a lot of testimony about the split of Starlight's profits between Holmes and Brand. This case is not a contract case between them in which this dispute must be resolved. It is of interest because it sheds light on Brand's thinking in withdrawing compensation for himself, but is not determinative of the issues raised by Dorula. Based on the evidence presented, the court finds that the agreed upon split was 90%/10%. There was an objective manifestation of this split when they began the venture. Brand, however, had subjective reservations, perhaps from the beginning. He expressed them, as Holmes testified, by continually seeking further compensation. 1 Tr. 97 ("Spencer [Brand] was always asking for bigger splits on every transaction."). Overall, there were many transactions in which the split was other than 90/10. While Holmes did not insist on a 90/10 split on each transaction, his concessions did not alter the original agreement.

---

[22](...continued)

A.        . . .Then Starlight sold that property . . . Greg would send me an e-mail saying here's what the gross profit is on that, split it, and – according to the following formula.

Q.        Okay. Why was it Greg Holmes sending you that e-mail; why weren't you able to do those calculations yourself?

A.        Because Greg was really the driving force behind making this work. And I chose to go along. And that's why.

2 Tr. 188.

### 4.  Starlight's Success.

For the first two years, Starlight put the lenders' money to good use. The gross income for Starlight was $11,232,895 for 2009; $8,847,891 for 2010; and $7,489,313 for 2011.  4 Tr. 161; Ex. 98 (Statement of Affairs, Question 1).  It completed 34 transactions using the Holmes Model in 2009 for a profit of $1,354,713.00.  All of the transactions were profitable.  In 2010, Starlight completed another 34 transactions for a profit of $1,573,015.00.  Only one transaction resulted in a loss.  In 2011, Starlight completed 16 transactions for a profit of $257,383.00.  Four transactions had a profit between $40,000 and $100,000, seven had a profit of less than $15,000.00, and five had losses between $1,500 and about $36,000.[23]  Ex. OO

### 5.  Starlight's Failure.

By 2011, Starlight's profits had fallen to less than half of what they had been in 2009 and 2010.  Holmes and Brand identified several reasons for this, although they dispute the exact reasons and the allocation of blame.  One was a change in the banks' rules on short sales.  Originally, the banks had few restrictions on how long a purchaser had to hold a property before he sold it.  As time passed and the banks gained more experience in short sales, they began to require properties be held for longer periods of time before the purchaser could sell the property.  4 Tr. 40, 161.  This adversely affected Starlight because the longer holding period increased its interest costs on each particular property and reduced the turnover of its inventory resulting in less effective use of the lenders' money.

---

[23]In some instances, Holmes personally paid off the second deed of trust or paid the settlement demanded by the second trust holder in order to complete the transaction.  Holmes conceded that these obligations were not included on Exhibit OO and thus the calculation of the profit.  He filed a proof of claim for the payment he made of second deeds of trust but withdrew the proof of claim.  *See* Claim No. 10.  These undisclosed payments by Holmes decrease the profits otherwise calculated.

Another cause of Starlight's demise was the uninvested cash on deposit in the bank. Holmes recognized this problem at the beginning when he first sought to repay the Dorula lenders when he did not need their money for a particular transaction. He was seeking to treat them as a line of credit and to pay interest only on the outstanding balance. The Dorula lenders objected and Starlight was required to borrow for one-year terms or pay a prepayment penalty. This resulted in idle funds sitting in Starlight's checking account. Starlight was paying 19% interest on the idle funds.

Brand was also concerned about the high rate of interest, and, without Holmes' knowledge, sought to put the idle funds to good use outside of the Holmes Model. He loaned Michael Blank money to purchase several properties in Maryland. Mr. Blank paid Starlight enough interest to cover the interest payments due from Starlight to its lenders. 4 Tr. 169. Brand also purchased a property in Washington, D.C. and renovated it. This was profitable. 4 Tr. 65. His most unsuccessful attempt at cash management was investing the idle funds in the stock market on a short-term basis. While initially successful – Brand testified that in 2010 he made a profit of "more than $100,000" – the effort was ultimately disastrous. He lost more than $400,000. 4 Tr. 166-167. The brokerage account was closed a few months before Starlight's bankruptcy. 4 Tr. 93.

Another area that contributed to Starlight's demise was Brand's and Holmes' dispute over their respective split of the profits. Holmes contended he was entitled to 90% of the profits. Brand contended that it was 50%. Holmes instructed Brand to disburse his profits, 90% of the total profit, on each deal to Holmes at the end of each transaction. Brand did so. When questioned about why he continued to disburse more to Holmes than he thought Holmes was entitled to, he stated that Holmes needed the money at that time to service his investments and believed that while Starlight

26

"was prepaying [Holmes] profit that was more profit than he was due . . . [Holmes and Brand] would settle up the profit that he made at the end." 4 Tr. 21-22, 27.

