# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| In re: | |
| STARLIGHT GROUP, LLC, | Case No. 11-18241-RGM (Chapter 7) |
| Debtor. | |
| W. MICHAEL DORULA, | |
| Plaintiff, | |
| vs. | Contested Matter (Objection to Proof of Claim 3, Docket Entry 128) |
| WILLIAM L. BROOKS, | |
| Defendant. | |
| ROBERT A. MELETTI and JULIE E. MELETTI, | |
| Plaintiffs, | |
| vs. | Contested Matter (Objection to Proof of Claim 3, Docket Entry 129) |
| WILLIAM L. BROOKS, | |
| Defendant. | |
| W. MICHAEL DORULA, | |
| Plaintiff, | |
| vs. | Contested Matter (Objection to Proof of Claim 4, Docket Entry 127) |
| CHARLES M. FLORY, | |
| Defendant. | |

1

| | |
|---|---|
| ROBERT A. MELETTI and<br>JULIE E. MELETTI,<br><br> Plaintiffs,<br><br>vs.<br><br>CHARLES M. FLORY,<br><br> Defendant. | Contested Matter<br>(Objection to Proof of Claim 4,<br>Docket Entry 130) |

## MEMORANDUM OPINION

The issue presented is whether a pre-petition settlement agreement between the debtor, Starlight Group, LLC, and two creditors, Williams L. Brooks and Charles M. Flory, was procured by fraud.[1]  The settlement agreement reduced their debts from $517,913.10 and $589,073.02, respectively, to a total of $200,000 to be paid in monthly installments of $833.34 over twenty years, split evenly between the two.  Brooks and Flory filed proofs of claims for the original amounts, asserting that the settlement agreement was procured by fraud.  Michael Dorula and Robert and Julie Meletti, also creditors, separately objected to Brooks' and Flory's proofs of claim.[2]  If the settlement agreement was procured by fraud, the proofs of claims should be allowed as filed; otherwise, the claims should be allowed in the reduced amount.  If the objections are successful, the total amount of claims in the case will be reduced, thereby increasing the distribution to the Dorula lenders.[3]

---

[1]Brooks and Flory are cousins.  Brooks is a practicing patent attorney.  Flory is a retired government employee. 1 Tr. at 184, 208-09.  Flory generally deferred to Brooks' advice.  1 Tr. at 211.

[2]The objections were identical and are treated together.

[3]The Dorula lenders are Christopher Townsend, Thomas Moak, Donald Olinger, Robert A. Meletti, Andrea Aunon and Dorula.  All are Dorula's friends and were recruited by him to lend money to Starlight.  They are all of the remaining creditors other than William and Athena Lathrop who filed a proof of claim for $2,095.00 for a security deposit.  Dorula successfully objected to the proof of claim filed by Kathryn Flanders which was disallowed.  *Dorula v. Flanders (In re Starlight Group, LLC),* 513 B.R. 666 (Bankr.E.D.Va. 2013) *reconsideration den.* 515 B.R. 290 (Bankr.E.D.Va. 2014).  He also successfully objected to the proofs of claims of J. Gregory Holmes.  *Dorula v. Holmes*
(continued...)

## Summary

The June 25, 2010 settlement agreement between Starlight and two creditors, Brooks and Flory, was procured by fraud and is void. Starlight started purchasing residential real property in January 2005 while the real estate bubble was rapidly expanding. 1 Tr. 29; 4 Tr. at 9.[4] It financed the purchases with bank loans that were secured by first deeds of trust on the purchased property and loans from private individuals, which included Brooks and Flory for the down payments and carrying costs. When the bubble burst, Starlight was left holding eleven properties, none of which had any equity. 1 Tr. at 30. All of the private lenders except Brooks and Flory accepted their losses. The sole member of Starlight, Spencer C. Brand, and Brooks and Flory were friends. Brooks and Flory periodically asked Brand about Starlight and their prospects for payment. Brand consistently told them that it was hopeless.[5] In 2009, Starlight began purchasing residential real property at short sales and selling it at a profit. It financed the purchases with loans from new private lenders. By early 2010, the short sale business was producing excellent profits. Brooks and Flory, however, had not given up on recovering on their loans. Brand approached them "out of the blue" and offered to

---

[3](...continued)
*(In re Starlight Group, LLC),* 531 B.R. 611 (Bankr.E.D.Va. 2015) (subordinating Holmes' claims to the Dorula lenders' claims).

[4]The transcripts are referred to as follows: June 7, 2013 as 1 Tr. ___; June 19, 2013 as 2 Tr. ___; June 25, 2013 as 3 Tr. ___ and September 10, 2015 as 4 Tr. ___.

[5]From 2008 through early 2010 when Brand approached Brooks and Flory about a settlement, Brand consistently told them that they were not going to be paid. Brooks testified, "Through that period, when I would ask him, I'd say things like – 2009/2010 – I'd say how are things going the properties? He'd either tell me they had another one short sold, either or there was one in foreclosure or going to go to foreclosure or that – or that – or that – I said, 'Are you in bankruptcy yet?' And he made it sound like they were real close, but they were still in business, but nothing was going on." 1 Tr. 204-205. When Brand proposed the settlement, Brooks testified, "What I remember him telling me, in addition to the statement that's in the document, he told me, he said, 'I don't want – I don't want your liabilities hanging over our heads forever.' Or something to that effect. 'And therefore, you sign this now. This is the only thing you're ever going to get or you will get nothing.' And it was like – it was just take it or leave it. To me, it was surprising, because I had asked him if there was any possibility of anything, any properties being bought, any continuing operations. And there's no evidence – no information that there ever would be." 1 Tr. at 203-204.

settle their claims, telling them that if they did not accept the settlement, they would never see anything. 1 Tr. at 190. On June 25, 2010, Brooks and Flory agreed to the settlement that reduced their claims and paid them over an extended period of time. Brand, who had no personal liability on Brooks' and Flory's loans, guaranteed payment of the settlement. Brooks and Flory were unaware that Starlight was actively engaged in a profitable business.

Brand was pessimistically telling Brooks and Flory that Starlight's prospects were hopeless. From 2008 through early 2010 when Brand approached Brooks and Flory about a settlement, Brand consistently told them that they were not going to be paid. Brooks testified, "Through that period, when I would ask him, I'd say things like – 2009/2010 – I'd say how are things going [with] the properties? He'd either tell me they had another one short sold, either or there was one in foreclosure or going to go to foreclosure or that – or that – or that – I said, 'Are you in bankruptcy yet?' And he made it sound like they were real close, but they were still in business, but nothing was going on." 1 Tr. at 204-05. When Brand proposed the settlement, Brooks testified, "What I remember him telling me, in addition to the statement that's in the document, he told me, he said, 'I don't want – I don't want your liabilities hanging over our heads forever.' Or something to that effect. 'And therefore, you sign this now. This is the only thing you're ever going to get or you will get nothing.' And it was like – it was just take it or leave it. To me, it was surprising, because I had asked him if there was any possibility of anything, any properties being bought, any continuing operations. And there's no evidence – no information that there ever would be." 1 Tr. at 203-04.

At the same time Brand was optimistically telling Dorula that Starlight's prospects were outstanding. Dorula testified:

>     THE COURT:       And Brand described the success they were having?
>     THE WITNESS:     Yes.
>     THE COURT:       And did he describe it optimistically?

| THE WITNESS: | Very much so. |
| THE COURT: | Tell me what he said. |
| THE WITNESS: | He explained to me the amount of money that they earned on the first three or four properties that were under the short sale. |

4 Tr. at 251.

| THE COURT: | And how was the investment described to you in March, or just before . . . Aunon put her money back in? |
| THE WITNESS: | It's – it was the same. I mean, when you say how was – |
| THE COURT: | Was it optimistic? |
| THE WITNESS: | They were. They – they were, and Mr. Brand had indicated that they received right of first refusal of property for various banks and trusts that Mr. Holmes formed a relationship. So then the banks would be coming to Mr. Holmes asking do you have a buyer for this property. And because of that was another reason – because you'll – you'll hear – and it's a known fact that short sales take a lot of time. You have to be very patient. And there's no guarantee it's going to go through. And because of the relationship that Mr. Holmes formed with the bank, and the cash that Mr. Holmes had, it sped up the process immensely. And having Starlight there to buy it, so Mr. Holmes was able to shortcut that short sale process and get properties in quicker. And because of that, the funds that he did have on hand at that time were being depleted and used for purchase. So this is why you see a lot of transactions going on in 2010. I was due to the opportunities that was |

presenting itself.

4 Tr. at 255-56. Dorula told his friends that "Spencer [Brand] informed me that they have been selected as the preferred short sale team by Trust Title. He was very excited about this since they have several properties for short sale." Ex. 9.

Brand had no reason for pessimism in 2009 and 2010 when he was negotiating the settlement with Brooks and Flory. Starlight's gross receipts were $11,232,895 and $8,847,891 for those two

5

years, respectively.  Its costs of goods sold were $10,665,119 and $8,339,960, respectively.  Dorula

Ex. 10.[6]

## Law Relating to Fraud

**Fraud by Concealment.**  Brooks and Flory assert three separate frauds, any of which is

sufficient to set aside the settlement agreement.  The first fraud is concealment of a material  fact.

"Concealment of a material fact by one who knows that the other party is acting upon the

assumption that the fact does not exist constitutes actionable fraud." *Allen Realty Corp. v. Holbert*,

227 Va. 441, 450 , 318 S.E.2d 592, 597 (1984); *Clay v. Butler*, 132 Va. 464, 474, 112 S.E. 697, 700

(1992); *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999); *Carlucci v. Han,* 907

F.Supp.2d 709, 740 (E.D.Va. 2012).  A party's duty to disclose certain information arises in the

context of the transaction.  *See Ware v. Scott*, 220 Va. 317, 320-21, 257 S.E.2d 855, 857-58 (1979)

(relying on Restatement (Second) of Torts § 551 (1977).[7]    Information that must be disclosed

---

[6]Two evidentiary hearings were held in this matter, the first on June 7, 19 and 25, 2013; and the second on September 10, 2015.  Two sets of exhibits were introduced at each hearing.  The exhibits in three sets are numbered, and in the fourth lettered.  The exhibits offered at the first hearing by Dorula will be referred to as Ex. [Letter]; and, at the second hearing as Ex. [Number].  The exhibits offered at the first hearing by  Brooks and Flory will be referred to as B&F (6/7/13) Ex. [Number]; and, at the second hearing as B&F (9/10/15) Ex. [Number].

[7]Restatement (Second) of Torts §551(2), Liability for Nondisclosure, states, in part:

One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

| | |
|---|---|
| (a) | matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and |
| (b) | matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and |
| (c) | subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and |
| (d) | .  .  . |
| (e) | facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts. |

(continued...)

includes "subsequently acquired information that he knows will  make untrue or misleading a previous statement that when made was true or believed to be so" and "facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them .   .   . would reasonably expect a disclosure of those facts."  Restatement (Second) of Torts § 551 (1977); *see also Ware*, 220 Va. at 320-21, 257 S.E.2d at 857-58.  Failure to disclose the information may be the equivalent of a false representation.  Purposeful concealment of a material fact unknown to the other party "may evince an intent to practice actual fraud" because "concealment always involves deliberate nondisclosure designed to prevent another party from learning the truth."  *Spence v. Griffin,*  236 Va. 21, 28, 372 S.E.2d 595, 599 (1988).

**Fraud by False Representation.**  The second fraud is the one more commonly pled:  fraud by a false representation.  The elements are "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and

---

[7](...continued)
The Comment on Clause (c) states:

> h.   One who, having made a representation which when made was true or believed to be so, remains silent after he has learned that it is untrue and that the person to whom it is made is relying upon it in a transaction with him, is morally and legally in the same position as if he knew that his statement was false when made.

Illustrations:

> 1.   A, a stock breeder, tells B, a prospective buyer, that a thoroughbred mare is in foal to a well-known stallion. The mare miscarries. Immediately afterwards B offers $500 for the mare relying, as A knows, upon his statement. A does not inform B of the mare's miscarriage. A is subject to liability to B for the loss that he suffers because the mare is not in foal as originally represented.

> 2.   A, the president of a mercantile corporation, makes a true statement of its financial position to a credit rating company, intending the substance to be published by it to its subscribers. The corporation's financial position becomes seriously impaired, but A does not inform the credit rating company of this fact. The corporation receives goods on credit from B, a subscriber of the rating company, who when the goods are bought is relying, as A knows, on the credit rating based on his statements to the rating company. A is subject to liability in deceit to B.