However, Brand did not always disburse his share, as computed by Holmes, to himself as directed by Holmes in his email instructions. At times, he did not disburse anything to himself. However, overall, he disbursed more to himself than Holmes instructed. Brand paid himself on an as-needed basis. 4 Tr. 20-21. He disbursed funds to himself or on his behalf three ways. He wrote checks to himself, paid his personal expenses, and wrote checks to his wife.[24] All were posted on Starlight's ledger as income to Brand or his wife. 4 Tr. 20. "[T]he goal . . . was that one day it would all even out at fifty-fifty." 4 Tr. 39. Nonetheless, Brand disbursed more to himself than directed by Holmes in this email instructions. Needless to say, Brand's conduct violated the basic principle of the Holmes Model, that is, at the end of each transaction, all the lender's money would be repaid and be safely in Starlight's bank account. By disbursing more than 100% of the profits on each transaction, that was not possible.

Brand offered another reason for Starlight's declining profits: Holmes started to buy properties that generated insignificant profits but generated commissions to Holmes. He believed that Holmes entered into transactions solely for the commission and without regard to the potential profit which he testified shrank over time. 6 Tr. 127. In fact, the losses on the transactions and the smaller profits principally occurred in the later months of Starlight's existence. There was no evidence that Holmes had stopped studying pricing on a daily basis; that he was no longer better at

---

[24]Starlight's Statement of Financial Affairs states that Starlight paid Mrs. Brand $58,768 and Mrs. Holmes $71,013. Statement of Financial Affairs, Question 23. Holmes testified that the profits paid to him were, at his instructions, reduced by the amount he instructed be paid to his wife.

pricing real estate than anybody else; or that his acumen had otherwise dulled.  At the time of the

trial, he was still engaged in short sales, although with another company.  2 Tr. 155.

### 6.  Starlight's Collapse.

Starlight's collapse came in August 2011.  Townsend's note was due on July 29, 2011.[25]

Meanwhile, Holmes had negotiated a short sale without Brand's knowledge, as was customary.

When Brand found out that settlement on the purchase was scheduled to occur near July 29, 2011,

he realized that Starlight did not have enough money to both close on the property and pay

Townsend's note.  Shortly before the scheduled closing, Brand told Holmes of his losses in the stock

---

[25]Holmes wanted to reduce the interest Starlight paid and put more of his money in Starlight which meant paying Moak's note when it matured.  He testified:

> I was making money, and the business was going well, I then had excess money and, therefore, I had to put my money somewhere.  Unless I could get nineteen percent interest, instead of having to borrow more money at Starlight, it made sense for me to put my money – loan my money to Starlight, and then it became so to the point where it built up so there was 900,000 dollars of my money in there.  It just built up to that point.  The fund at that point had north of two – two million dollars in it.  I didn't see the need for two million dollars in the fund.

> I then said, well, let's – let's remove the other money that's nineteen percent out of the fund.  I think Mr. Brand had a discussion with Mr. Moak.  Mr. Moak wanted to reinvest, and he then told Mr. Moak, well, we don't want you – we don't want to take your money at nineteen percent.  And he goes what are you talking about I'm only getting fourteen percent.  And he said no, Mr. Dorula's getting five percent override on every dollar that you have invested.  And Mr. Moak said, heck with Mr. Dorula, I'll take twelve percent.  I want to put the money back in, I know it's a safe place to put it back in.

> So Mr. Brand came to me and said do you want to take a half a million dollar note from Mr. Moak at twelve percent with no override to Mr. Dorula.  And I said, what I want is to get rid of the nineteen percent money altogether.  Mr. Brand said to me, if we get – if we start giving money back, they're all – they will never give us money again.  I said at that point, I don't care if they give us money again; my model is now have a two-year track record and we do not have to pay nineteen percent for money.

2 Tr. 137-138.

Holmes' decision to reduce reliance on high-interest loans and to retire the loans from the Dorula lenders raised questions in Dorula's mind about Starlight's business.  He instructed Brand that he was not to reinvest the loans in new purchases after August 2011.  5 Tr. 228-230.  Dorula also testified that he and his friends would have continued lending during a workout at reduced rates.  The court questions whether Dorula had made the decision to pull the plug on Starlight, but is satisfied that he was willing to stay in to fund a work-out.

market and that Starlight did not have enough money to both close on the property and pay

Townsend's note.  4 Tr. 113; 6 Tr. 114-115.

Holmes demanded that Brand turn over Starlight's ledger to him, which Brand did.  6 Tr.

116-117.  When he reviewed the ledger, he was "shocked" to learn that instead of there being $2.1

million in outstanding loans to Starlight as he believed to be the case, there was actually $3.5 million

in outstanding loans.  6 Tr. 170.  When Holmes learned this, he instructed Brand to put the proceeds

of sale of the properties into escrow.  6 Tr. 171.  The escrow agent – chosen by Holmes –  was

originally Scott Flanders, but was changed to Don Olinger, a Dorula lender, on August 11, 2011.