(6) resulting damage to the party misled." *Winn v. Aleda Constr. Co.,* 227 Va. 304, 308, 315 S.E.2d

195, 195 (1984); *Carlucci v. Han*, 907 F.Supp.2d at 740; *Klaiber v. Freemason Assocs., Inc.*, 266

Va. 478, 485, 587 S.E.2d 555, 558 (2008); *Diaz Vicente v. Obenauer*, 736 F.Supp. 679, 690 (E.D.

Va. 1990).

**Constructive Fraud.**  The third fraud is constructive fraud.  The elements of constructive

fraud are "a showing by clear and convincing evidence that a false representation of a material fact

was made innocently or negligently, and the injured party was damaged as a result of his reliance

upon the misrepresentation." *Mortarino v. Consulting Eng'g Servs., Inc.,* 251 Va. 289, 295, 467

S.E.2d 778, 782 (1996) (citing *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148, 439 S.E.2d

387, 390 (1994)).  Constructive fraud arises when one has represented as true that which is really

false in such a way as to induce a reasonable person to believe it with the intent that the person will

act upon the misrepresentation.  *Id.*  Unlike actual fraud, constructive fraud does not require scienter

or intent to mislead – it can be established whether the representation is innocently or knowingly

made.  *Diaz Vicente v. Obenauer*, 736 F.Supp. at 690 (citing *Chandler v. Satchell*, 160 Va. 160, 168

S.E. 744 (1933)).  At its essence, constructive fraud "consists of the breach of a legal or equitable

duty which, irrespective of moral guilt, is declared by the law to be fraudulent because it tends to

deceive others or violate their confidence." *Howarth v. Rockingham Publ'g Co.*, 20 F.Supp.2d 959,

970 (W.D. Va. 1998).


**Burden of Proof**

A properly executed and filed proof of claim "constitute[s] prima facie evidence of the

validity and amount of the claim."  Fed.R.Bankr.P. 3001(f).  The party objecting to the proof of

claim must overcome that presumption. *Juniper Dev. Group v. Kahn (In re Hemingway Transport,*

*Inc.*), 993 F.2d 915, 925 (1st Cir. 1993); *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173 (3d Cir. 1992).

If the objecting party overcomes the presumption, the claimant bears the burden of proof of its

claim. *In re Organogenesis, Inc.,* 316 B.R. 574, 583 (Bankr. D. Mass 2004).  In this case, the parties

agree that the proofs of claim assert claims for the original contractual amounts and that there was

a novation that reduced the principal amounts to $200,000.  The objecting creditors have overcome

the presumption by the stipulation with Brooks and Flory that the settlement agreement was a

novation.[8]  1 Tr. at 285.  The burden shifts to Brooks and Flory to prove the validity of their original

claim, that is, that the novation was procured by fraud.  If the novation was procured by fraud, it is

not a valid contract and the original contract remains in effect.  *Honeywell, Inc. v. Elliott,* 213 Va.

86, 89-90, 189 S.E.2d 331, 334 (1972) (an essential requisite of a novation is "the validity of the

new contract"); *see also Metrocall of Delaware, Inc. v. Cont'l Cellular Corp.,* 246 Va. 365, 373, 437

S.E.2d 189, 193 (1993) ("[A] written, mutual release memorializing a compromise and settlement

may be rescinded for fraud in its procurement.").  Brooks and Flory must prove fraud by clear and

convincing evidence.  *Mortarino*, 251 Va. at 295, 467 S.E.2d at 782; *Winn,* 227 Va. at 308,  315

S.E.2d at 195.

### Credibility of Witnesses

The evidence in this case is extensive.  It is sometimes contradictory, ambiguous or unclear.

The witnesses' credibility is a factor considered in resolving the conflicts and ambiguities in the

evidence and determining the weight to be given to it.  Of the four principal witnesses – Brooks,

---

[8] The Supreme Court of Virginia set out the nature and elements of a novation in *Honeywell, Inc. v. Elliott*, 213
Va. 86, 89-90 (1972).  A novation is a mutual agreement among all parties concerned for discharge of a valid existing
obligation by the substitution of a new valid obligation. Its essential requisites are a previous valid obligation, the
agreement of all parties to the new contract, the extinguishment of the old contract, and the validity of the new contract,
the proof must be clear and satisfactory.

9

Flory, Dorula and Brand – Brooks and Flory were the most credible. Their testimony principally concerned the statements Brand made to them, most of which were corroborated by Brand. Most of their testimony was uncontested. Brand was the least credible. While his testimony about his conversations with Brooks and Flory was generally the same as their testimony, his testimony about his own real estate knowledge and his own intentions is viewed with skepticism.

All have an interest in the outcome of the case. Brooks and Flory would like their claims allowed as filed. If they are, they will receive larger distributions. Dorula would like the claims allowed in the settlement amount. This would result in a smaller pool of claims and thereby a larger distribution to himself and to his friends whom he recruited to loan money to the debtor. While Brand made no claims against Starlight and was granted a discharge in bankruptcy of his debts in his own bankruptcy case on April 30, 2012, he aligned himself with the Dorula lenders over Brooks and Flory. *See, e.g.,* 4 Tr. at 109, 144.[9]

Brand's credibility is adversely affected by the fact that he was not forthcoming with J. Gregory Holmes, the creator of Starlight's short-sale business model and Starlight's real estate, or the Dorula lenders during the period while Starlight was actively engaged in the business of short sales. He invested money loaned to Starlight in the stock market. He did not tell Holmes or Dorula that he was doing this and did not admit to the significant loss until the Townsend note was due and

---

[9]Brand testified that "[I]n my mind, Mr. Brooks' and Mr. Flory's money was all gone, number one." 4 Tr. at 109. He amplified this later in his testimony:

THE COURT:     And why was it that you didn't tell Brooks and Flory about the short sales and the new venture that Starlight was involved in?

THE WITNESS:   Well, it didn't cross my mind because in my mind, it was a completely new entity. Their money was gone. They wanted me to pay them. So now, it was up to me to try to figure out how to – you know, kind of come up with some means of trying to pay them something. But I didn't see the two connected at all.

4 Tr. at 144.

there was not enough money to pay it and close on a scheduled purchase.  He directed  payments

due to himself to his wife even though she did nothing to earn the money.  He did this to make it

appear, for Social Security purposes, that she had income.  According to Holmes, he paid himself

more than they had agreed upon.  Brand knew of the disagreement but said nothing.

The findings of fact are based on the entire record in this case and the witnesses' testimony

was given credit as appropriate.[10]


### Findings of Fact[11]

Starlight Group, LLC, is a single-member limited liability company organized by Spencer C.

Brand in 2004 or 2005 to invest in the then rapidly appreciating real estate market.  1 Tr. at 27.  The

plan was to purchase properties, hold them for at least one year so that the profits would be taxed

at capital gains rates, and sell them at a profit.  The venture was very promising.  The first purchase

was such an outstanding success that the property was not even held for the planned one-year period.

It was purchased in January 2005 and sold three months later for a gross profit of $60,000.  1 Tr. at

29.[12]  Eleven other properties were purchased.

The purchases were financed by loans from banks  and private lenders.  4 Tr. at 9-10.  Brand

personally borrowed the bulk of the money needed to purchase the properties from banks.[13]  1 Tr.

---

[10]The court considered the credibility of several of the witnesses in this case and of Holmes in another proceeding in this bankruptcy case.  *See Dorula v. Holmes (In re Starlight Group, LLC),* 531 B.R. 611, 615-616 (Bankr.E.D.Va. 2015).  The findings of fact in this case are based solely on the record in this case.

[11]This section together with the additional facts in the Discussion section constitute the court's findings of fact. Fed.R.Bankr.P. 7052.

[12]Brand testified that it was $60,000 on June 7, 2013 and $69,000 on September 10, 2015.  4 Tr. at 10.

[13]The properties were titled in Brand's name but were held for Starlight's benefit.

at 31; 4 Tr. at 10.  Mortgage loans were easily obtained if there was a ten or twenty percent down

payment.  Brand turned to private lenders for the down payments and carrying costs.[14]  1 Tr. at 28-

29.  The private lenders' notes were unsecured three-year notes bearing ten percent interest or, in

lieu of interest and at the election of the lender at the end of the three years, a percentage of the

profits from the sale of the property for which the lender's money was used as the down payment.

1 Tr. at 28, 36, 185-86.

Starlight borrowed about $7 million to purchase the 12 properties.  About $6 million was lent

to Brand personally by banks and was secured by a first deed of trust on the property purchased.[15]

The remaining $1 million was lent directly to Starlight by private lenders who were unsecured.  1

Tr. at 34.  There were from eight to ten private lenders, including Brooks and Flory.  Tr. 1 at 33-34.

Brooks and Flory lent Starlight substantial amounts in 2004 and 2005.[16]  *See, e.g.,* Ex. B, Real Estate

Investment Agreement between Starlight and Brooks dated June 1, 2005 and Ex. C, Real Estate

Investment Agreement between Starlight and Flory dated June 1, 2005.

Starlight's success was short-lived.  While the first purchase was very successful, the other

eleven were failures.  After the properties were purchased, "the real estate market started

collapsing."  4 Tr. at 15.  It "turned south rapidly.  Property values began to plummet," Brand

---

[14]The properties were to be leased while held by Starlight and the rents reduced, but in many cases did not eliminate the carrying costs, that is, the mortgage payments and other costs of ownership.

[15]Brand – not Starlight – was the borrower.  Brand testified that banks would not make loans to limited liability companies at the time so he had to be the borrower and the properties had to be titled in his individual name. Nonetheless, all the properties were intended to belong to Starlight.  1 Tr. at 90.  Brand had no personal liability to the private lenders such as Brooks and Flory.  4 Tr. at 26.

[16]Brooks' proof of claim was for $517,913.10.  (Proof of Claim 3).  Flory's proof of claim was for $589,073.02. (Proof of Claim 4).  Both proofs of claims included interest to November 16, 2011, the petition date.  Each also made a loan to a related company, Northstar, that intended to invest in real estate in Shippensburg, Pennsylvania, for student housing at the University of Pennsylvania.  1 Tr. at 34.  When that project failed to materialize, Brand – without objection from Brooks or Flory – transferred the money loaned to Northstar to Starlight.  It became an obligation of Starlight which used the money in its venture.  1 Tr. at 35, 41.

12

testified.  1 Tr. at 29.  At first, Brand – believing that the downturn would be short-lived – intended

to hold the properties until the market and the properties' values returned.  1 Tr. at 29-30.  Most

were rented, albeit with negative cash flows.  *Id.*  He spent all of the rental income and the private

lenders' money to service the loans and to maintain the properties.  When the private lenders' money

ran out, he resorted to his personal credit cards.  1 Tr. at 31-32.  The real estate market did not

recover and he was unable to maintain the mortgage payments.  By November 16, 2011, when

Starlight filed its petition in bankruptcy, eight of the eleven properties had been sold at short sales.

4 Tr. at 23-24.  The chapter 7 trustee abandoned the remaining three properties on May 10, 2012,

and January 19, 2013.  Notices of Abandonment (Docket Entries 62 and 124).  As of July 24, 2013,

the abandoned properties were "foreclosed or right now, in the process of foreclosure with the

exception of one."  1 Tr. at 30.

The private lenders lost all the money they loaned to Starlight.  Over time, Brand testified,

"all the other lenders [other than Brooks and Flory] had realized they had lost their money, and had

walked away."  1 Tr. at 61.  Only Brooks and Flory continued to inquire about payment of their

notes.  They retained counsel, Ronald L. Eakin, who sent Starlight letters on April 28, 2008, when

their notes matured.  1 Tr. at 59-60; 4 Tr. at 24-25.  Brand met with Eakin, Brooks and Flory but no

resolution was reached.  4 Tr. at 25.  Brand used the meeting not to reach a settlement, but to explain

why there was a loss and why Starlight was unable to meet the demand for payment.[17]  1 Tr. at 60,

---

[17]Brand testified:

Q.    Now, after you received the letter in April 2008 from Mr. Eakin demanding payment of the
        money that Mr. Flory and Mr. Brooks had lent to Starlight, what did you do?
A.    I went out and met with the attorney, Mr. Eakin and Charlie Flory.
Q.    Okay.  And what did you discuss at this meeting?
A.    I tried to explain why Starlight didn't have any money, what had happened to the real estate
        market, why they were in the state that the property that we'd had at that point.
Q.    And when did these meetings occur?