5 Tr. 237-238.

Dorula learned of Starlight's losses from Brand at the end of July 2011.  5 Tr. 73-74.  Shortly

after this, Holmes telephoned Dorula and left messages that they needed to speak but without Brand

being present.  5 Tr. 74-76.  Dorula began to feel uncomfortable with Holmes at this meeting.[26]

---

[26]Dorula testified:

Q.    And what took place at that meeting?
A.    Mr. Holmes comes in with a stack of material and we go into a conference room. And he was
      extremely upset and was telling me that Brand is – Brand's deranged, that –
Q.    Mr. Brand is what?
A.    Deranged.
Q.    Deranged.
A.    Deranged.
Q.    Okay.
A.    And that he's losing it.  He stole all this money.  He's just – Mr. Holmes just found out that
      Mr. Brand stoled *[sic]* all this money and – and then he started showing me different
      documents that he was trying to prove that this took place, that he didn't know about it.
Q.    What documents did Mr. Holmes show you?
A.    They were the – we didn't go through all of the documents that he had, but he showed me
      the exhibit that we have where it's Mr. Holmes' pencil numbers.  And that's what we
      discussed more at that time.  And I don't know the number of that exhibit.
Q.    Okay.  But what was the nature of the document that you're referring to that Mr. Holmes gave
      you?
A.    It was to show what properties are out in – to be sold and the debts of all of the investors that
      he knew of.
Q.    And what was the purpose, if you – did you have any understanding what the purpose was
      in Mr. Holmes showing you that document?  Why did he show it to you, if you know?

(continued...)

Dorula, Townsend and Olinger met with Holmes about the losses at a second meeting.  After

Townsend and Olinger left, Dorula spoke with Holmes alone.  Dorula suggested a scenario that

would permit Starlight to continue in business and generate enough profits to cover the losses.

Dorula was "shocked" at Holmes' summary dismissal of the suggestion.[27]  After that meeting, the

---

[26](...continued)

A.      I'm sure I would be speculating, but I – there was – to me, for – okay.  Wait a minute.  Let me – this is – this is where I – I like facts.  I don't like emotion.  I like to get the facts, and I saw Mr. Holmes had a lot of emotion.    And – but what came out of that was that it appeared that Mr. Holmes was using the word "we" more than I was comfortable with.  And the "we" was that he was now placing himself as part of the lenders and not as part of, you know, the partnership, if you will, between him and Starlight and the entity that he placed in this transaction, or his model, to receive these funds.    So I was quite taken by that, surprised, and didn't under – so that was the first meeting.

5 Tr. 76-77.

[27]Dorula was examined by his counsel about the meeting.  He testified:

A.      .  .  . So [Townsend, Olinger and I] went over to meet with Greg [Holmes], and Greg was providing, again, information that he wanted to share with us.  I stayed after they had left and explained to Greg that I think there is a way that this can be worked out, and that based on the properties and based on the funds that he still has use for, I could get the agree – the investors to agree that we could continue with this process.

However, Holmes would have to give up his profits by putting it back in, you know, and then could be used to purchase additional property, which I still thought it was a good deal, because personally I was showing him that you're still receiving three commissions on these short sales.  I'm just asking leave the profit in and we can start building this up, whatever is missing. We still didn't know what was missing.

.  .  .

Q.      Had you analyzed the properties that Starlight had [and] its capital requirements before making that proposal to Holmes?

A.      This was just based on Holmes' numbers –

Q.      Okay.

A.      – that he provided to me.  And it made sense from the standpoint of I knew the lenders – the investors' loan amount, and I could see from the sheet that he provided that he had the exact purchase price of the properties that were still to be sold.

Q.      Okay.  So based on the information Holmes gave to you, you proposed a plan that would work out –

A.      Just a scenario, you know, to show how we could continue, and to his benefit he would continue to get the commissions, plus he would be able to have these lenders who were still pleased.  I mean, you know, you're getting a cash payment every month, and they still wanted to do that.  Even if it was at ten percent they would probably still do that.  And that's what – I mean, part of this was to get them to reduce, you know, that commission down or the interest down.

My commission would go away.  I wouldn't be getting anything on this.  We would just continue to build up.  Greg's response to me after I presented this was, wait a minute, that's my profit.  And at – and that was when I was more than shocked and, you know, tried

(continued...)

30

relationship between the two broke down.  Dorula testified that "it moved from me trusting Holmes

very well to the point that I do not trust him at all about anything." 5 Tr. 88-89.

At the time that Brand informed Holmes and Dorula of the losses incurred in the stock

market, Starlight owned eight properties purchased as a part of its short-sale venture.  5 Tr. 236.[28]

Starlight sold four of the eight properties before it filed bankruptcy and received $1.3 million in net

proceeds of sale.  The remaining four were sold by the chapter 7 trustee.  The net proceeds of sale

from the four properties Starlight sold were deposited into the escrow account controlled by

Olinger.[29] 5 Tr. 236-238.  Olinger, Dorula and Brand authorized the distributions of these proceeds

to the Dorula lenders.  5 Tr. 239-241.

Holmes sued Starlight on November 15, 2011, to recover on his notes and scheduled a

hearing on his motion for a temporary restraining order for November 17, 2011.  Ex. 8.  Starlight

filed a petition in bankruptcy on November 16, 2011.

### 7.  Holmes' Relationship to Starlight

Holmes had a very close relationship to Brand and Starlight.  Brand had been a long-time

friend and mentor whom Holmes trusted.  The close relationship was reflected in Brand giving

Holmes a half interest in the Trinity Square property.  They spoke frequently and Holmes turned to

Brand for guidance.  1 Tr. 32-33.  They attended the same Bible study group.  Holmes had been

---

[27](...continued)
               to explain to him that if it wasn't for this money, you wouldn't have had any of this profit.
               And he just said, this is my profit, and would not give up on that profit.  That's what that note
               is coming from.
5 Tr. 78-80.