(continued...)

13

189; 4 Tr. at 25, 170.  Over the following years, Brooks and Flory had numerous conversations with

Brand.[18]  1 Tr. at 40, 189-90.[19]

---

[17](...continued)
A.      Shortly after that I letter, that don't recall I'd – within a month, I would think.

1 Tr. at 59-60.

Brooks testified:

Q.      Now, did you see Mr. Eakin about collecting these loans?
A.      Yes.
Q.      And what did he do for you?
A.      We had a meeting with Mr. Flory, Mr. Brand and Mr. Eakin at his office in Manassas.
Q.      By his office, who do you mean?
A.      . . .  My recollection is it's Mr. Eakin's office.  And we submitted the demand letter to him, and
        Mr. Brand said I'm sorry, I cannot or will not – I can't remember what he said – no money will be
        paid.

4 Tr. at 170.

[18]Brand testified that he "met with Billy [Brooks] and Charlie [Flory] repeatedly, and told them what going on."

Q.      At that time, did Starlight have the money to pay what was demanded here?
A.      No.  In fact, when Starlight started going – when the properties started losing considerable
        value – to put it in perspective, Prince William County in 2005, I think there were something
        like six foreclosures.  By 2007, for there were 4000 of them.
                So that's what was happening to the real estate market.
                I met with Billy and Charlie  repeatedly, and told them what going on .  .  .
        Starlight ran out of money.  There was back –
Q.      These conversations you just described, when did they occur?
A.      Well, prior to this, we met probably half a dozen times out at the airport as well as at Billy's
        apartment over in Fairfax.

1 Tr. at 39-40.

Brooks testified about conversations after the meeting with Eakin.

Q.      Did you subsequently have a meeting with Mr. Brand about this?
A.      I stayed in touch with him.  Charlie and I were very, very disappointed.  We kind of knew
        that would be the outcome, because we had kind of stayed in touch with him as [a] friend.
        I looked up to him as kind of like a mentor.  Charlie had known him for years.  I mean, many
        years.  I've been with him to several church activities.  I've been to the movies with him.
                I took him flying.  I have a little private plane and I took [him] flying in that to visit
        my parent's farm. He took me to Hillsdale College to some events.
                And every time I saw him, over the next year or so, I would always ask little
        questions like: "How the properties are doing?"  And it was always an answer like: "Oh
        gosh, another one – we're short selling another.  We're short selling another one."
                I said, "Are you still in business?"  He said, "Yeah, but barely.  And you
        know, it [is] just so bleak."

(continued...)

14

In May 2010, almost two years after the Eakin meeting, Brand "all of a sudden out of the blue" contacted Brooks and wanted to enter into a settlement agreement.  1 Tr. at 190;  4 Tr. at 175. Brooks and Flory turned down Brand's initial settlement offer of granting them a mortgage on one of the properties.  4 Tr. at 175.  Brooks testified that after some discussions:

> [Brand] came back again and I guess, and said that he was going to give us $200,000 split between Charlie [Flory] and me over a period of 20 years.  And I thought, well that's like throwing us a bone, 'cause that's hardly – he could stop that at any time. But I thought something is better than nothing.  And he flat out said that we would never get anything if we didn't take this.

1 Tr. at 191.  At the second trial, he also testified that after some discussions:

---

[18](...continued)
> I did talk to him periodically just to get a feel for what's happening.

1 Tr. at 189-90.

> Brand testified:
>
> A.    Well, I sent them letters showing the monies – that the monies they had put in were all lost. And I showed them the specific properties that were a part of the properties on their list, what our purchase price was for those properties, and what the sale price was.  So, basically, I had communicated with them there's nothing left here.

4 Tr. at 49.

> Brooks testified about conversations with Brand after the meeting in 2008:
>
> A.    And so I stayed in touch with [Brand] casually, and I testified to this earlier, that there would be phone calls periodically where we would just say, like, how are things going, what's new with the properties?  And he'd say not – it's not good.  There was another short sale.  And it was that kind of environment for – up until 2010.

4 Tr. at 172-73.

[19]Brand also organized another limited liability company, Northstar Holdings, LLC, "to develop student housing up at Shippensburg University in Pennsylvania.  At that time," Brand testified, "the idea was to build student housing facility.  Again, this was a hot real estate item at the time – to build student housing facility and then convert the units to condos so the parents could buy a condo for their student while they were going to school."  1 Tr. at 34.  Brand continued, "Northstar collapsed as well.   .   .  The real estate market was collapsing and the assets of Starlight were dwindling.  So we – the agreement with Northstar was those funds could be used for the student housing or for any other real estate project to [move] funds over to Starlight.  Again, to try to stop those properties from collapsing."  1 Tr. at 34-35.  The lenders at Northstar and Starlight were the same, including Brooks and Flory.  There was no objection to transferring the loans from Northstar to Starlight.  *See* Ex. F, G and H.

[Brand] came up with a little bit sweeter offer, which was the $200,000 paid over twenty years. But I have to tell you that I considered that virtually worthless because paid over twenty years I considered Starlight – and if he gave his personal guarantee, which I think he said he did, and he probably did – I considered both of those to be virtually worthless because I figured they were both on shaky ground, because they had all these properties that we knew of that were underwater.

4 Tr. at 175.

On June 25, 2010, Brooks and Flory agreed to accept $200,000, split evenly between them, to be paid over 20 years in satisfaction of their claims. Exs. L and M.

Despite painting a dismal picture of Starlight, and unbeknownst to Brooks or Flory, since 2009 Starlight had been working with Holmes, the real estate agent who was acting as Starlight's real estate agent, in a new investment model involving the short-sale of properties. 4 Tr. at 150. This new phase of Starlight's business involved new lenders. It was very profitable. Holmes' investment in Starlight increased from $110,000 at the beginning of 2009 to $900,000 by the beginning of 2011. 1 Tr. at 221, 229. Starlight had gross sales of $11,232,895 in 2009 and $8,847,891 in 2010 with gross profits of $567,776 and $514,453, respectively. It was generating profits in June 2010. 4 Tr. at 244 (Holmes' testimony).

Three individuals, Andrea Aunon, Christopher Townsend and Thomas Moak, loaned Starlight money in 2009 to finance Starlight's purchase of real estate at short sales. In July 2009, Holmes decided that he did not need all of the money that they had lent to Starlight and directed Brand to pay it back to them. Ex. 6; 4 Tr. at 29-30. He repaid Aunon and Townsend. Dorula and his friends were very upset. They had gone to great expense to sell stocks to raise the money, and it was returned in three months. The significant interest rate that they received – 14% – did not adequately compensate them if the loans were outstanding only for a short period.

The Dorula lenders did not make any new loans from July 2009, when Aunon's and Townsend's loans were paid early, until March 2010. They were not willing to act as a line of credit. During this hiatus, Dorula negotiated new terms: one-year loans with a pre-payment penalty of the unearned interest for the balance of the year's term. In addition, they were to receive a security interest. Aunon made the first new loan on the new terms on March 29, 2010. The rest of the Dorula lenders followed.[20]

Dorula testified about the period from August 2009 through March 2010:

| | |
|---|---|
| THE WITNESS: | There was silence for a period of time, and once Mr. Holmes came back from vacation, there wasn't anything in the pipeline at that time, so it was going to take him time to look for the additional opportunities that were out there. |
| | Once these opportunities were found – and I want to say I began communications again in November of 2009 – was when we started discussing new terms. We had to make sure that this doesn't happen again, and then I would feel comfortable going back to Mr. Townsend and the Aunons to let them know – you know, my comfort, if – you know, I could get there. |
| THE COURT: | Now, it seems like a long time from November to March. Was there no urgency? They didn't have anything to close on? |
| THE WITNESS: | It was – that was the reason, at the time that – when Mr. Holmes went on vacation, it was a long vacation. And this was the reason that he wanted to give that money back, instead of paying, you know, the interest on it, and let it just sit there. |
| THE COURT: | All right. And when did the discussions begin in earnest? You said they started in November. |
| THE WITNESS: | November. And I would say January was when we had the draft. And by March we had it, you know, completed, both the promissory note and the security agreement. |
| THE COURT: | And how was the investment described to you in March, or just before . . . Aunon put her money back in? |

---

[20]One of the reasons no loans were made before March 2010 was that Holmes had gone on an extended vacation. In addition, each short sale required time to be processed. By March 2010, Holmes had returned to work, built a relationship with a bank, and started to fill the short-sale pipeline. 4 Tr. at 254.

| THE WITNESS: | It's – it was the same.  I mean, when you say how was – |
| THE COURT: | Was it optimistic? |
| THE WITNESS: | They were.  They – they were, and Mr. Brand had indicated that they received right of first refusal of property for various banks and trusts that Mr. Holmes formed a relationship.  So then the banks would be coming to Mr. Holmes asking do you have a buyer for this property. |
| | And because of that was another reason – because you'll – you'll hear – and it's a known fact that short sales take a lot of time.  You have to be very patient.  And there's no guarantee it's going to go through.  And because of the relationship that Mr. Holmes formed with the bank, and the cash that Mr. Holmes had, it sped up the process immensely. |
| | And having Starlight there to buy it, so Mr. Holmes was able to shortcut that short sale process and get properties in quicker.  And because of that, the funds that he did have on hand at that time were being depleted and used for purchases. |
| | So this is why you see a lot of loans coming in, in 2010.  It was due to the opportunities that were presenting itself. |
| THE COURT: | In March, when Ms. Aunon's loan was made, did you expect to turn to your investor group and ask for more money during the succeeding months? |
| THE WITNESS: | I was.  Everyone knew it. |
| THE COURT: | And what did Brand say – what did he say about that? |
| THE WITNESS: | He – he indicated that because of this right of first refusal that they had with – I'm sorry, I can't remember the name, but of this bank and trust, that opportunities were coming up and they, in turn, would have to have more cash, you know, as the pipeline, you know, continued to – to grow. |

4 Tr. at 254-56.

The business venture continued until the summer of 2011 when Brand told Holmes that he

had lost over $200,000 of Starlight's money in the stock market.  Holmes also asserted that Brand

was paying himself more than the agreed upon 90/10 split of the profit.[21]

---

[21]Holmes testified:

Q.    At any time, did you review what Mr. Brand had spent the funds from Starlight on?
A.    No.  Not until he gave me the – gave me his ledger in July of 2011.
Q.    And what did you find out when you reviewed the ledger?

(continued...)

## Discussion

## Fraud by Concealment

The evidence relating to the fraud by concealment is largely uncontested.  Brooks' and Flory's initial notes matured on May 1, 2008.  Their attorney, Ronald L. Eakin, wrote a demand letter to Starlight on April 28, 2008.  A meeting followed in which Brand explained that Starlight had lost all its money and that there was no likelihood that there would be any funds available to pay Brooks and Flory in the future.  Brand, as the managing member of Northstar Holdings, LLC, wrote a letter on March 11, 2009, stating that, "Any loans or investments made by investors, including Mr. Brooks, in Northstar Holdings, LLC should be written off as bad debts or worthless stock."  Ex F, Letter dated March 11, 2009.[22]  Eakin took no further action to collect the debts.

Brooks and Flory maintained contact with Brand after Eakin's meeting.  They continually asked how things were going with their loans.  On each occasion, Brand replied negatively.  "Oh gosh, another one – we're short selling another.  We're short selling another one."  1 Tr. at 190.  There were no prospects for payment.[23]

---

[21](...continued)
A.      I found he was spending his money on everything and anything.
Q.      What do you mean by that?
A.      Well, he was paying all his personal mortgages.  He was paying himself and his wife salaries or fees.  He was paying principal off on property that he personally owned.  He was paying his credit cards.
Q.      And what expenditures did you believe he should have been making?
A.      Starlight related.

4 Tr. at 160.

[22]The letter stated that the $100,000 March 14, 2006, loan to Northstar "was used to sustain Mr. Brooks *[sic]* investment in the bundle of properties held by Starlight Group, LLC."

[23]Brand testified that at the Eakin meeting in May 2008, "I tried to explain why Starlight didn't have any money, what had happened to the real estate market, why they were in the state that the property that we'd had at that point."
(continued...)