[28]Starlight owned four more properties from its first real estate venture.  Starlight listed eight properties on its schedules when if filed bankruptcy.  Each of the four from the Starlight's first real estate venture was encumbered by a deed of trust.  The trustee abandoned them.

[29] The remaining properties became properties of the estate when the bankruptcy was filed. See *In re Starlight Group, LLC*, No. 11-18241-RGM, Schedule A (listing the four properties held in Starlight's name).

Brand's and Starlight's real estate agent when Starlight was first organized and was looking for properties to purchase and hold for appreciation.  1 Tr. 42; 2 Tr. 179.  Holmes was Starlight's real estate agent when the market crashed and successfully sold some of Starlight's original 12 properties at short sales.

The short sale investment scheme was Holmes' creation.  He first approached Jeff Palmucci and offered him the opportunity to act as the ostensible short-sale purchaser.  When Palmucci declined, he turned to Brand who accepted. 6 Tr. 194.  The critical work was performed by Holmes. He selected the properties Starlight bought, negotiated the short sale purchase price with the bank, signed Brand's name as manager of Starlight to the sales contracts, hired and supervised contractors for repairs or renovations that were necessary, advanced his own money to pay for utilities and repairs, negotiated with second trust holders, reached agreements with the owners of the distressed properties to handle second trustholders who would not release the owners from further liability on the second trusts, made monthly payments to second trustholders who did not release the owners, negotiated and signed listing agreements for Starlight when Starlight placed the properties for sale, negotiated sales contracts, signed Brand's name as manager of Starlight on the sales contracts, maintained financial records to determine the profits from each transaction, informed Brand of the profits and directed him how to disburse the profits.  2 Tr. 60-61; 7 Tr. 39; 7 Tr. 40.  Holmes testified, "I was making the decisions on price.  I mean, that would not be a normal situation with a buyer and a seller.  I was – I was managing – I was managing rehabs of properties.  I was putting utilities in my name.  I was paying expenses that were occurring.  I mean, no realtor would do that for a client."  7 Tr. 42.

Holmes provided Starlight with the funds for its first purchases, initially $110,000 and later $200,000 more. He approached Dorula for loans to Starlight; negotiated the first interest rates, the finder's fee, his guarantee, and the structure of the notes; and directed Brand how the promissory notes were to be written. 2 Tr. 197-198. He guaranteed the first series of loans. The terms he originally negotiated with Dorula remained essentially the same throughout Starlight's life. The most significant change was after Holmes first directed Brand to repay the loans when the funds were not immediately available. Dorula and his friends objected and insisted on one-year term notes with a prepayment penalty. As a result of the change in terms, Holmes declined to guarantee further loans and the Dorula lenders believed that their notes were secured by all of the assets of Starlight.

Holmes promised Brand that neither Brand nor Starlight would be responsible for any loss on any transaction, that he would cover all losses.[30]  2 Tr. 62. When a property did not make a profit, Holmes wrote a check for the loss. *See, e.g.*, Ex. L at 12 (Ascot Way, loss of $3,394.54). He also paid Brand $250 when there was no profit. *See, e.g.*, Ex. L at 4 (Island Place).

---

[30]Holmes testified:

    Q.     . . . And do I understand from your earlier testimony that had things gone very horribly
           wrong, and should there have been a loss suffered, that you would not have asked Brand to
           – or Starlight to pay any of the deficiency?
    A.     Correct.
    Q.     You were going to cover all losses –
    A.     Correct.
    Q.     – of the transaction. Okay.

1 Tr. 55:15-22.

    Q.     You were going to cover any losses that occurred. Is that correct?
    A.     Correct. He [Brand] had upside but no downside.

1 Tr. 49:18-20.

33

Holmes, in addition to his real estate commissions, received 90% of the profits from each transaction.  Brand received 10%.  Holmes was not looking for a partner, but a bookkeeper and a way to avoid having a financial interest in the transactions that would trigger disclosures required under Va.Code (1950) §54.1-2138, 2139; 18 Va. Admin. Code §135-20-210 and 220.

Holmes dominated Brand, both personally and financially.  Brand testified in reference to the split of the profits:

> Q.  Well, I'm confused about the nature of the pressure.  In what way were you pressured to adopt Mr. Holmes' suggestion that he be paid more than fifty percent?
>
> A.  I was too weak to stand up to Greg's overbearing manner, his haranguing at times, repeated multiple calls, multiple whatever e-mails, et cetera on various issues.  And I just went along.

6 Tr. 89-90.

He testified earlier:

> Through this whole process, the money became attractive to me, and I became a coward.  And there were many times during this business relationship with Greg I should have just said stop, but I didn't.  I went along, because it was beneficial to me to go along.  And it was easy – I slipped into kind of instead of an unconditional love, to unconditional acceptance, and I thought I could change things.
>
> We knew that we were running into some kind of problems; I didn't know – I've never seen these documents before – before your deposition.  We certainly wouldn't have done that, because this is all completely off of the HUD-1.  It's backdoor agreements with the second trust holder, with – again, to my knowledge, should the first trust holder ever know that the second trust holder was – I didn't know any of that.
>
> The concern also raised its head when the FBI pulled files out of Scott Flander's office to look at.  And then the news came out that the FBI was investigating Greg.  I didn't stop, but I could have stopped it, in terms of my relationship with Greg.  Because, again, Greg is extraordinarily gifted and quite persuasive, and I went along with it.