Brand proposed a settlement with Brooks and Flory in early 2010. It came "out of the blue." On March 3, 2010, Brand, as managing member of Starlight, wrote separate letters to Brooks and Flory. The letters were the same, except for the identification of the properties involved. They stated:

> The loan you made of $100,000.00 on March 14, 2006 and received by Starlight Group, LLC on behalf of Northstar Holdings, LLC was used to sustain the following properties purchased by Starlight Group, LLC on your behalf.
>
> Unfortunately, because of the catastrophic decline in the real estate market we were forced to liquidate these assets at a substantial loss.
>
> As a result, you incurred a total loss of $100,000.00.

Exs. G and H, Letters dated March 3, 2010. The two letters identified five properties as having been sold from July 11, 2008 through October 19, 2009, all at substantial losses. The negotiations concluded with the execution of the June 25, 2010 settlement agreement.

During the entire time of the negotiations, while Brand was denigrating Starlight to Brooks and Flory, he was enthusiastically boosting Starlight to Dorula. 4 Tr. at 251-52, 255, and 259-60. He was telling Brooks and Flory that Starlight was out of business while telling Dorula that Holmes had a special relationship with a bank, that the short-sale pipeline was filling up, and that Starlight would need to borrow money from the Dorula lenders to close on the transactions. Ex. 9. Brooks and Flory relied on Brand's repeated statements about Starlight's dire condition, that Starlight was

---

[23](...continued)
1 Tr. at 60.

Brooks testified that at the "meeting at [Eakin's] office . . . Mr. Brand flat out said, 'Well, I don't have the money.' We said, 'We don't – it doesn't matter. You know, it doesn't what the properties' – he said, 'We've had a bad time in real estate.' I said, 'That was a loan to you. We want our 10 percent' – you know – 'our principle back with the 10 percent as called for in the contract.' He said 'Well, I'm not going to give you.'" 1 Tr. at 189-190. The same attitude continued through the settlement negotiations. Brooks testified that he accepted the settlement agreement because "I thought something is better than nothing. And he flat out said that we would never get anything if we didn't take this." 1 Tr. at 181.

out of business, that it was winding up its financial affairs, and that there would be no funds available from the disposition of the remaining assets for distribution to Brooks and Flory. At the time of the settlement agreement and during the period that it was being negotiated, Brand concealed the fact from Brooks and Flory that Starlight was in business and was doing very well.[24] Even though the statements were true when made to Eakin in May 2008 and to Brooks and Flory until 2009, that is, that Starlight was out of business and was winding up its affairs, Brand had new information – that Starlight was engaged in a new and profitable line of business – that made the prior statements false.

Brand had an obligation to tell Brooks and Flory about Starlight's new business when he was negotiating the settlement agreement with them. He knew that they were relying on his prior statements about Starlight's death spiral while he knew – and knew that they did not know – that Starlight had pulled out if its death spiral and was, again, soaring. He wanted them to believe that Starlight was dead, that they were the only private lenders who had not walked away. Had they

---

[24]Brand was actively engaged in the business. In defending his position that Holmes and he agreed that Starlight's profits should be split 50/50 between them testified that he did more than merely "show[] up at settlement and sign[] the deed":

> That's not true. I spent hundreds of hours in prayer. I spent hours at Long and Foster trying to stop them from releasing Greg [Holmes] from employment. It didn't work. I spent hours with Greg at Keller Williams before they fired him, as well.
> Before that, I brought many of the deals to Greg. I did open houses for Greg. I did lock boxes on these properties. It wasn't – it's not quite the way he described it.
> In addition, I held these lenders together as long as I could to make this work. I was on the phone often with Mike Dorula and some of the other lenders.
> So it wasn't just me sitting around expecting 50 percent of something. And without Starlight, Greg could not obtain three commissions on every deal. As a result of Greg's the involvement with Starlight, he grossed he grossed *[sic]* over $3 million over the course of our time together.
> I thought that was quite substantial.

1 Tr. at 84-85. Brand also testified:

> Q.   Now, Mr. Brand, how, in the end, did Starlight do in the year of 2010?
> A.   Well, I think extraordinarily well, in terms of the gross revenue, if you will want to call it that.

1 Tr. at 70.

found out about the new business, they could have caused significant problems.  He wanted to

reduce their claim and establish a small fixed payment so that they would no longer be a threat to

Starlight.  Brand's failure to disclose the change in circumstances of Starlight constitutes fraud by

concealment which voids the settlement agreement.

### Actual Fraud

The elements of fraud by a false representation are (1) a false representation (2) of a material

fact (3) made intentionally and knowingly (4) with intent to mislead (5) which is relied on by the

party misled, and (6) resulting damage to the party misled.  *Winn,* 227 Va. at 308, 315 S.E.2d at 195;

*Klaiber,* 266 Va. at 485 , 587 S.E.2d at 558 (2008).

**Representations.**  Brooks and Flory point to the first and seventh recitals in the June 25,

2010 agreement as representations – among others – Starlight made in connection with obtaining

the settlement agreement.  They are:

> WHEREAS Starlight and Northstar .   .   . were in the business of real estate
> investment, including provision of financing secured by mortgages on real property
> and equity investment in real property; and .   .   .

> WHEREAS Starlight and Northstar have been unable to meet their monthly and final
> payment obligations and will be unable to do so in the future.

Ex. M, Agreement, at 3; Ex. N, Agreement, at 3.

> Q.   And this is the settlement agreement you eventually entered into on June 25,
>       2010?  It's the last sentence on the first page, first paragraph.
> A.   Yes, it is.
> Q.   Okay.  And you read this agreement before you signed it?
> A.   I did.
> Q.   Okay.  And you read the clause in the beginning of the second page that says,
>       "Whereas Starlight and Northstar have been unable meet their monthly and
>       final payment obligations, and will be unable do so in future"?
> A.   It's pretty clear to me what it said.  Yes, I understood completely.  And it was
>       consistent with the statements he had made to me the previous 3 years.

22

Q.    Did he make any representations to you regarding the activities of Starlight?

A.    None.

Q.    Did he advise you that you were in business or not?

A.    He didn't advise me of any such thing.

Q.    Okay.

A.    The first time I heard that, it was when the – it was from the Bankruptcy Court that there were still some properties a year and half later.

Q.    And so, when did you first realize that Starlight had not ceased operations but was, in fact, a going business?

A.    When I got a notice from – about the bankruptcy of Starlight, which was probably late 2011.

Q.    Okay.

A.    And then, I started – and it said in there, you perhaps may have a claim.  And I was thinking, oh, my God, I couldn't believe it.

There were four properties they said there no mortgages – no liens attached – no mortgages. .   .   .

Q.    Now, what would you have done if you'd known that Starlight was continuing in business in 2010?

A.    I would have never have signed that agreement.

1 Tr.  at 192-94.

While Brooks and Flory point to the recitals in the settlement agreement, they do not rely on them as the exclusive representations made by Brand.  While Brand – and Dorula by extension – understandably sought to limit the representations he made to the recitals, the evidence is clear that he made many other representations about Starlight's circumstances.[25]  Brooks testified as to why he and Flory agreed to settle in June 2010, when they previously had refused to settle.  The initial settlement draft was dated May 16, 2010.  Ex. L.

Q.    What changed between the May agreement and the June agreement that made you reconsider?  You didn't sign the May agreement.

A.    The fact – the fact the he was going to give us a little piece of money – a few dollars.

Q.    Okay.  All right.

A.    Because there was the affirmation that they had no money.  I didn't know where that money was coming from.

---

[25]There is no merger clause in the settlement agreement.  Even if there were a merger clause, it would not necessarily preclude proving that the settlement agreement was procured by fraud.

23

.   .   .

Especially, since we figured they had no money, based on what they told us, for the last several years.

.   .   .

Q.      .  .  . You had an opportunity to ask him the direct question about Starlight, did you not?

A.      I asked him direct questions.  I just testified to that, several times.  All those meetings and even during that period over the last several years.  And he always – he never stated about any activity.

1 Tr. at 198-99.

THE COURT:          Before you go Mr. Brooks, the representations made to you to get sign this were what?

THE WITNESS:        The one that I signed.  What I remember him telling me, ***in addition to the statement that's in the document,*** he told me, he said, "I don't want – I don't want your liabilities hanging over our heads forever."  Or something to that effect.  "And therefore, you sign this now. This is the only thing you're ever going to get or you will get nothing."

And it was like – it was just take it or leave it.  To me, it was surprising, because I had asked him if there was any possibility of anything, any properties being bought, any continuing operations.   And there's no evidence – no information that there ever would be.  I just –

THE COURT:          Was he saying there wasn't ever, did he not respond to that?

THE WITNESS:        See, that's what I've been trying to remember.  Through that period, when I would ask him, I'd say things like – 2009/2010 – I'd say how are things going the properties?  He'd either tell me they had another one short sold, either or there was one in foreclosure or going to go to foreclosure or that – or that – or that – I said, "Are you in bankruptcy yet?"

And he made it sound like they were real close, but they were still in business, but nothing was going on.

So I just don't how know much more I inquired further.  I don't know whether he was passed it and then he flat out said, "Take this now or leave it, 'cause you're not going to get anything more from Starlight."

1 Tr. at 203-05 (emphasis added.)

24

> Q.     Well, my point – let me ask you this directly:  When you asked Mr. Brand how things were going and how the properties were doing, and had he told you that one went to foreclosure, the other is not doing well, was he referring to these properties [that were listed on an attachment to the June 1, 2005 investment agreement]?
>
> A.     Well, when he would – we didn't ask in general.  We were talking about collectively, all the properties of Starlight at this time.  Like I said, I didn't feel like my investment was tied only to these listed in the schedule.
>
> Q.     Wait a minute.  We were talking about all – how were you talking about all properties?
>
> A.     He had a list of 11 or 12 properties that Starlight owned.  It's – it was a general statement and that you know, another property – obviously, nothing was going well, in general.

1 Tr.  at 207.

The reference to the "list of 11 or 12 properties" was to the properties Starlight purchased for appreciation during its first investment effort, not the properties later purchased as short sales during Starlight's second investment effort.  Of the "list of 11 or 12 properties", Holmes sold "as either the buyer's agent or the selling agent for Starlight on ten of them, and received a referral fee on one of them."  1 Tr.  at 43.

Brand wrote a letter to "The Investors in Northstar Holdings, LLC" on March 11, 2009.  He told the investors that their loans or investments in Northstar "should be written off as bad debts or worthless stock."  Ex. F.  It stated that Northstar terminated all its business activities in 2008 and that the company had been terminated with the Virginia State Corporation Commission.  It advised the investors that Brooks' Northstar investment "was used to sustain Mr. Brooks' investment in the bundle of properties held by Starlight Group. .  .  . Unfortunately, the cataclysmic drop in the real estate values" and other actions "consumed all cash including Mr. Brooks' loan and forced sales of the properties with catastrophic losses."  Ex. F; 1 Tr.  at 41.

On March 3, 2010, Brand sent separate letters to Brooks and Flory telling them that their $100,000 investments in Northstar that had been transferred to Starlight had been lost.  He identified

five properties – three for Flory and two for Brooks – in which the Northstar investment "was used

to sustain .  .  . properties purchased by Starlight." Exs. G and H. "Unfortunately, because of the

catastrophic decline in the real estate market we were forced to liquidate these assets at a substantial

loss." *Id.* Some details of the disposition of the five properties were given. The sales dates given

were July 11, 2008; August 13, 2008; February 10, 2009; June 24, 2009; and October 19, 2009.

The final settlement agreement dated June 25, 2010, uses the past tense verb "were" in the

first recital. It stated that Starlight and Northstar *were* in the business of real estate investment."

It does not use the present tense, "*are* engaged in the business of real estate investment." The

May 16, 2010 draft used the present tense, "are." Ex. L. The use of the past tense in the settlement

agreement, which was changed from the present tense in a preliminary draft, supports Brooks' and

Flory's testimony that they reasonably understood that the business was concluded and that, except

for liquidating its properties, neither Starlight nor Northstar was operating. This was certainly true

of Northstar, according to the March 11, 2009 letter to investors which reported Northstar had been

terminated by the Virginia State Corporation Commission. Ex. F. In the context of the discussions

with Brand, and the settlement agreement referring to both entities in the past tense, Brand led

Brooks and Flory to believe that Starlight was not engaged in business.