2 Tr. 207-208.

> Q.  What role would you have in determining how much to send to Metro or working out that –

34

> A.    Greg would have told me the amounts.
>
> Q.    Would you have had any authority to say yes or no, in your view?
>
> A.    Well, I would have had the authority, but I didn't exercise it.
>
> Q.    Why not?
>
> A.    Well, because I withdrew and took kind of a cowardly go-along position with all sorts of things, to be honest with you. I mean, I wish I could say there was another reason, but I just went along.

2 Tr. 222-223.

In testifying about closing on a purchase on August 1, 2011, or paying Townsend's note when it became due and about speaking with the Dorula and his lenders about Starlight's losses, Brand testified:

> Mr. Keegan [an attorney] and Holmes, at that closing, both of them – you know, sometimes I think my cowardice is staggering to me when I – it is. At that meeting, they told me do not talk to any of the lenders, period. In fact, Greg reiterated that in his e-mail. Don't talk to anyone. Don't tell them anything that's happened. I will handle it. And Greg talked about how he could come up with a strategy to work us out of this mess – and that he would take care of it with the lenders. Vince Keegan reiterated that, that Greg was an extraordinarily gifted salesman. He could figure out a way to work a deal to get us out of this mess. So, Spencer, go home, and shut up, and you should be ashamed of yourself, which, of course, I was. And that's what I did. So I had no contact with the lenders whatsoever. Now, I knew better than that, but I still did it.

3 Tr. 60-61.

While Brand was certainly seduced by the money, he went along with Holmes and followed his instructions, often against his better judgment.

After Starlight collapsed, Holmes took his "Holmes Model" to Flanders and started a new relationship that pursued the same business with the same business model. Again, the profits were split 90%/10%. This time, however, Holmes had a bank line of credit. 2 Tr. 155-156.

35

The court finds that Holmes was the de facto manager and owner of Starlight. He effectively controlled Starlight.[31] The business model was his idea. It commenced the business of short sales with his money. He obtained the principal financing. He selected the properties Starlight purchased and the price at which they would be purchased and sold. He signed listing agreements and real estate contracts for Brand without Brand knowing that they were signed until after Holmes had signed them. He made the principal corporate decisions. He received the overwhelming financial benefit of the venture and assured Brand that despite the fact that he was the record owner, he would suffer no loss. When he found out about Starlight's losses, he chose to close on a purchase and not pay Townsend's maturing note. Immediately before the closing, he promised Brand he would find a way out of the "mess" and instructed Brand to go home and remain silent. Shortly after the closing, he summarily rejected Dorula's initial work-out idea and moved the business to a successor corporation he controlled.

Holmes is also an insider as a person in control of Starlight under §101(31)(B)(iii) of the Bankruptcy Code. The test in the Fourth Circuit is that "the alleged insider 'must exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets.'" *Butler v. David Shaw, Inc.*, 72 F.3d 438 (4th Cir. 1996) (*quoting Hunter v. Babcock (In re Babcock Dairy Co.*), 70 B.R. 662, 666 (Bankr.N.D.Ohio 1986)). This he did.

---

[31]For Dorula's perspective, see 5 Tr. 86 ("We came in at your [Holmes'] direction. You were controlling everything. If one of your people that you put in place did something, you bear responsibility, was my feeling.").

## II.  Applicable Law

## A.  Equitable Liens.

[E]very express executory agreement in writing, whereby the contracting party
sufficiently indicates an intention to make some particular property, real or personal,
or fund, . . . a security for a debt or other obligation, . . . creates an equitable lien
upon the property so indicated which is enforceable against the property.

*Hoffman, v. First National Bank of Boston*, 205 Va. 232, 236, 135 S.E.2d 818, 821 (1964) (adopting

and quoting the definition in Pomeroy's Equity Jurisprudence 5th ed., §1235); *Harper v. Harper,*

159 Va. 210, 218, 165 S.E. 490, 493 (1932).  The Court of Appeals for the Fourth Circuit applied

this definition in *Penn Lumber Co. v. Wilson,* 26 F.2d 893 (4th Cir.1928) and *Stickney v. General*

*Electric Co.,* 44 F2d 362 (4th Cir. 1930).

There is a difference between the existence of an equitable lien and a bankruptcy trustee's

ability to avoid an equitable lien.  *Beskin v. Bank of New York Mellon (In re Perrow),* 498 B.R. 560,

576 (Bankr.W.D.Va. 2013).  A bankruptcy trustee has the ability to avoid certain liens.  *See, e.g.,*

11 U.S.C. §§544 and 547.  In *Penn Lumber,* while the Court of Appeals found that there was no

equitable lien, it held that if there had been one, the trustee's strong arm rights would have prevailed

over Penn Lumber's equitable lien.  The general analysis involves answering two questions. First,

is there an equitable lien; and, second, can the trustee in bankruptcy avoid the equitable lien.  In this

case, the trustee is not involved in the objections or the adversary proceeding.  He has not asserted

his strong arm rights and they are not a consideration.  The contest is between creditors.  Only the

first question in the analysis needs to be answered.