The court finds as a matter of fact that Brand represented to Brooks and Flory on multiple

occasions from at least April 28, 2008 through June 25, 2010, that Starlight was not engaged in

business except liquidating the eleven properties it purchased prior to the collapse of the real estate

market;[26] that it had no funds with which to pay Brooks and Flory; and that it would not have funds

with which to pay Brooks and Flory in the future. Brand told them that the eleven properties were

---

[26]The twelfth property was sold for a profit of $60,000 before the collapse.

being sold at short sales, which meant that there were no funds available to pay Brooks and Flory after payment of the mortgages secured by the properties.  While the written representation in the June 25, 2010 settlement agreement was narrower, in the context of the discussions over more than two years, it was properly understood to include not only full payment, but partial payment as well.

**Reliance.**  Brooks and Flory reasonably relied on Brand's representations in entering into the settlement agreement.[27]  Brooks testified that he would never have signed the settlement agreement if he had known that Starlight was still in business.  1 Tr. at 194.  He signed it after negative reports for over two years, concluding that "something is better than nothing.  And he flat out said that we would never get anything if we didn't take this."  1 Tr. at 191.  On June 25, 2010, Brooks and Flory signed the settlement agreement in reasonable reliance on Brand's representations that Starlight was out of business and that its properties had been and were being sold at a loss.  *See* Exs. G and H.

Dorula argues that Brooks and Flory cannot show that they reasonably or justifiably relied on Brand's statements because they did not ask questions or conduct further investigation into Starlight's business activities.  Dorula Proposed Findings ¶ 77, Proposed Conclusion of Law ¶¶ 7 - 8.  However "one cannot, by fraud and deceit, induce another to enter into a contract to his

---

[27]Flory attended meetings with Brooks and Brand.  He was "very friendly with [Brand].  I e-mailed [him] jokes for years.  We went with Billy – we went flying, and various things, like, we went to the movies together, and just – I had become really good friends with him."  1 Tr. at 210.  Flory testified:

| | |
|---|---|
| Q. | . . .[Y]ou've heard Mr. Brooks testify, correct? |
| A. | Yes. |
| Q. | And do you have anything to add? As far as his discussions he may have had with Mr. Eakin or things like that? |
| A. | In fact, since Mr. Brooks is a lawyer – and I'm not knowledgeable on that – almost all of these actions that happened between Billy and myself and Spencer, I deferred to Billy.  And Billy would make the calls and have the conversations, and I was the yes man.  And we went along – I went along with almost everything Billy said. |

1 Tr. at 210-11.

disadvantage, then escape liability by saying that the party to whom the misrepresentation was made

was negligent in failing to learn the truth." *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d

614, 629 (4th Cir. 1999) (quoting *Nationwide Ins. Co. v. Patterson*, 229 Va. 627, 631, 331 S.E.2d

490, 492 (1985)).   Brooks and Flory did not choose to remain in the dark, but made reasonable

inquiry under the circumstances and relied on Brand's affirmative statements of Starlight's allegedly

dismal situation.   Brooks and Flory were told several times that Starlight was failing and that there

was no chance their loans would be paid, despite the fact that Starlight was not only still in business

but thriving.   Given the history of the parties, their reliance on Brand's representations was

reasonable and justifiable.

**Falsity.**   The representations were false.   Starlight was actively engaged in business on

June 25, 2010, and had been for about a year when Brooks and Flory signed the settlement

agreement.   Starlight started buying short sales and selling the properties at a profit in early 2009.

1 Tr.  at 44, 46, 138, 219.   Brand testified that it did  "extraordinarily well, in terms of the gross

revenue." 1 Tr.  at 70.   He added, "I'm not quite sure how well it if I – we were paying 19 percent

rate of interest.  I'd have to look at the financial statement to see.  But we bought and sold a lot of

property."  1 Tr.  at 70-71.

Brand's own tax returns show that Starlight was actively engaged in business in 2009 and

2010.[28]   Starlight's income and expenses are reported on Schedule C on Brand's 2007, 2008, 2009

and 2010 federal tax returns.   They show gross receipts for Starlight of $39,870; $68,731;

$11,232,895; and $8,847,891, respectively.  Ex. 10.  The costs of goods sold were $10,665,119 and

$8,339,960 for 2009 and 2010.  *Id.*  There were no costs of goods sold in 2007 or 2008.  Ex. P.

---

[28]As a single member limited liability company, Starlight's income and expenses are reported on the member's
tax return, that is, Brand's Schedule C for Starlight.

28

Brand asserts that the Schedule Cs show that Starlight was operating at a loss.  The 2009 net loss shown on the tax return was $3,505.  The 2010 net loss was $466,931.  Both show significant "Other Expenses" on line 27:  $414,479 and $505,867, respectively.  The rest of Brand's tax returns were not offered into evidence.  The "Other Expenses" are not explained.  However, it is clear that Holmes received a percent of the profits from each sale.  He testified that it was supposed to be 90%.[29]  Brand testified that it was supposed to be 50%.  1 Tr. at 47.  The other 10% or 50%, depending on who is to be believed, went to Brand.  Exhibit 9 consists of 26 emails from Holmes to Brand which contain Holmes' instructions to Brand on how to disburse the profits from the sales.  Most show a profit on the individual transactions.  They total $228,155.08, with $167,850.00 payable to Holmes or his wife and $39,868.32 to Brand.  These payments do not show on the Schedule Cs unless they are included as "Other Expenses."  Holmes testified that he made significant profits from the transactions and that he loaned money to Starlight from those profits.  1 Tr.  at 221.  The amounts payable to Holmes were profits from the sales.  The agreement was to split the profits between Brand and Holmes.[30]  In 2009 and 2010, Starlight engaged in numerous transactions that resulted in significant profits to Starlight.  While the profits were distributed to

---

[29] Holmes testified that:

Q.    And what was monetary arrangement with Mr. Brand and Starlight on those transactions?

A.    My monetary arrangement that once there was a determined net profit on deal, and net profit would be property was acquired, property was sold. You deduct all the expenses that were associated with the sale of that property and whatever was left, I would keep 90 percent of the profit and he would keep 10 percent of the profit.

1 Tr. at 220-21. Holmes calculated the net profits and the split.  1 Tr.  at 222-23.  The split of the profits was in addition to Holmes' real estate commissions.  1 Tr.  at 222.

[30]They do not disagree that the profits were to be split, only the percentage of the split.

Holmes and Brand, they were, nonetheless, profits.  Brand's argument that there were no profits is not well taken.

This argument, though, is a distraction.  The representation was that Starlight was not engaged in business; however, it clearly was.  Whether it was at a profit or loss is not critical.  Brooks and Flory were induced to sign the settlement agreement because Starlight was not in business which eliminated any prospect of future payment.  Brooks was adamant that he would not have signed the settlement agreement if he had known that Starlight was in business.

Brand does not – and cannot – deny that Starlight was actively engaged in business while he was negotiating with Brooks and Flory.  However, he seeks to avoid responsibility for this misrepresentation by arguing that Starlight was not profitable and by attempting to shift the focus solely to the language in the seventh recital that Starlight has "been unable to meet its monthly and final payment obligations and will be unable to do so in the future."  Ex. L.  The representations – that Starlight was not engaged in business and that it was not profitable – are two separate representations.  It is quite plain that Starlight was actively engaged in business and that the representations to the contrary in the latter part of 2009 through June 25, 2010, were false.  It was an important representation.  Brooks testified that he asked Brand, "'Are you still in business?'  He said, 'Yeah, but barely.  And you know, it just so bleak.'"  1 Tr. at 190.  Brooks further testified:

> Q.    Now, what would you have done if you'd known that Starlight was continuing in business in 2010?
> A.    I would have never have signed that agreement.
>          In my mind, since it was such a little bit of an amount and it was not guaranteed.  He said, he personally guaranteed it, but you know, I took that to mean nothing.  Because I figured he was worth nothing after the fiasco with the earlier properties.
>          I told myself, if there was a 1 percent chance that Starlight would ever be able to pay that back, I would not sign that agreement.

> My cousin and I talked about it. We thought – we just thought, based
> on everything that he told us, that there was absolutely zero chance based on
> what he said, that there was no properties. .   .   .
> Like I said, if there was any chance, I'd never sign it.

1 Tr. at 193-94.

Brand seeks to justify his representation that Starlight could not meet its current or future

obligations by arguing that the new lenders – those that loaned Starlight money after the collapse

for the purpose of purchasing short sales – were fully secured and, therefore, no money was

available to pay Brooks and Flory.  This, however, overlooks the fact that the recital is not limited

to paying Brooks and Flory.  It is a general statement that Starlight is and has been unable to meet

its monthly obligations.  In truth and in fact, Starlight was quite handily meeting its current monthly

obligations.  As Dorula testified, he and his friends were paid on the first of every month.  4 Tr.  at

259.

On June 25, 2010, Brand reasonably believed that Starlight would make all final payments,

other than to Brooks and Flory, when they became due.  Those payments were to the Dorula lenders.

Until August 2011, every note required to be paid on maturity was paid on time.  In August 2011

when there were insufficient cash funds to go to closing on a property and pay Townsend when his

note matured, Brand, at the insistence of Holmes, closed on the purchase.  The demise of Starlight

followed – not because Townsend was not paid, but because Brand admitted to Holmes that he had

lost more than $200,000 in the stock market day trading and Holmes passed the information onto

Dorula and his friends.

In short, the representation in the seventh recital was false.  The representation was for all

monthly and final obligations.  It was false because Starlight was able to and did meet all of its

monthly and final obligations and did so from 2009 through August 2011.  The only exceptions were

31

Brooks and Flory.  Had Brooks and Flory known that monthly and final obligations were being made on time to all other creditors, they would not have signed the settlement agreement.

Brand also seeks to use the lien theory by arguing that he could not pay Brooks and Flory from the encumbered assets.  He quietly omits that he paid Brooks and Flory their monthly settlement payments from these very funds.  1 Tr. at 69.  He also paid the mortgages on the properties purchased during Starlight's first venture.  *See* 1 Tr. at 94-96.

More importantly, though, the predicate was false.  The security agreements were never perfected.  No financing statement was ever signed or filed.  There were no control agreements for bank deposits.  Va. Code Ann. §8.9A-312(b)(1)(2014) ("[A] security interest in a deposit account may be perfected only by control.").  Brand testified:

> Q.   Did there come a time when you went to an attorney and asked for some form of security agreements for these new lenders?
>
> A.   Yes.  .  .  .
>
> Q.   Can you tell the Court the circumstances of that?  Why that happened and what you did.
>
> A.   Well, I went and spoke with Andy Bisulta, who prepared the security agreement.
>
> The purpose of that security was to secure these loans coming into Starlight with all of assets at Starlight.  So whether Starlight – at one moment in time, owned some real estate that it had purchased or whether Starlight had cash in its checking account, whether Starlight held notes – which it eventually held some notes.
>
> At any moment in time, the lenders that put money into this – in this new short sale phase of Starlight, were secured by all assets of Starlight, LLC.  .  .  .
>
> Q.   I'd ask you to turn to Exhibit Q.  And look at that and tell me if you recognize that.
>
> A.   Yes.  This one of the security agreements.  This one is made out to Michael and Donna Dorula.
>
> Q.   Okay.  And can you tell me what security is offered in this agreement?
>
> A.   Well, the collateral shall include, but not limited to, the following:  Each and every account receivable, all debtor's real estate holdings and chattel paper of every nature.
>
> I assumed that meant my checking.  I don't know what chattel paper is.

But, I assumed that meant all the stuff in Starlight. . . .

Q.      Did you believe that this included money that Starlight had in its account?

A.      . . . Oh, yes.  I believed it was 100 percent of everything we had.  And the reason for that is because we were buying and selling real estate so fast, in other words, sometimes we would close on a property on day 1 and sell by day 3.

And it was not practical to secure just by real estate, so we secured by all of the assets of Starlight, because at any moment in time, I could sell a property for $700,000.  That $700,000 could be sitting in a SunTrust checking account.

Well, that belonged to those lenders, even though it was in the checking accounts, not in a piece of property.  Because it was turning like that all the time.