## B. Equitable Subordination.

The equitable remedy of subordination was recognized by the Supreme Court in *Pepper v. Litton,* 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939) and codified by Congress in 11 U.S.C. §510(c) of the Bankruptcy Code of 1978.[32]  An equitable remedy is a part of "a complex system of established law and is not merely a reflection of the chancellor's sense of what is just or appropriate." *Owen v. Tiller,* 243 Va. 176, 179, 413 S.E.2d 51, 53 (1992) (citing *Price v. Price,* 122 W.Va. 122, 124, 7 S.E.2d 510, 511 (1940)).  In bankruptcy, three elements are usually necessary to invoke equitable subordination:  (1) inequitable conduct; (2) injury to creditors or an unfair advantage for the claimant; and (3) a remedy that is not inconsistent with the provisions of the Bankruptcy Code.  *Benjamin v. Diamond (In re Mobile Steel Co.),* 563 F.2d 692, 700 (5th Cir. 1977).  *See also United States v. Noland,* 517 U.S. 535, 116 S.Ct. 1524, 1528 L.Ed.2d 748 (1996); *United States v. Reorganized CF&I Frabricators of Utah, Inc.,* 518 U.S. 213, 116 S. Ct. 2106, 135 L. Ed. 2d 506 (1996).

If the creditor against whom equitable subordination is sought is an insider of the debtor, that creditor's dealings with the debtor are subject to closer examination than that of noninsiders.  *In re Systems Impact, Inc.,* 229 B.R. 363 (Bankr.E.D.Va. 1998).  The initial burden is on the moving party to present "material evidence of unfair conduct" by an insider.  *Id.*  The insider creditor must then rebut the evidence by proving "the good faith and fairness of its dealings with the debtor."  *Id.*

---

[32]Bankruptcy Code §510(c)(1) states:

[A]fter notice and a hearing, the court may .  .  . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of any other allowed claim or all or part of an allowed interest to all or part of another allowed interest .  .  .

(*citing Allied Eastern States Maintenance Corp. v. Miller (Matter of Lemco Gypsum, Inc.*), 911 F.2d

1553 (11th Cir. 1990).

## III.  Conclusions

### A.  The Dorula Lenders' Liens.

The Dorula lenders were promised liens in lieu of Holmes' personal guarantee after Holmes

directed Brand to repay the Dorula lenders' loans.  They agreed to loan new money only if there was

a prepayment penalty and the notes were collateralized.  Starlight and the lenders entered into a

UCC security agreement that purportedly encumbered all of Starlight's assets, both real and personal

property.  The security agreements, while intending to grant a lien on Starlight's real estate, were

ineffective to do so.  That can only be accomplished by a deed of trust.

An equitable lien gives effect to the equitable maxim that equity "regards that as done which

ought to be done." *Virginia Shipbuilding Corp. v. United States*, 22 F.2d 38, 50 (4th Cir. 1927).  A

recurring application of this maxim is the imposition of an equitable lien on property intended to be

collateral for a loan.  *Hoffman,* 205 Va. at 236, 135 S.E.2d at 821-822 ("creates an equitable lien

upon the property so indicated which is enforceable against the property") (quoting Pomeroy's

Equity Jurisprudence, 5th ed., §1235); *Perrow,* 498 B.R. at 576 ("The lien created is enforceable

against the property.")  The party does not necessarily have to promise to convey, assign, or transfer

the collateral for the maxim to apply.  It will apply even if the "contracting party sufficiently

indicates an intention to make some particular property, real or personal, or fund, therein described

or identified, a security for a debt or other obligation . . . ." *Union Trust Co. of Maryland v.*

*Townshend (In re Smith)*, 101 F.2d 903, 908 (4th Cir. 1939).        Here, if the security agreements

39

had been properly drafted as deeds of trusts and recorded, the Dorula lenders would have had

priority over all other creditors, including Holmes, as to the real estate.

A second applicable equitable maxim is that he who remains silent when he should have

spoken, will not be heard when he should remain silent.  Brand and the Dorula lenders thought that

they were receiving security for the loans in lieu of Holmes' guarantee.  2 Tr. 200-201; 4 Tr. 194-

196; 5 Tr. 68.[33]  Holmes knew of the ineffectiveness of the lien as to the real estate but said nothing.

---

[33]Brand testified:

> Q.    So let me ask you at this point. Can you tell me whether or not you understood that should
> there be some complete catastrophe and Starlight was very suddenly insolvent that the money
> would first go to those who had given security agreements to before Mr. Holmes was repaid
> any money on his loans?
> A.    Oh, yes, absolutely.

2 Tr. 200.

> Q.    Mr. Brand, in response to one of the Court's questions, you said that, we understood that the
> new lenders would be in a preferred position.
> A.    Yes.
> Q.    I have two questions. When you say "we", whom did you mean?
> A.    Me and Greg Holmes, and the lenders themselves believed that –
> Q.    Okay.
> A.    – the secured lenders.