1 Tr.  at 49-53.

Brand may have been uninformed as to the need to file financing statements or have control

agreements, but he knew that a deed of trust was necessary to encumber real property and that

there were no deeds of trust.  He testified:

Q.      And you're familiar with a deed of trust, correct?

A.      Yes.

Q.      And you know to get a lien on real estate you've got to have a deed of trust, right?

A.      Yes, *I didn't see this as a lien on real estate*.  I saw it as – I thought the others did as well – as a lien on the assets of Starlight, which may or may not include the real estate at any given point in time.  Because the moment this money came in – let's say, today, it would go into a SunTrust checking account.  So now, that's monies in the SunTrust checking account where the assets back in this security agreement whether they were in real estate or not.

Q.      But *you knew if it was been used to purchase real estate that none of the lenders had a lien on the real estate.  You knew that.  Cause you know what a deed of trust is, correct?*

A.      *Yes.  But that didn't concern me that they didn't have a lien on an individual piece of real estate property.*

1 Tr.  at 91-92 (emphasis added).

His knowledge of deeds of trust arose from the fact that he was a licensed real estate agent;

that during the first phase of Starlight's existence the 12 properties were purchased with bank loans,

each of which was secured by a deed of trust; that he felt that there was insufficient time to record

and release deeds of trusts because the two short sale transactions, the purchase of the property and its sale – once approved – initially occurred within a matter of days; and that he offered Brooks and Flory deeds of trust on properties Starlight purchased during its first phase but required Brooks and Flory to release them – even without payment – if the properties were sold.  *See* Ex. L, Settlement Agreement dated June 25, 2010, at ¶1.[31]

Brand's argument that the new lenders held liens on all of Starlight's assets is not well taken. The security agreements were not perfected, and he knew that the real estate was not encumbered because there were no deeds of trust.

**Knowledge.**  False statements must be made intentionally and knowingly.  *Yuzefovsky v. St. John's Wood Apts.*, 261 Va. 97, 111, 540 S.E.2d 134, 142 (2001).  On June 25, 2010, Brand knew that Starlight was actively engaged in new business – this time, buying properties at short sales and then selling them for a profit.  He knew that the business was very active and profitable.  He was distributing profits to Holmes and himself.  The timing of Brands' settlement offer is revealing.  He had had discussions with Brooks and Flory for more than two years with no serious settlement offers from him.  When Starlight began distributing profits, Brand made a settlement proposal "out of the blue."  1 Tr. at 190–91.  He stated that he did not want Starlight's liabilities hanging over his head forever.  This reason rings hollow.  The obligations were Starlight's, not his.  If Starlight was liquidating its assets and no proceeds were anticipated to be available to Brooks and Flory because the properties were all subject to bank deeds of trusts and had no equity, Brooks' and Flory's debts

---

[31]Paragraph 1 states, in part:

Brooks and Flory agree to jointly accept a Note . . . secured by the Real Property. . . Upon consummation of a sale of the Real Property and disbursement of net proceeds, if any, . . . Brooks and Flory agree to give a Certificate of Satisfaction releasing the Deed of Trust recorded against the Real Property . . . though the Note will remain outstanding as to all balances not liquidated by the net proceeds of sale of the Real Property.

would have been of no practical concern to Starlight and of no legal consequence to Brand personally. However, Brand created a $200,000 personal liability where there was none when he guaranteed the settlement payments.

The real reason for the "out of the blue" settlement offer was that Starlight was making money. It was doing "extraordinarily well," Brand testified. 1 Tr. at 70. Collection activity by Brooks and Flory would have endangered the new, profitable business. In order to control the risk, Brand offered a significant settlement payable over a long term. As long as Starlight paid the monthly installment, Brooks and Flory had no ability to sue Starlight or jeopardize the new business.

Brand asserts (and Dorula accepts and argues) that he believed – and therefore did not knowing misrepresent – that all of Starlight's assets were encumbered when he signed the settlement agreement on June 25, 2010, and that he could not make payments to Brooks and Flory from the encumbered assets, including from Starlight's real estate and the $757,522.15 Starlight had in its checking account.[32]

Brand's testimony on his state of mind is not credible. Brand first seeks to assert that he relied on the advice of counsel for his understanding that all of Starlight's assets were encumbered. The best evidence for a defense based on advice of counsel is the attorney's testimony. It is necessary to understand what the attorney was retained to accomplish, what he was told and knew, and what he told his client. Here, the lawyers upon whom Brand asserts he relied did not testify.

The first lawyer was Andy Bisulta who prepared the security agreement. 1 Tr. at 49-50. While Brand testified that the purpose of the security agreement was to secure the Dorula lenders'

---

[32]A few days later the cash asset became a real estate asset.

new loans with all of the assets of Starlight, he did not testify what he told Bisulta or what Bisulta told him about the security agreement.  1Tr. at 53.

The second attorney was Townsend who was one of the lenders.  Brand testified that he reviewed the security agreement.  But, Brand did not send the draft security agreement to Townsend and never spoke with him.[33]  Nor is it clear what Dorula asked Townsend or the advice, if any, that Townsend gave Dorula.  1 Tr. at 50-51; 4 Tr. at 235-37.  He did not discuss with Townsend how to obtain a lien on real property.  4 Tr. at 218:9-12.

Brand's assertion that he believed that the security agreement created a lien on the real estate is not credible.  He knew about deeds of trust and knew that they were the mechanism used to obtain liens on real estate.  Holmes' instruction to Brand to return Aunon's and Townsend's loans in July 2009 distressed Dorula and started the process of creating the security agreements.  4 Tr. at 32; Ex. 6.  There were two problems.  Holmes was unwilling to guarantee payment of new loans and the lenders had expected longer term loans.  4 Tr. at 102.  Brand and Dorula discussed various ways to assure that any new loans would not be repaid early and to replace Holmes' guarantee.  The repayment issue was resolved by a prepayment penalty.  The guarantee issue required more discussion.  Brand and Dorula knew about deeds of trust and discussed, Dorula testified, "filing a deed of trust on each property."  He continued:

---

[33]Brand testified that he send the proposed security agreement to Townsend.  "I sent the agreement to Chris Townsend, who was one of the lenders." 1 Tr. at 50.  Dorula testified that he emailed it to Townsend.  Dorula testified:

| Q. | Now, do you know where the actual security agreement document came from? |
|---|---|
| A. | It was drafted by Spencer Brand's attorney. |
| Q. | Okay. |
| A. | And provided to me by Spencer in draft format. |
| Q. | Okay.  And when you received that document, which was the proposed security agreement, you took it to Mr. Townsend? |
| A. | I e-mailed it to Mr. Townsend. |

4 Tr. at 235.  The court credit's Dorula in this matter.

> Q.    Now, who came up with that option?
> A.    It's a known option.
> Q.    It's a known option by both you and Mr. Brand?
> A.    When you provide a loan, if the – if I can, just –
> Q.    Go ahead.
> A.    – what my knowledge is. Once you provide a loan, and if property is purchased for that loan, you then can get a deed of trust and a lien on that property, and you would file that, so you would have to do that each time a property is acquired.
> Q.    Are you aware of any other way to get a lien on a piece of real property in the Commonwealth of Virginia, other than a deed of trust or mortgage?
> A.    I'm not.

4 Tr. at 217.  In fact, when the venture began to fall apart and Dorula saw problems, he sought to have deeds of trust placed on Starlight's properties.  4 Tr. at 242.

Brand knew about deeds of trust.  In addition to his discussions with Dorula, as a realtor and as one who had purchased twelve properties for Starlight and other properties, including his home, Brand knew deeds of trust were required to create liens on real property.  1 Tr. at 91.  He attended Starlight's closings and signed the closing papers.  He knew that there were no deeds of trust on any of Starlight's properties purchased during the short sale venture.

They rejected using deeds of trust because they were too cumbersome.  The loans were not used to purchase specific properties but were deposited into Starlight's checking account.  When a purchase was made, a check was written from the checking account.  It would have been difficult to determine who was secured by which purchase and there could be multiple lenders on the same property.  In addition, the properties purchased were intended to be sold very quickly, within days. 4 Tr. at 101-02  It would be burdensome to have to record the deeds of trust and then immediately obtain and record released.[34]  While neither Brand nor Dorula testified about the costs of recording

---

[34]Dorula testified about the necessity for a deed of trust in order to obtain a lien on real estate:

> Q.    You and Mr. Brand knew that a deed of trust would work and you said, well, we're not going

(continued...)

deeds of trust, they would have been expensive for the short time that they would have been needed.

His testimony that he believed it was improper to use Starlight's money in the short sale venture to pay creditors from the first venture is not credible.  He used money loaned by the Dorula lenders to pay creditors from the first venture.  He paid Brooks and Flory their monthly payment.  He paid monthly mortgage payments to banks secured by deeds of trust including properties purchased during the first venture.  He invested in the stock market.  While he now seeks to justify his belief that he could not use the Dorula lenders' money except for short sales, his conduct was inconsistent with his testimony and Dorula's proposed findings of fact on these matters.

Brand testified that there were no assets in Starlight that was not secured on June 25, 2010, that is, assets that could legitimately have been used to pay Brooks and Flory.  4 Tr. at 69:15-22.  The statement is misleading at best and knowingly false at worse.  While there were three loans totaling $500,000 that were subject to security agreements as of June 25, 2010, (*See* Ex. 15) there were two other lenders as of June 25, 2010, who had loaned Starlight over $1 million and who were both unsecured.  Holmes had loaned Starlight $590,000 as of June 25, 2010.[35]  Moak had loaned Starlight $500,000 in 2009 and was unsecured.  Ex. 6 (Brand's email to Dorula); Ex. 12 (SunTrust

---

[34](...continued)
> to do that.  We're going to do something else.  That's too much work is what you said, right?
> A.   I said that it was too much work – too much paperwork to have all of those individuals filing with the deed of trust as quickly as they were turning over properties.
> Q.   But did you understand that may be the only way to do it?
> A.   I –
> Q.   You understand that today that's the only way to do it, correct?
> A.   I think that it is the only way.  However, I am convinced that when the properties stopped being acquired – when Brand came out and met with Holmes, I e-mailed the whole group, but with Chris Townsend specifically, and said we need to get liens on all of these properties now, because everything has stopped.  And Mr. Townsend did not follow up on that advice.

4 Tr. at 242.

[35]There were three notes as of June 25, 2010:  note dated March 10, 2009 with a principal balance of $200,000; note dated October 1, 2009 with a principal balance of $215,000; note dated May 17, 2010 with a principal balance of $175,000.  Proof of Claim 11.

bank statements with checks for the payment of interest to Moak on the first of each month from January 2010 through September 2010.) Moak's 2009 loan matured after June 25, 2010, and was renewed as a secured loan. Even if the security interests were fully enforceable as to the three loans as of June 25, 2010, against all of Starlight's assets, there was amble equity well beyond the debts owed to the Dorula lenders on June 25, 2010 from which payments could have been made to Brooks and Flory without violating the letter or intent of the security agreements. Of course, it would have been contrary to the short-sale business model he and Holmes agreed to and had Brand paid Brooks and Flory, the payment would have taken cash out of Starlight, reduced the cash available for purchases of properties at short sales, and resulted in Holmes quickly recognizing Brand's initial misrepresentation about Starlight's financial status when he agreed to use Starlight. 4 Tr. at 148-51 (Holmes' testimony); Ex. 4 at 7-11 (Holmes' deposition testimony); 4 Tr. at 44 (Brand's testimony). The June 25, 2010 settlement agreement with Brooks and Flory solved Brand's problem. Brooks and Flory reduced their claims and had no right to payment except monthly payments in accordance with the settlement agreement which were made by Starlight as agreed until Starlight filed bankruptcy and then by Brand until he filed bankruptcy.

Brand's substantial stock losses were not incurred until the summer of 2011. B&F (9/10/15) Ex. 5. As of June 30, 2010, Brand had transferred $50,000 from Starlight's checking account to the stock account at which time the account had a net value of $43,378. *Id.* (December 2009 and June 2010 statements.) The first year of trading, which began on December 12, 2009, with the purchase of SPDR Gold Trust, was profitable. 4 Tr. at 68; B&F (9/10/15) Ex. 5 at SCH000059 (December 2009 statement).

The representations were made knowingly and with the intention to deceive Brooks and Flory.

**Damages.**    Brooks and Flory were damaged by entering into the settlement agreement. They gave up their original claims for a single claim of $200,000.  Brooks and Flory had the ability to collect the entire amount due to them on June 25, 2010, if they had known that Starlight was actively in business and was profitable.  There was cash in the bank and unencumbered real estate to achieve this.