4 Tr. 194.

Dorula testified:

> Q.    Okay. And did you understand that you and the other investors who took these notes with
> the security agreements would be in a preferred position as opposed to other general
> creditors?
> A.    Yes.
> Q.    And why did you think that?
> A.    The way that the wording is in the agreement, that they would not be able to take – do any
> actions that would violate this agreement and that would cause any property not to be
> available for our collateral and for – that they would not allow liens and all of the other
> actions that could be taken against the assets.
> Q.    Could you tell me whether or not that, based on the security agreement, you understood that
> you would be paid ahead of other general creditors from Starlight funds?
> A.    Yes.

5 Tr. 68.

At every closing on the sale of a property by Starlight, he saw the settlement statement and saw that

no deed of trust was being paid.  He remained silent.  Had he spoken, the defect could have been

remedied and the Dorula lenders would have obtained a first lien on the real estate.  Holmes would

have been, effectively, subordinated to them.  Instead, he avoided his personal guarantee and left

open an opportunity for him to recover on his loans without giving the Dorula lenders what they had

bargained for.

An equitable lien is not necessary to create a lien on Starlight's personal property.  The

security agreements created liens on Starlight's personal property in favor of the Dorula lenders.

The liens were effective as between the lenders and Starlight.[34]  Va.Code (1950) §8.9A-201(a)[35]; *In*

*re Alford,* 1990 WL 10091744 (Bankr.E.D.Va. 1990); *Felmey v. Household Finance Corp.,* 9 B.R.

331 (Bankr.E.D.Va. 1981).  The liens were not perfected.

## B.  Enforceability of the Liens Against Holmes.

Both the equitable lien on Starlight's real property and the unperfected UCC lien on

Starlight's personal property are effective against Starlight, a party to the security agreements.

Va.Code (1950) §8.9A-201(a).  The question is their effect against Holmes, an unsecured creditor.

An equitable lien is enforceable against the property.  *Hoffman,* 205 Va. at 236; 135 S.E.2d

at 821-822 ("creates an equitable lien upon the property so indicated which is enforceable against

the property") (quoting Pomeroy's Equity Jurisprudence, 5th ed., §1235); *Perrow,* 498 B.R. at 576

---

[34]There has been no request to determine the priority of any of the Dorula lenders as among themselves.  They appear to accept that all share pro rata and without priority among themselves.

[35]Va.Code (1950) §8.9A-201(a) states:

*General effectiveness.*  Except as otherwise provided in the Uniform Commercial Code, a security agreement is effective according to its terms between the parties, against purchasers of the collateral, and against creditors.

("The lien created is enforceable against the property.") In *Harper v. Harper,* the equitable lien was prior in time to the widow's dower rights.

An equitable lien may be subject to rights of third parties such as *bona fide* purchasers for value. *Penn Lumber Co. v. Wilson; Perrow,* 498 B.R. at 576. The Dorula lenders' equitable liens are not subject to rights of either the chapter 7 trustee or Holmes. The chapter 7 trustee has not asserted his strong arm rights. Holmes is an unsecured creditor, not a *bona fide* purchaser for value. He never had an interest in the real property, only an unsecured claim against Starlight.

The security interests in the personal property are binding on Holmes. Va.Code (1950) §8.9A-201(a) expressly provides that a security agreement is effective against creditors – in this case, Holmes – and is enforceable as to him. Va.Code (1950) §8.9A-203(b). Nor does Holmes have any priority over the Dorula lenders under Va.Code (1950) §8.9A-317(a) because he never became a lien creditor. Va.Code (1950) §8.9A-317(a)(2).

While not necessary to finding that Holmes is subject to the Dorula lenders' equitable liens, the equities of this case favor them. Holmes knew of the intended lien on the real property. While he denies that he was aware that the Dorula lenders had a security interest, the assertion is not credible. He testified that his personal guarantee was released because the Holmes Model had proven itself, 7 Tr. 94, and that he was unaware that the Dorula lenders received security interests, *Id.* at 93-94. However, he set the initial terms of the loans. He personally guaranteed the initial loans. After the prepayment incident, he knew that the terms were modified. He knew that the new loans were for one-year periods. He did not want to guarantee the longer term loans and knew that

he was not personally guaranteeing them because he signed no new guarantees.[36]  Brand testified

that Holmes knew about the security agreements.[37] 2 Tr. 200; 201.[38]  *But see* 7 Tr. 132-133.

Considering the evidence as a whole on this issue, the court does not credit Holmes' denial and finds

that he knew the new loans were intended to be secured by all of Starlight's assets, including the real

estate.

Holmes also knew that a deed of trust, not a security agreement, was needed to encumber

the real estate.  He was an experienced real estate agent who had extensive personal real estate

experience and negotiated numerous short sales.  Each involved a deed of trust.  He saw deeds of

trust being paid on the settlement statements when the distressed properties were purchased by

Starlight, but that there were no deeds of trusts being paid on the settlement statements when the

properties were sold by Starlight.

Holmes controlled Starlight.  The venture was his idea.  The business model was his.  The

initial money to operate the business was his.  He found Dorula and his friends and initially obtained

their financial support through loans.  The Dorula lenders were Starlight's principal lenders.  He

located and negotiated the purchases of the properties without consulting or seeking the approval

---

[36]The first guarantees were only for the particular note he guaranteed.  He did not issue a blanket guarantee for future indebtedness.