## Constructive Fraud

Dorula defends against Brooks' and Flory's claim of actual fraud by accepting Brand's argument that Brand believed that Starlight could not legally pay Brooks and Flory because all of its assets were fully encumbered for the benefit of the Dorula lenders.  As it turns out, the purported liens did not affect Brooks' and Flory's ability to reach Starlight's assets.  There were no deeds of trust encumbering the real estate and the security interests were not perfected.  Dorula argues that Brand's error with respect to the effect of the security agreements is not relevant because actual fraud requires a knowing misrepresentation and Brand's misrepresentation was innocent.

Dorula's argument is not persuasive for two reasons.  First, Brand was not mistaken about the effect of the security agreements.  He knew that the security agreements did not create liens on the real estate.  There was no innocent misunderstanding.  Second, even if Brand was innocently mistaken, his actions constituted constructive fraud.  Constructive fraud occurs when "a false representation of a material fact was made innocently or negligently."  *Mortarino,* 251 Va. at 295, 467 S.E.2d at 782.  If Dorula's argument were accepted, it would merely change the actual fraud to constructive fraud which would also vitiate the settlement agreement.

## The Parties' Proposed Findings of Fact and Conclusions of Law

The parties, at the request of the court, prepared proposed findings of fact and conclusions of law.  Dorula's Proposed Findings of Fact and Conclusions of Law (Docket Entry 436) ("Dorula

Proposed Findings") are eloquently and succinctly stated. They are generally in accord with the court's findings of fact concerning the course of Starlight's business and Brooks' and Flory's loan. *See* Dorula Proposed Findings ¶¶1 - 15; 30 - 42; 51 - 54; 56 - 64; 67 - 68. However, the court's findings of fact and Dorula's proposed findings of fact diverge when Dorula relies on Brand's testimony of his own understanding, knowledge or feelings. *See* Dorula Proposed Findings ¶¶28, 45, 52, 72 - 75. Dorula fully credits Brand's testimony while the court does not. The court views his testimony skeptically. When portions of his testimony are accepted, they are accepted cautiously and after careful consideration.

For example, Dorula unquestioningly accepts Brand's testimony that he was motivated in making the 2010 settlement offer because he was fearful that Flory would "'hire a hit man' if he and his cousin [Brooks] were not paid. . . . Brand took Flory's threat seriously and was greatly disturbed because he felt that Flory might actually be capable of following through on it." Dorula Proposed Findings ¶¶27 - 28. "Brand's motivation for making an offer to Brooks and Flory stemmed from his anxiety over Flory's death threat, his desire to end any association with them . . ." *Id.* at ¶52. While Dorula skillfully weaves these two events into a single narrative to explain why Brand proposed the settlement, the court rejects the narrative.[36] Brand's conversation with

---

[36]The court is aware that Brand testified that:

Q.    . . . Let me ask you: Do you remember all of this as you sit here today?
A.    Yes, absolutely. That's why I kept the paper, and that's why I kept the recording.
Q.    Okay. Can you tell me whether or not this motivated you to negotiate?
A.    Yes, it did. I mean, I have a wife that has multiple sclerosis for 20 years and I have four children. I took this very seriously. I think – because Charlie, I thought, was an eccentric kind of individual to begin with. And I didn't – you know, these things –  I don't – I never heard anyone ever express anything like this to me ever in my life.

1 Tr. at 68-69.

The court notes that Dorula's proposed finding ¶27 could be read to insinuate – by noting Brooks and Flory are
(continued...)

Flory was on May 13, 2008. 1 Tr. at 67-69. Brand's first settlement proposal was on May 16, 2010,

more than two years later. During these two years, Brand maintained social contact with Brooks

and Flory. Brand never expressed any reservation about these activities or testified to any other

comment or action than caused him concern. The court does not accept Brand's testimony that two

years after the purported threat and after numerous social contacts, that he was motivated to enter

into a settlement with Brooks and Flory because of the old threat, particularly because at that very

time, Starlight had proved it could make a lot of money, and Brand – having misrepresented to

Holmes that Starlight had no outstanding liabilities – believed that Holmes would withdraw from

the venture if he found out about the Brooks and Flory liability. 4 Tr. at 43, 48, 53 and 150; Dorula

Proposed Findings, ¶¶64 and 67. The threat was made while Flory was very upset. There was no

evidence of any other threats. The relationship returned to a social relationship. The settlement

proposal came only after Starlight was again making money.

Dorula's proposed findings of fact seek to minimize the contacts between the parties between

2008 and 2010. *See* Dorula Proposed Finding ¶19 ("very limited social contact"). He seeks to

downplay the significance of communications about Starlight. While there were not a large number

of contacts, there was more than "very limited social contact." The relationship was friendly. They

attended movies together, visited Brooks' parents' farm, and flew in Brooks' small airplane. During

this period, Brooks and Flory sought to remain informed as to the status of Starlight. The parties

agree, and it is clear, that Brand downplayed Starlight's activities and did not disclose anything

about the new short sale venture.

---

[36](...continued)
cousins in the same proposed finding that sets out the threat – that Brooks was somehow involved in the threat. Dorula
Proposed Finding ¶27. There is no evidence of this and Brand testified that "[Flory] said don't tell Billy I told you this."
1 Tr. at 67.

Dorula argues that Brooks and Flory could not have reasonably relied on Brand's statements. He naturally presents the period from May 2008 though June 25, 2010, in the light most favorable to himself. He seeks to present Brooks and Flory as doing nothing during this period and failing to find out about the new short sale venture when they could have. He seeks to show that Brooks and Flory were not acting reasonably in relying on Brand's statements of Starlight's inactivity because they knew that he had defrauded them in the past. The court does not accept these proposed findings of fact or the arguments derived from them. Brooks' and Flory's actions were reasonable.

For example, Dorula states in proposed finding 26:

> 26. Flory testified that after May of 2008 he heard rumors of Starlight buying and selling numerous properties, but although the circumstances were not clear to him, he made no effort to investigate. See Transcript (06/07/13) 213:11-25.

Dorula Proposed Findings ¶26. The transcript referenced states:

Q.    Were you aware that in 2010, June of 2010, that Starlight engaged in buying and selling short sale properties?
A.    I – I had that from – I don't know if it was 2010, but I know they were involved in all sorts real estate dealings, and it was kind of cloudy in there. And at that point, I really wasn't too concerned, because I was to get my 10 percent even if they were going to invest in something else. I listened to Billy most of the time.
Q.    Were you aware that he had entered into an agreement with Mr. Holmes to market properties?
A.    I had heard of Mr. Holmes, and – but I wasn't real clear on it.

1 Tr. at 213.

The lines Dorula cites are but a portion of the overall examination. Considering the testimony as a whole yields a different reading. Flory starts by stating that he is a 72-year-old government retiree who, in 2013, had known Brand for 15 years. The friendship began when he was working part-time for an electrician friend after his retirement from the government. They were doing work at Brand's home and returned several times. He struck up a "very good" friendship with

Brand. "I was very friendly with him. I e-mailed him jokes for years. We went with Billy – we went flying, and various things, like, we went to the movies together, and just – I had become really good friends with him." 1 Tr. at 210. He first invested with Brand in 2002 or 2004 which was before Brooks invested with Brand. He eventually loaned Starlight a total of $300,000 and generally deferred to Brooks with respect to the loans. Brooks made most of the arrangements. He then testified:

> Q.    Did you talk with Mr. Brand periodically prior to [signing the settlement agreement]?
> A.    Oh, yeah.
> Q.    How often would you talk to him?
> A.    Over those 15 years, I'd talk to him quite regularly. Quite regularly, meaning, 2, 3, 4, times a year, not counting the times I worked out there. And then, as time went on, and I was getting the feeling it was a lost cause. I maybe only talked to him once a year.
> Q.    And you talked  –  after you made the investments, you would talk about your investments with him?
> A.    Yes.
> Q.    And specifically, about the repayment of those investments?
> A.    Yes. Well, early on, what – instead of making payments to me, he had told me that whatever interest I was to get, if I leave it in the pot, it would roll over and I was compounding. That went on for a number of years. And I have a stack of papers about like that thick (indicating). Like, every month, he would send me a paper of how much it would work – how much it was worth, how much interest had accrued, and it was compounding.
> Q.    Were you aware that in 2010, June of 2010, that Starlight engaged in buying and selling short sale properties?
> A.    I – I had that from – I don't know if it was 2010, but I know they were involved in all sorts real estate dealings, and it was kind of cloudy in there. And at that point, I really wasn't too concerned, because I was to get my 10 percent even if they were going to invest in something else. I listened to Billy most of the time.
> Q.    Were you aware that he had entered into an agreement with Mr. Holmes to market properties?
> A.    I had heard of Mr. Holmes, and – but I wasn't real clear on it.
> Q.    Okay. All right.

1 Tr. at 212-14.

The last reference – whether Flory was aware that Starlight was engaged in buying and selling short sale properties – does not refer to the period starting in 2009.  Flory's statement is best understood as referring to the period before the crash in 2008.  Prior to the crash, Flory expected a 10% return on his loan and was not overly concerned about the nature of Starlight's real estate ventures.  After the crash, he knew that he was not being paid his 10%.  Dorula uses the testimony to show Flory's knowledge of Starlight's short sales – and therefore that Starlight was in business in 2010.  It would follow, Dorula concludes, that Flory knew the statement in the settlement agreement was false and could not rely on it.

While Flory's testimony could appear ambiguous, the court finds that in context Flory was not referring to Starlight's real estate activity in 2010, but to Starlight's real estate activity before 2008.  Brand's statements that Brooks and Flory should accept the settlement because they would otherwise receive nothing and Brooks' and Flory's direct testimony that they were unaware of Starlight's real estate activity when they entered in the settlement refer to 2010.  Flory's testimony Dorula highlights refers to the earlier period, before 2008.  After the crash, Brand told all of Starlight's lenders that their loans were lost and should be written off.  There were no papers going out to any of them describing how their investment was compounding. There were no written communications except for the March 11, 2009 letter telling the Northstar investors that he had lost their money and should write it off.  Ex. F.  Prior to the market crash, Starlight was engaged in various real estate projects.  Northstar, a sister company that Brooks and Flory loaned money to, was actively seeking to develop property in Pennsylvania.  Flory's testimony, while not crystal clear, should be read in this light.  It relates to the period of time when Starlight was investing in property for appreciation, not as part of a short sale venture.  After the market crash, Flory heard nothing

45

more about his money compounding or Starlight buying or selling properties. Dorula's Proposed Finding ¶26 confuses the time periods involved in this case.

The record is clear that from March 2008 through May 2010 there were social contacts between Brand and Brooks and Flory, that Brooks asked Brand questions about the Starlight, and that initially, nothing was happening. 4 Tr. at 172-73. As Brand testified, "[T]here was no reason to have discussions because there was no money to give back and I'm desperately trying to figure out how to, you know, keep alive myself." 4 Tr. at 115. That is consistent with Brooks' testimony that Brand told him that Starlight was not going to have any money to pay him. Brooks did not believe that Brand would ever have the ability to buy any real estate because of the short sales of the properties purchased for appreciation and caught in the market crash. 4 Tr. at 178-79. Holmes advised Brand to sell them at short sales to avoid foreclosures and deficiency judgments. 4 Tr. at 18. In these circumstances, it was reasonable for Brooks and Flory to continue to rely on what initially were Brand's truthful statements.

Dorula argues that Brooks and Flory should not have relied on anything Brand said because they were advised by their attorney that Brand had defrauded them. This was not developed sufficiently to show that reliance was unreasonable. The alleged fraud appears to have been depositing one or more of Brooks' or Flory's checks into a trust account for Brand's wife. 4 Tr. at 173. This occurred before the real estate market crash while Brooks and Flory were still making loans to Starlight. They declined to seek a criminal prosecution. Not enough is known, such as the amount of the money involved and whether the wife's trust account was used as a conduit for either the Northstar or Starlight investments, to render Brand's later statements suspect. In fact, his statements with respect to Starlight's first venture were accurate and Brooks and Flory knew this. The shortcoming was Brand's failure to correct them when Starlight's circumstances changed.