[37]When asked whether Holmes knew about the security agreements Starlight was giving to its lenders, Brand testified that he did know "from the very beginning, because that enabled him to withdraw his personal security – his personal guarantee." 2 Tr. 199. When asked how he knew that Holmes knew about the security agreements, Brand testified that they had "many discussions," . . . "saw them," . . . "understood how the money was coming in, he understood what percentage interest rate we were paying, what finder's fees we were paying, and he understood the security agreement." 2 Tr. 200.

[38]Brand testified:

Q.     So let me ask you at this point. Can you tell me whether or not you understood that should there be some complete catastrophe and Starlight was very suddenly insolvent that the money would first go to those who had given security agreements to before Holmes was repaid any money on his loans?
A.     Oh, yes, absolutely.
Q.     Why do you say that?
A.     Because that's the way that we structured it, and I believe that's the way that we all understood it.
2 Tr. 200-201.

of Brand, the ostensible principal of Starlight.  He signed Brand's name to the sales contracts. He

calculated the profits.

### C.  Application of Equitable Subordination.

It is not necessary to apply equitable subordination to give effect to the Dorula lenders'

property rights – that is, their equitable liens – as to Starlight's real property.  Their equitable liens

arise independently of equitable subordination.  Independent of the Dorula lenders' equitable liens,

Holmes' claims would be equitably subordinated to the Dorula lenders' claims.  In addition, if

necessary, equitable subordination would give effect to the priority of the Dorula lenders' equitable

liens.[39]

If there were no equitable liens, the application of equitable subordination would be

appropriate and would result in the same priorities.  The three elements required for equitable

subordination are present.  Holmes' knowledge of the intended liens, his knowledge that they were

not properly effected, and his control of Starlight are inequitable conduct.  The Dorula lenders were

injured and Holmes would obtain an unfair advantage – a prorata distribution of estate funds when

he should receive a distribution only after the Dorula lenders.  Equitable subordination is not

inconsistent with the provisions of the Bankruptcy Code.  In fact, it would achieve the same result

as if the matter were resolved by a Virginia court under Virginia law.  *Benjamin v. Diamond (In re*

*Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977).

### D.  Relief Granted

This case is before the court on the objections to Holmes' proofs of claims and the complaint

to subordinate Holmes' claims.  Holmes is the only adverse party in these proceedings.  The relief

---

[39]The Dorula lenders' equitable liens are a prepetition property rights.

requested will be granted.  Equitable subordination would result in the same relief.  It may be granted "only to the extent necessary to offset injury or damage suffered by the creditor in whose favor the equitable doctrine may be effective." *In re Franklin Equipment Co.*, 418 B.R. 176 (Bankr.E.D.Va. 2009).  Holmes' inequitable conduct does not extend to Brooks and Flory who loaned money to Starlight during its first business foray.  They never thought that they had a security interest in any of Starlight's assets and Holmes was not involved in the operations of Starlight at that time except as a realtor.  Similarly, other unsecured creditors without security agreements are not adversely affected by Holmes' conduct.  Holmes' claims should be subordinated only to Dorula's and his friend's claims to the extent of the security agreements.  The chapter 7 trustee will first pay all administrative expenses and priority claims.  He will then determine the prorata distribution of all creditors and disburse that amount to all of them except Holmes.  He will disburse Holmes' portion prorata to the Dorula lenders until their claims are paid in full.  If they are paid in full, any balance of Holmes' portion will be paid to him.[40]

---

[40]An individual creditor seeking to assert a claim of equitable subordination as to its claim must assert a particularized injury distinct from that of the estate as a whole.  *See In the Matter of Vitreous Steel Products Co.*, 911 F.2d 1223, 1231 (7th Cir. 1990) ("[I]ndividual creditors must have an interest in subordination separate and apart from the interests of the estate as a whole."); *Nobska Venture Partners I, LLP et al. v. WWC Capital Fund II, LP et al.*, 2011 Bankr. LEXIS 815 (Bankr.D.Md. 2011); *In re Elrod Holdings Corp.*, 392 B.R. 110, 114-115 (Bankr.D.Del. 2008) (finding that a secured creditor with injury different from that of the estate as a whole had standing to bring a claim for equitable subordination to its claim).  In this case, Dorula has shown an injury to himself and the other Dorula lenders, each of whom also had a security agreement, but not the other unsecured creditors.

Although both the Mellettis and the Dorulas assert a claim of equitable subordination of Holmes' claims to the claims of ***all*** other unsecured creditors in their objections to Holmes' proofs of claims and  Dorula sought the same relief in his complaint, relief is only granted as to those particular creditors for their particular injury.  The trustee does not have exclusive standing to bring these actions.  *See,  St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) ("If a claim is a general one, with no particularized injury arising from it, and if that claim could be brought by any creditor of the debtor, the trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action."); *In re PHP Healthcare Corp.*, 128 Fed. Appx. 839, 844-45 (3d Cir. 2005) (stating that "an individual creditor of a debtor may not assert a general claim belonging to all creditors.").

45

Alexandria, Virginia
June 12, 2015

/s/ Robert G. Mayer_____
United States Bankruptcy Judge

Copy electronically to:

Richard G. Hall
John T.  Donelan
Robert M. Marino

19302