46

The most significant proposed findings of fact that diverge from the court's findings concern Brand's state of mind.   Dorula argues that Brand did not intend to make any false   Dorula endeavors to modify the representations made in the settlement agreement.   "Starlight and Northstar have been unable to meet their monthly and final payment obligations and will be unable to do so in the future."   Ex. M, Agreement, at 3; Ex. N, Agreement, at 3; Dorula Proposed Finding ¶47.   In fact, Starlight regularly met its monthly payments to the Dorula lenders, and Brand and Holmes reasonably expected to pay them in full from the sale of the properties and turn a substantial profit in the interim.   The written representation was not limited to   Brooks' and Flory's loans.   It addressed the totality of Starlight's   financial affairs.   The representation was not limited to unsecured creditors.   It encompassed all creditors.   The representation was not limited to payment of unsecured creditors from Starlight's cash flow after payment of secured (or supposedly secured) creditors and operating expense.     It was an unqualified and unlimited statement.   Moreover, the payments to the Dorula lenders, payments for operating expenses, and distributions to Holmes and Brand were not episodic or sporadic.   They were regular and made when due.   Only Brooks and Flory were left out.   The representation was at best incomplete and misleading.   The court does not accept Dorula's Proposed Finding of Fact ¶47.

The differences between Dorula's proposed findings of fact and the court's arise, in part, from the weight given to the testimony.   Brooks and Flory were credible witnesses.   Most of their testimony was corroborated.   Brand does not deny Brooks' and Flory's testimony of the representations he made to them.   However, his testimony as to his state of mind, his knowledge and his understandings needs to be carefully scrutinized.   None is corroborated and much is contradicted by his conduct.   He knowingly misled Holmes as to the financial condition of Starlight when they began the short sale venture.   He used idle Starlight money to invest in the stock market.   While

47

arguably not prohibited, the Dorula lenders did not intend to loan their money for such a risky

venture.   They expected their money to be invested in real estate short sales.   Brand concealed his

stock market loss from Holmes until it could no longer be concealed.   Brand paid himself more than

the amounts Holmes stated in his closing instructions without telling Holmes.   Brand's excess

payments to himself were outside the business model, and there was no way within the business

model to replace these funds at the end of the day without Holmes later taking less than he said he

was entitled.   This difference in the weight Dorula and the court give to the testimony that Dorula

uses to support his proposed findings of fact and conclusions of law is one reason many of his

proposed findings of fact cannot be accepted.


### The District Court's Questions

The District Court, in remanding this case, set out five questions that concerned it:

> 1.      Whether the balance in Starlight's ledger for June 25, 2010 was
> $652,291.60 or negative $245.00.

The balance in Starlight's ledger for June 25, 2010, was $652,291.   Both parties agree.

Responses to U.S. District Court's Questions ("Brooks and Flory Answers") (Docket Entry 442) at

1; Supplementary Proposed Findings of Fact and Conclusions of Law ("Dorula Answers") (Docket

Entry 443) at 1.   Brooks and Flory's proposed answer explains both numbers in further detail.

> 2.      Why the SunTrust account balance is a more accurate gauge of
> Starlight's ability to pay Brooks' and Flory's claims, as opposed to
> the balance in its general ledger.

The parties agree that the SunTrust Bank account should be the same as on Starlight's general ledger except for checks and deposits in transit.[37] [38]

> 3.    Whether the amounts claimed for "Other Expenses" on Starlight's 2009 and 2010 tax returns represented Brand's and Holmes' profits. This will require inquiry into Brand's personal tax returns for those years.

The "Other Expenses" overwhelmingly are Brand's and Holmes' profits. Starlight is a single member limited liability company owned solely by Brand. Single member limited liability companies do not file separate federal income tax returns. The income and expenses are reported on the member's federal income tax return, in this case, on Brand's federal income tax return. Brand and Holmes split the profits which they called "Consulting Fees."[39] Starlight's 2009 income

---

[37]The parties now appear to believe that because there is "less difference than was thought between the SunTrust Account Balance on June 25, 2010 and what was shown on the General Ledger, the answer to this question has less significance as well." Dorula Answers at 3. Brooks and Flory seem to agree, stating that "[t]his question is answered by the response to Question a." Brooks and Flory Answers at 2.

[38]There is no single document that shows the value of real estate owned as of a particular date. This would assist in more fully understating Starlight's financial circumstances on a particular date. The bank statement and the ledger show cash flowing into and out of the SunTrust bank account. However, when money flowed out of the Sun Trust bank to purchase real property the bottom line on Starlight's balance sheet did not change. The cash asset was converted into a real estate asset.

[39]Some of the consulting fees that were otherwise due to Holmes and Brand were paid to their wives. *See, e.g.* 1 Tr. at 259 (Holmes testifying). Brand testified:

Q.    Now, let me ask about the consulting fees, can you describe for the record what the consulting fees were?

A.    When Mr. Holmes or I drew money from Starlight, they were considered consulting fees. And my agreement with Greg at that time, or his agreement – put it this way. The consulting fees were a means to pay Greg an additional sum of money beyond real estate commissions without crossing the line that as a realtor he couldn't receive additional payments for the sale of the property. And it was at that time that when Greg was – I was sending to Greg and he was requiring either eighty-eight or ninety percent of the funds generated from each sale if funds were generated from that sale. Other consulting fees would have gone to me, as I'd mentioned, and my wife, I'll treat the two of us the same because it was attributed income to me. The others could have been, you know, 5,000 here or 3,000 there to other individuals that I – for something that they might have done.

Q.    Well, what proportion of these consulting fees that are shown on here in the amount of

(continued...)

and expenses reported on Brand's Schedule C, Profit or Loss from Business, shows gross receipts of $11,232,895 with a gross profit of $567,776; total expenses of $571,281; and a net loss of $3,505. B&F (9/10/15) Ex. 1 at 5. Line 27 shows "Other Expenses" of $414,479. The "Other Expenses" are itemized on page 2 of Schedule C and consist principally of consulting fees in the amount of $409,792. *Id.* at 6. The 1099-MISC issued by Starlight to Holmes for 2009 showed nonemployee compensation of $337,720.53 which was his portion of the $479,018 consulting fees. B&F (9/10/15) Ex. 3; 4 Tr. at 80-82.

The 2010 Schedule C showed gross receipts of $8,847,891; gross profit of $514,453 expenses of $981,384 and a net loss of $466,931. B&F (9/10/15) Ex. 2 at 11. It showed "Other Expenses" of $505,867, of which $479,018 are consulting fees. *Id.* at 2. Starlight issued 1099-MISC to both Holmes and his wife reflecting nonemployee compensation of $113,000 and $123,413, respectively. B&F (9/10/15) Ex. 4.

> 4.    Whether security agreements were in place covering Starlight's assets on June 25, 2010.

Three security agreements had been executed on or before June 25, 2010: (1) Andrea Aunon for $200,000 dated March 29, 2010; (2) Andrea Aunon for $200,000 dated April 13, 2010; and (3) Dorula for $100,000 dated May 19, 2010. None was perfected. There were no deeds of trust encumbering any of Starlight's properties it purchased at short sales, although banks held deeds of

---

[39](...continued)
215,000, what proportion of this, if you know, would have been Mr. Holmes' consulting fee?
A.    Well, probably at that time close to ninety percent. Let's be conservative, eighty-five percent.
Q.    And how is it determined what he would receive as a consultant?
A.    On each transaction Mr. Holmes would either e-mail me or call me and tell me what his share of that transaction was to be, what his consulting was to be, and what was to be Starlight's.

4 Tr. at 51-52.

trust on the eleven properties Starlight purchased before 2009.  Holmes did not have a security

interest for his loans which totaled $590,000.00 on June 25, 2010, and increased to $915,643.14 as

of November 16, 2011.  Proof of Claim 11.[40]  Holmes, like Brooks and Flory, was an unsecured

creditor.  Moak's loan of $500,000 was also unsecured as of June 25, 2010.

> 5.    Whether Brand knew or should have known that the security
> agreements with new lenders did not give them priority over Brooks
> and Flory as to Starlight's assets.

This factual question relates more to the actual fraud finding than the constructive fraud

finding and is more fully answered above.  In summary, this question is about Brand's state of mind.

Evidence favorable to Brand on this issue came primarily from Brand whom the court found, on

these issues, to be unreliable.  None of his testimony on this issue could be directly corroborated.

The court's findings of fact on these issues rely more on circumstantial evidence and the

inferences drawn from it.  While Brand had the security agreements prepared by an attorney, it is

not clear what he told the attorney, what he requested the attorney to do or what the attorney told

him.  The initial form of the security agreement was reviewed by Townsend, an attorney and one

of the Dorula lenders, but there is no evidence what he considered, including the weight that he put

on them as a  lender.  His review is of questionable value because an attorney who has even a basic

real estate practice would immediately recognize that the real estate was not subject to a lien and

would not be subject to a security agreement.

---

[40]The Proof of Claim was for six promissory notes with a total balance due of $915,643.14.  The six notes were
as follows: Note dated March 10, 2009 with a principal balance of $200,000; note dated October 1, 2009 with a principal
balance of $215,000; note dated May 17, 2010 with a principal balance of $175,000; note dated July 20, 2010 with a
principal balance of $130,000; note dated August 27, 2010 with a principal balance of $70,000; and note dated June 29,
2011 with a principal balance of $45,000.  The Proof of Claim was equitably subordinated to the claims of the Dorula
lenders.  Order dated June 12, 2015 (Docket Entry 416).

Brand was a licensed real estate agent and an active participant in real estate investments. All twelve of the real estate purchases during Starlight's first venture were secured by deeds of trust. None of the real estate purchases during Starlight's second venture – the short sale venture – was secured by a deed of trust. His knowledge of deeds of trust is further evidenced by the actions in the first Starlight venture. The banks were secured by deeds of trust on the property that they financed but the private lenders were not. The properties in which they had the right to share in the profits as an alternative to the payment of interest were enumerated in letters to them. He offered Brooks and Flory a deed of trust on one of the properties. A draft settlement agreement dated May 16, 2010, provides that Brooks and Flory were required to release the proposed deed of trust upon the sale of the property even if they were not paid in full. Ex. L, Draft Settlement Agreement dated May 16, 2010. It shows that Brand understood that a lien was created on real estate by a deed of trust and that it would not ordinarily be released by the lender except upon payment of the debt. The agreement provided for a release of the deed of trust upon payment of less than Brooks' and Flory's entire debt, even if there was no payment. Brand knew about the effect of deeds of trust from the short sales of the remaining eleven properties Starlight purchased with the intent to hold for appreciation. He knew that in the short sale process, the bank secured by the deed of trust had to agree to release the deed of trust for less than the amount owed. He also knew that the private lenders in the first venture, including Brooks and Flory, did not have to consent to the sale. He knew that they did not have a lien on the real estate. He never asked any of them to consent to a sale of a property even if they had the right to share in the profits of the sale – a right at that time totally without value. Brand knew or should have known that the security agreements with the Dorula lenders did not give them priority over Brooks and Flory to Starlight's assets.

52

## Conclusion

Brand procured Brooks' and Flory's June 25, 2010 settlement agreement by fraud.  For two years he affirmatively represented that Starlight was no longer operating, that it was in liquidation, and that there were no funds available for unsecured creditors from the liquidation of its properties.  While these representations were correct for a period of time, they became false when Starlight began purchasing properties at short sales and selling them.  This was a very successful venture.  Brand concealed the new business from Brooks and Flory in order to protect the new business activity.  Brand successfully sought to limit and to control the payment of the claims of the only creditors of the first venture who had not walked away from their claims.  In doing so, he failed to correct his prior representations which were now false so that Brooks and Flory continued to rely on them.  This constitutes fraud by concealment.

Brand made false representations to Brooks and Flory with respect to both Starlight's activities and its ability to pay.  Brooks and Flory reasonably relied on Brand's false representation that Starlight was no longer in business except for winding up its financial affairs at a loss.  Had they known the truth, they would not have entered into the settlement agreement.  The settlement agreement falsely stated that Starlight was unable to and would be unable to meet both its monthly and final payments.  The success of the short sale venture shows that payments could have been made and, except as to Brooks and Flory, were being made.  This constituted actual fraud.  If Brand was mistaken about these matters, particularly the effect of the security agreements and the operation of the business, it constituted constructive fraud.

The settlement agreement is void ab initio because it was procured by fraud.  Brooks' and Flory's proofs of claims will be allowed as filed.

Alexandria, Virginia
May 20, 2016

/s/ Robert G. Mayer
Robert G. Mayer
United States Bankruptcy Judge

Copy electronically  to:

Richard G. Hall
Bennett A. Brown
Donald F. King, Trustee

20503